UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Timothy M. Kelley; and Jamie A. Fine;** | **CIVIL ACTION NO. 13-10222** |
| *and all others similarly situated,* | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| vs. | |
| **Fidelity Management and Trust Company; Fidelity Management and Research Company; Fidelity Investments; and John Does 1-25,** | |
| Defendants. | |

## I.     INTRODUCTION

1.      This Complaint presents a case of fiduciary self-dealing in violation of the Employee Retirement Income Securities Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

2.      Plaintiff Timothy M. Kelley ("Kelley") is a former participant in both the Avanade, Inc. 401(k) Retirement Plan ("Avanade Plan") and the Hewlett-Packard Company 401(k) Plan ("HP Plan"). Plaintiff Jamie A. Fine ("Fine") is a current participant in the Delta Airlines 401(k) Plan ("Delta Plan"). In this Complaint, Kelley and Fine are together referred to as "Plaintiffs." Plaintiffs bring this class action on behalf of the Avanade Plan, HP Plan, Delta Plan, and on behalf of all similarly-situated ERISA plans (collectively, "Plans") to recover investment earnings wrongfully taken from the Plans by Defendants Fidelity Management and Trust Company ("FMTC"), Fidelity Management and Research Company ("FMRC") and Fidelity Investments (collectively, in the singular, as "Fidelity" or as "Defendants").

3.     Fidelity caused certain of the Plans' assets to be deposited on an interim basis in interest-bearing accounts before it invested or disbursed monies as directed by the Plans' participants. Income earned on or derived from the Plans' assets while invested in such accounts is "float income." *See* paragraph 37 below. The float income was an asset of the Plans under ERISA. Fidelity exercised discretion and control over the investment of the Plans' assets in such accounts and over the collection and allocation of float income. Accordingly, Fidelity was a fiduciary for the Plans with respect to the float income. As a fiduciary, Fidelity was prohibited from dealing with the float income for itself or for the benefit of another and was required to deal with that float income with prudence and unflagging loyalty. Fidelity did not. Instead, it engaged in prohibited transactions and breached its fiduciary duty in two distinct ways.

4.     First, Fidelity used float income to pay itself trust and record-keeping fees above and beyond the fees authorized in the trust agreements between the Plans and Fidelity. Thus, Fidelity engaged in repeated self-dealing transactions and breaches of duty in violation of § 406 and § 404 of ERISA whenever it paid itself float income.

5.     Second, Fidelity remitted float income into the mutual fund options selected by the Plans' participants without crediting the amount of that float income to the contributions made by Plans or the Plans' participants. This had the effect of disseminating the value of the float income generated by the Plans' assets to all of the investors in the mutual fund, and substantially diluting the value of the float income received by the Plans and the Plans' participants. Thus, Fidelity engaged in repeated transactions for the benefit of others and breaches of duty in violation of § 406 and § 404 of ERISA whenever it invested float income into its mutual funds.

2

6.     On March 31, 2012, following a four-week trial in *Tussey v. ABB, Inc.*, *et al.*, Case No. 06-04305-CV-NKL, in the U.S. District Court for the Western District of Missouri, Central Division ("*Tussey*"), the Court (Judge Nanette Laughrey) concluded that Fidelity's actions violated its ERISA fiduciary duties in the same way that Kelley and Fine allege that it has done here with its other client retirement plans.[1] (The Court's findings of fact and conclusions of law Order dated March 31, 2012 is incorporated herein.)

7.     The *Tussey* trial record reveals that Fidelity's practice of misallocating float income—in violation of ERISA—did not just victimize the ABB PRISM Plans investor classes represented in that case: it harmed the entire population of Fidelity's client retirement plans and investors, to whom Fidelity owed fiduciary duties under ERISA. Fidelity's own witnesses admitted to the breadth of their practice of skimming float income at the *Tussey* trial:

> Q. And so the ABB PRISM Plans are handled the same way as your other large contribution plans are handled, correct?
>
> A. For the entire population, which is not just large plans, ***but it's all plans***.

Trial Tr. vol. 5, 1179: 1-4, Jan. 11, 2010 (emphasis added).

8.     Plaintiffs bring this action to recover the float income that Fidelity improperly took from the members of the proposed nationwide class in clear violation of ERISA.

9.     In *Tussey*, the Court found with respect to issues of liability that: (a) "Fidelity Trust breached its fiduciary duties to the Plan when it failed to distribute float income solely for the interest of the Plan;" (b) "Fidelity Research violated its fiduciary duties when it transferred float income to the Plan's investment options instead of the Plan."

---

[1] Having brought claims for recovery in *Tussey*, the plaintiffs and class members in that action are excluded from the class that Kelley and Fine propose in this case.

10.     With respect to the issue of damages/remedies, the *Tussey* Court found that the PRISM Plan "must be compensated for its losses and any ill-gotten gains by Defendants when they used Plan assets for their own benefit." The Court further held that the Fidelity Defendants were jointly and severally liable for the Plan's losses for Fidelity breaches concerning float.

11.     Fidelity is foreclosed in this action from re-litigating the liability and damages issues that were decided against it in *Tussey*. Fidelity fully litigated these issues (among others) in *Tussey*. The trial lasted nearly four weeks, the record of which comprises sixteen volumes of trial transcripts. The *Tussey* parties identified more than 2,700 exhibits in their trial briefs. Fidelity was represented by no fewer than 22 attorneys—from at least five different blue-chip law firms: (1) Morgan, Lewis & Bockius LLP; (2) O'Melveny & Myers, LLP; (3) Goodwin Procter LLP; (4) Bryan Cave LLP; and (5) Lathrop & Gage LLP. And these liability and damages issues were essential to and determined by the Court's valid and binding final judgment.

## II.     JURISDICTION AND VENUE

12.     Subject matter jurisdiction in this district is proper pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1). The claims asserted here are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

13.     Venue is proper in this district pursuant to ERISA § 502(e)(2) because FMTC and FMRC are located in this District.

III.    **THE PARTIES**

A.    **Plaintiffs**

14.    Kelley resides in Eugene, Oregon. Through the Avanade Plan and the HP Plan in which he was once invested, Kelley invested in Fidelity mutual funds and other investment instruments and accounts, using contributions from his employers as well as his own contributions. Kelley was an active participant in the Avanade Plan from approximately February 2008 to July 2010. He was an active participant in the HP Plan from approximately February 2007 to January 2008. Kelley suffered losses as a result of the prohibited transactions that are more fully described in this Complaint.

15.    Fine resides in Smyrna, Georgia. Through the Delta Plan, Fine invested in Fidelity mutual funds and other investment instruments and accounts, using contributions from her employer as well as her own contributions. Fine has been an active participant in the Delta Plan since on or about 1997. Fine suffered losses that are more fully described in this Complaint.

B.    **Defendants**

16.    Defendant FMTC is a Massachusetts corporation with its headquarters in Boston, Massachusetts. FMTC is a trust company and manages assets for over 500 institutional clients worldwide, with more than $175.5 billion in trusts and other assets under management as of June 30, 2012. FMTC is a subsidiary of Fidelity Investments. As trustee, FMTC is, by definition, a fiduciary to the Plans.

17.     Defendant FMRC is a division or subsidiary of Fidelity Investments and an affiliate of FMTC. FMRC is a registered investment company that serves as the leading asset manager and investment advisor for the Plans' investment accounts. FMRC has three divisions. Its Equity and High-Income Divisions are based in Boston, Massachusetts. The Fixed-Income Division is based in Merrimack, New Hampshire. FMRC has trillions of dollars under administration and management.

18.     Fidelity Investments is FMTC's and FMRC's parent company and was organized in 1946 under the laws of the Commonwealth of Massachusetts. It is a privately-owned company and one of the largest mutual fund and financial services companies in the world. Through its subsidiaries, including FMTC and FMRC, Fidelity Investments provides a full range of products and services for institutional investors worldwide. Its executive offices are located in Boston, Massachusetts.

19.     John Does 1-25 are affiliates and subsidiaries of the named Defendants who exercised discretion or control over the Plans' assets with respect to float income.

## IV.     FIDELITY'S FIDUCIARY STATUS

20.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent that "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or

has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i).

21.     **Investment Manager**. Under ERISA, an Investment Manager is a fiduciary. ERISA defines Investment Manager as:

> Any fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title)
>
> (A) who has the power to manage, acquire, or dispose of any asset of a plan;
>
> (B) who
>
>> (i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b-1 et seq.];
>>
>> (ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b-3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;
>>
>> (iii) is a bank, as defined in that Act; or
>>
>> (iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and
>
> (C) has acknowledged in writing that he is a fiduciary with respect to the plan.

ERISA § 3(38).

22.     Here, Defendants are named and/or serve as the Investment Manager, Trustee, Advisor or administrator of Kelley's Avanade Plan and HP Plan, and Fine's Delta Plan. Thus, Defendants were fiduciaries to Kelly, Fine, as well as to the proposed class of Plans. Moreover, Defendants exercised discretion and control over the Plans' assets because they made (and continue to make) investment decisions concerning the Plans' assets with respect to float income.

## V.     DEFENDANTS' FIDUCIARY DUTIES

23.     ERISA § 502(a)(2) provides that a civil action for breach of fiduciary duty for relief under ERISA § 409 may be brought by a participant, beneficiary, or fiduciary of a plan.

24.     ERISA § 409(a) "Liability for Breach of Fiduciary Duty," provides, in relevant part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

25.     ERISA prohibits certain transactions with Plans involving parties in interest and fiduciaries because of their significant potential for and risk of abuse. Specifically, ERISA § 406 provides as follows:

> (a) Transactions between plan and party in interest
>
> Except as provided in section 1108 of this title:
>
> > (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107 (a) of this title.

(b) Transactions between plan and fiduciary.

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

## VI.   DEFENDANTS' VIOLATIONS OF ERISA

26.    Defendants' ERISA violations arise from (1) their self-dealing practice of appropriating for themselves much of the float income earned on Plan assets for the period during which those assets were on deposit in interim accounts before they were either (a) transferred into the investment options that the Plans' participants selected (in the case of contributions) or (b) issued as payments to Plan participants (in the case of disbursements); and (2) their practice of investing float income generated by the Plans' assets for the benefit of

investors other than the participants in the Plans. These processes are further described below.

27.     Plan participants and the participants' employers, make contributions to Plans. Such contributions are Plan assets. According to, *inter alia*, the *Tussey* trial record and district court decision, these contributions are deposited into an account known as the Fidelity Participant Recordkeeping System Depository Account or a similar account under the Defendants' control.

28.     Once Defendants receive funds from the Plans, they are processed through a dedicated transfer process that Defendants have established. At all relevant times during this process, Defendants maintain discretionary control over the Plans' assets.

**The Contribution Process.**

29.     The *Tussey* trial record and district court decision demonstrate that, during the Class Period, funds coming from Plan sponsor contributions flowed generally according to the following process:

a.  Contributions were transferred into the Fidelity Participant Recordkeeping System Depository Account (the "Depository Account") twice per day, typically at 1:00 pm and 4:00 pm. The contributions were transferred to an account known as the consolidated repurchase agreement account ("REPO Account"), which was held at Deutsche Bank. These funds were pooled or co-mingled in the REPO Account with funds from other Fidelity accounts in addition to the funds from the Depository Account.

b.  Any contributions made after 4:00 pm were held in the Depository Account overnight.

c.  Once funds were transferred to the REPO Account, they were transferred to the FICASH Program ("FICASH").

   i.  The FICASH Program was not an account, but a process that invested in secured overnight vehicles. FICASH was managed by FMRC.

    d.  The following day, the principal in FICASH was returned to the REPO Account.

    e.  After that, the funds were returned back into the Depository Account.

    f.  And finally, Defendants moved funds into the actual investment options selected by Plan participants.

    30.    The *Tussey* trial record and district court decision demonstrate that, during the Class Period, the flow of funds for participant contributions was similar:

    a.  Participants' contributions were first transferred into a regional bank account.

    b.  The next day, these contributions were transferred into the Depository Account.

    c.  Later on the same day, the funds were moved into one of three investment concentration accounts and then reflected in the books of the individual investment options.

    31.    The *Tussey* trial record and district court decision demonstrate that, during the Class Period, any portion of the float income not retained by Fidelity was invested in mutual funds in such a way as the remaining float income was distributed to all mutual fund investors without regard for the Plans' and the Plans' participants' interest in the float income such that the float income properly belonging to the Plans and the Plans' participants inured to the benefit of other investors in the mutual funds.

**The Disbursement Process.**

    32.    The *Tussey* trial record and district court decision demonstrate that, during the Class Period, when disbursements of Plan assets were triggered, they were received by participants after the following general sequence:

    a.  The day after disbursements were triggered, funds moved from their respective investment concentration account into a redemption bank account. The redemption bank account was held at Deutsche Bank, and was registered to Fidelity Operations for the benefit of the investment options.

b.  Later that same day, the IRS was paid.

c.  Also later that same day, the remaining funds were transferred to the REPO Account.

d.  Once funds reached the REPO Account, they were transferred to FICASH.

e.  The following day, after remaining with FICASH overnight, the principal of those funds initially transferred to the FICASH was transferred back to the redemption bank account.

f.  Depending on state tax remittance schedules, state taxes were then paid.

g.  Either on or after the same day that the redemption bank account received funds back from the FICASH program, participants may have received electronic disbursements from the redemption bank account.

h.  If participants did not receive an electronic disbursement, the redemption bank account transferred funds to a disbursement bank account. The disbursement bank account was held at Deutsche Bank. The disbursement bank account then issued a check to participants.

i.  Finally, participants received funds after they cash or deposit their checks.

j.  As with the contribution processes described above, Fidelity retained some portion of the float income for itself and the remainder was credited to mutual funds, not to the individual participants who were taking a disbursement. Unlike contributions, however, participants taking a disbursement no longer had an interest in any mutual fund. Thus, the entirety of float income earned on their disbursements was taken from them to pay Fidelity or to invest in mutual funds.

**The Exchange Process.**

33.     The *Tussey* trial record and district court decision demonstrate that, during the

Class Period, the flow of funds for exchanging funds between investment options, as from, for

example, "Investment Option A" to "Investment Option B" was as follows:

a.  The day after a trade is placed, funds moved to the Depository Account from the corresponding investment concentration account to Investment Option A.

       b.   Funds then moved from the Depository Account to the corresponding investment concentration account to Investment Option B.

34.     In each of the contribution, disbursement, and exchange processes described above, participants purchased and sold investment options at the per-share net asset value ("NAV") on the trade date, *i.e.*, the date of their purchase or sale request.

35.     Interest was earned on these Plan assets when funds lie in the various accounts (excluding the REPO Account). Income was also earned when funds in FICASH were invested in overnight secured vehicles.

36.     Because only the amount of the contribution principal was transferred back to the Depository Account following an overnight holding, interest was also earned on the income that remains in FICASH.

37.     As used herein, the term "float" or "float income" refers to both (a) the interest earned on the contribution principal and (b) interest on the on the income remaining in FICASH.

38.     The *Tussey* trial record and district court decision demonstrate that, during the Class Period, all of the accounts in the processes described above incurred bank expenses. Because maintaining these accounts was integral to the services Fidelity rendered to the Plans and Plan participants, such bank expenses were part of Fidelity's ordinary operating expenses for recordkeeping and administering the Plans.

39.     Except for the REPO Account's expenses, the bank expenses described above were paid or offset by the interest earned in the accounts. For example, the Depository Account was first credited with any interest earned by the account. Remaining expenses were paid with float earned in FICASH.

40.     Thus, Fidelity was using float income to pay its ordinary operating expenses for recordkeeping and administering the Plan.

41.     By using the float income to pay their own operating expenses, Defendants diverted Plan assets and engaged in self-dealing. Defendants diverted float income from Kelley's HP Plan and Avande Plan, and Fine's Delta Plan, and from the proposed class of Plans. Further, Fidelity had already been paid for such trustee and administration services through revenue sharing arrangements with mutual funds and other sources as provided in its trust agreements.

42.     Following the payment of Defendants' operating expenses, any remaining float was then distributed *pro rata* among individual investment options that chose to receive it, rather than to the specific Plan participants or beneficiaries to whose contributions generated the float income in the first place. As a result, interest generated by the Plans' assets was not disbursed solely for the benefit of the Plans' participants and beneficiaries.

43.     Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . ." 29 U.S.C. § 1002(21)(A). This definition does not depend on payment or nonpayment of a fee to such a person. 29 C.F.R. § 2510.3-101(a)(2) ("[A]ny person who exercises authority or control respecting the management or disposition of such underlying [plan] assets, and any person who provides investment advice with respect to such assets for a fee . . . is a fiduciary of the investing plan.").

44. Thus, although Defendants were not paid any fee for running FICASH, they nevertheless are fiduciaries to the Plan to the extent they managed Plan assets in FICASH, as they exercised discretionary authority and control when they invested Plan assets in various overnight securities.

45. Plaintiffs had no knowledge of Defendants' ERISA breaches and violations until shortly before the filing of this Complaint.

## VII.   CLASS ACTION ALLEGATIONS

46. ERISA §§ 409(a) and 502(a)(2) authorize ERISA plan participants, beneficiaries and fiduciaries to sue in a representative capacity for losses suffered by plans as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of the Avanade Plan, HP Plan, Delta Plan, and all other similarly-situated Plans, *i.e.,* all ERISA employee-benefit plans having Plan assets invested with Fidelity where Fidelity deposited plan assets into temporary interest-bearing accounts and retained or used for its own benefit the interest earned on such assets. Plaintiffs seek to restore losses to the Plans and the participants in the Plans, for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).

47. **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plans and the following class of persons similarly situated persons (the "Class"):

> All ERISA plans, and the participants, beneficiaries, and named fiduciaries of those plans, that invested or maintained investments, during the period of February 1, 2007 to the present in any Fidelity investment fund where Fidelity deposited plan assets into temporary interest-bearing accounts and retained or used for its own benefit the interest earned on such assets.

15

The named plaintiffs and class members in *Tussey v. ABB, Inc.*, *et al.*, Case No. 06-04305-CV-NKL, in the U.S. District Court for the Western District of Missouri, Central Division, are excluded from the Class.

48.      **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs understand that hundreds of Plans and thousands of Plan participants throughout the country invested in Fidelity funds as an investment option for the participants in the Plans, and that both the Plans and participants contribute to those funds.

49.      **Commonality**. The claims of Plaintiffs and the Class originate from the same misconduct and violations of ERISA. Proceeding as a class action is particularly appropriate here because Fidelity uniformly applied system for processing contributions and disbursements for Plans, and, therefore, Defendants' self-dealing in violation of ERISA's prohibited transaction provision has affected all Plans in the same manner. Furthermore, common questions of law and fact exist for all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

    a.      Whether Defendants are fiduciaries under ERISA;

    b.      Whether Defendants engaged in a prohibited transaction under ERISA § 406(b)(1) by utilizing float income for its own purposes to pay or offset bank expenses;

    c.      Whether float income is an asset of the Plans;

       d.        Whether Defendants' acts proximately caused losses to the Plans and, if so, the appropriate relief to which the Plans are entitled;

       e.        Whether the *Tussey* Court's legal determination that Fidelity violated ERISA by retaining float income has claim preclusion or issue preclusion effect with respect to Defendants' conduct in other cases;

       f.        Whether Defendants' conduct is permitted based upon any prohibited transaction exemption or other authority.

50.    **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class because Kelley and Fine seek relief on behalf of the Plans and their participants pursuant to ERISA § 502(a)(2), and, thus, Plaintiffs' claims on behalf of the Plans and their participants are not only typical of, but identical to, a claim under this section brought by any Class member. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

51.    **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

52.     **Rule 23(b)(1)(A) & (B) Requirements.** Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

53.     **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

54.     **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII.   REMEDY FOR FIDUCIARY'S VIOLATION OF ERISA

55.    Prohibited transactions involving the diversion and use of Plan assets for benefit of the fiduciary or a third party rather than for the benefit of the Plan or Plan participants creates a presumption that, had the funds not been diverted, the Plans would have received additional investment returns on those diverted funds. In this way, the remedy restores the Plans' lost value and returns the participants to the position they would have occupied had the funds not been diverted to the fiduciary's use but prudently invested for the benefit of the Plan and Plan participants consistent with the fiduciary duty owed to them.

56.    Plaintiffs, on behalf of the Plans and Plan participants, are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plans in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2); (c) disgorgement of profits earned thereon as a result of prohibited transactions; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

57.    Under ERISA, each Defendant is jointly and severally liable.

## IX.   CLAIM FOR RELIEF – PROHIBITED TRANSACTION UNDER ERISA § 406

58.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

59.     Defendants were at all relevant times ERISA fiduciaries with respect to Plaintiffs and the Plans.

60.     The float income retained by Defendants, or used to benefit Defendants by payment of its operating expenses, consisted of interest earned from Plan assets. The returns from investing Plan assets in overnight securities are Plan assets.

61.     By transferring the interest income to the Depository Account, which is an account registered to Defendants for the benefit of investment options, Defendants transferred Plan assets to an entity that was neither a Plan participant nor beneficiary.

62.     By transferring float income to mutual funds without regard to the interests of members of the Class and for the benefit of other shareholders in mutual funds, Defendants acted for the benefit of other persons in transactions involving the Plans' assets.

63.     The scope of the fiduciary duties and responsibilities of the Defendants included managing the assets of Plaintiffs and the Plans.

64.     Defendants' conduct constituted self-dealing and prohibited transactions with fiduciaries and parties in interest, namely themselves, which transactions were *per se* prohibited by § 406 of ERISA. Such transactions were not exempted by an individual, class, or statutory exemption.

65.     As a result of the prohibited transactions engaged in by Defendants, Plaintiffs and the Plans suffered losses in the form the interest income retained by or applied for the benefit of Defendants and the return they would have realized on that income had it been prudently invested for their benefit by Defendants.

66.     Pursuant to ERISA §§ 409, 502(a)(2), and (a)(3) Defendants are liable to restore the losses to Plaintiffs and the Plans caused by their violations of § 406, and to disgorge their compensation and profits thereon, and subject to other equitable relief as appropriate.

## X.     CLAIM FOR RELIEF – BREACH OF FIDUCIARY DUTY UNDER ERISA § 502

67.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

68.     Defendants owe to the Plans, its participants and beneficiaries extensive fiduciary duties including, without limitation:

   a.  To perform duties with the utmost loyalty and fidelity to the Plans and their participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

   b.  To ensure, at all times, that Plans' assets shall be held for the exclusive purposes of providing benefits to participants in the Plans and their beneficiaries;

   c.  To ensure, at all times, that the Plans avoid prohibited transactions;

   d.  To track and account for all transactions involving the Plans and Plans' assets so as to ensure that Plans assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA.

69.     Defendants breached their fiduciary obligations to Plaintiffs and the Plans by, among other conduct failing to exercise the loyalty, care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters.

70.     As set forth in detail above, as a result of these breaches, Plaintiffs and the Plans have suffered financial losses and damages.

71.     At all times, the Defendants were co-fiduciaries, and each knowingly participated in the fiduciary breaches of the other.

72.     Pursuant to ERISA § 409 and ERISA § 502(a), Defendants are personally liable to make good to Plaintiffs and the Plans for the losses they experienced as a result of Defendants' breaches of fiduciary duty.

73.     Pursuant to ERISA § 409 and ERISA § 502(a), Defendants are personally liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## XI.   **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for judgment as follows:

A.      A determination that this action is a proper class action and certifying Kelley and Fine as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      A Declaration that Defendants, and each of them, have violated ERISA § 406;

D.      An Order compelling Defendants to make good to Plaintiffs and the Plans all losses resulting from their self-dealing prohibited transactions and to restore to the Plaintiffs and the Plans all profits that the participants and beneficiaries would have made if Defendants had fulfilled their fiduciary obligations;

E.      Imposition of a constructive trust on any amounts by which any Defendants were unjustly enriched at the expense of Plaintiffs and the Plans as a result of the prohibited transactions.

F.      Restoration of any losses to Plaintiffs and the Plans, allocated among the participants' individual accounts within the Plans, in proportion to the accounts' losses as required by ERISA;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    An Order awarding attorney fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law;

I.    An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants; and

J.    Granting such other and further relief as the Court may deem just and proper.

## XI.    **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims so triable.

Dated: February 5, 2013                                Respectfully submitted,

Joseph C. Peiffer, Esq.
FISHMAN HAYGOOD PHELPS
WALMSLEY WILLIS & SWANSON
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170-4600
Tel: (504) 586-5259
Fax: (504) 586-5250

Todd M. Schneider
Mark T. Johnson
SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Tel: (415) 421-7100
Fax: (415) 421-7105

Garrett W. Wotkyns
Michael C. McKay
SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
8501 North Scottsdale Rd., Suite 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Fax: (866) 505-8036

James L. Kauffman
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7121
Fax: (850) 436-6147

*/s/ Elizabeth Ryan*
Elizabeth Ryan, BBO No. 549632
John Roddy, BBO No. 424240
BAILEY & GLASSER LLP
125 Summer Street
Suite 1030
Boston, MA 02110
Tel: (617) 439-6730
Fax: (617) 951-3954

Gregory Y. Porter
BAILEY & GLASSER LLP
910 17th Street, NW
Suite 800
Washington, DC 20006
Tel: (202) 463-2101
Fax: (202) 463-2103

Suyash Agrawal
Jeannie Y. Evans
AGRAWAL EVANS LLP
308 West Erie Street, Suite 502
Chicago, IL 60654-3924
Tel: (312) 448-8800
Fax: (312) 445-9949

Richard S. Frankowski, Esq.
BURKE HARVEY & FRANKOWSKI, LLC
One Highland Place
2151 Highland Avenue, Suite 120
Birmingham, AL 35205
Tel: (205) 588-8671
Fax: (205) 930-9054

*Attorneys for Plaintiffs*