**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE FIDELITY ERISA FLOAT LITIGATION | CIVIL ACTION NO. 13-10222-DJC |

**CONSOLIDATED COMPLAINT**

I.   **INTRODUCTION**

1.      This Consolidated Complaint presents a case of fiduciary self-dealing in violation of the Employee Retirement Income Securities Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

2.      The Plaintiffs bring this class action on behalf of the ERISA retirement plans in which they are or have been participants or fiduciaries to recover investment earnings wrongfully taken by the Defendants from their plans and a proposed class of all similarly-situated ERISA retirement plans (collectively, "Plans").

3.      The Defendants (referred to collectively herein as "Fidelity" or "Defendants") caused certain of the Plans' assets to be deposited on an interim basis in interest-bearing accounts before it invested or disbursed monies as directed by the Plans' participants.  Income earned on or derived from the Plans' assets while invested in such accounts is "float income." The float income was an asset of the Plans under ERISA.  Fidelity exercised authority or control over the investment of the Plans' assets in such accounts and over the collection and allocation of float income.  Accordingly, Fidelity was a fiduciary for the Plans with respect to the float income.  As a fiduciary, Fidelity was prohibited from dealing with the float income for itself or for the benefit of another and was required to deal with that float income with prudence and

unflagging loyalty to the Plans.  Fidelity did not.  Instead, it engaged in prohibited transactions and breached its fiduciary duty in two distinct ways.

4.      First, Fidelity used float income to pay trust and record-keeping and/or banking fees above and beyond the fees authorized in the trust agreements between the Plans and Fidelity.  Since Fidelity was itself responsible for payment of these fees, it engaged in repeated self-dealing transactions and breaches of duty in violation of ERISA §§ 404 and 406 and Department of Labor Regulations, 29 C.F.R. § 2550, whenever it used float income to pay such fees.

5.      Second, Fidelity remitted float income into the mutual fund options selected by the Plans' participants without crediting the amount of that float income to the contributions made by the Plans or the Plans' participants.  This had the effect of disbursing the value of the float income generated by the Plans' assets to all of the investors in the mutual fund, and substantially diluting the value of the float income received by the Plans and the Plans' participants.  Thus, Fidelity engaged in repeated transactions for the benefit of others and breaches of duty in violation ERISA §§ 404 and 406 and Department of Labor Regulations, 29 C.F.R. § 2550, whenever it paid float income to its mutual funds.

6.      On March 31, 2012, following a four-week trial in *Tussey v. ABB, Inc., et al.*, Case No. 06-04305-CV-NKL, in the United States District Court for the Western District of Missouri, Central Division ("*Tussey*"), the district court concluded that Fidelity's actions violated its ERISA fiduciary duties in the same way that the Plaintiffs allege it has done here with its other client retirement plans not involved in *Tussey*.[1]  *See Tussey v. ABB, Inc.*, No. 06-

---

[1]      Having brought claims for recovery in *Tussey*, the plan in that action is excluded from the class that the Plaintiffs propose in this case.

04305-CV-NKL, 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012). (The Court's findings of fact and conclusions of law in the Order dated March 31, 2012 are incorporated herein.)

7.     The *Tussey* trial record reveals that Fidelity's practice of misallocating float income—in violation of ERISA—did not just victimize the ABB PRISM Plan in that case: it harmed the entire population of Fidelity's client retirement plans and participants, to whom Fidelity owed fiduciary duties under ERISA. Fidelity's own witnesses admitted to the breadth of their practice regarding float income at the *Tussey* trial:

> Q. And so the ABB PRISM Plans are handled the same way as your other large contribution plans are handled, correct?
>
> A. For the entire population, which is not just large plans, ***but it's all plans***.

(Trial Tr. vol. 5, 1179: 1-4, Jan. 11, 2010 (emphasis added).)

8.     In *Tussey*, the Court found with respect to issues of liability, among other things, that: (a) "Fidelity Trust breached its fiduciary duties to the Plan when it failed to distribute float income solely for the interest of the Plan;" and (b) "Fidelity Research violated its fiduciary duties when it transferred float income to the Plan's investment options instead of the Plan." *Tussey*, 2012 WL 1113291, at *2.

9.     With respect to the issue of damages/remedies, the *Tussey* Court found that the ABB PRISM Plan "must be compensated for its losses and any ill-gotten gains by Defendants when they used Plan assets for their own benefit." *Id.* at *3. The Court further held that the Fidelity Defendants were jointly and severally liable for the Plan's losses for Fidelity breaches concerning float. *Id.* at *38.

10.    The Plaintiffs bring this action to recover the float income that Fidelity improperly took from the members of the proposed nationwide class in clear violation of ERISA.

11.     Fidelity is foreclosed in this action from re-litigating the liability and damages issues that were decided against it in *Tussey*.  First, Fidelity had a full and fair opportunity to litigate those issues and did, in fact, fully litigate the issues (among others) in *Tussey*.  The trial lasted nearly four weeks, the record of which comprises sixteen volumes of trial transcripts.  The *Tussey* parties identified more than 2,700 exhibits in their trial briefs.  Fidelity was represented by no fewer than 22 attorneys—from at least five different law firms: (1) Morgan, Lewis & Bockius LLP; (2) O'Melveny & Myers, LLP; (3) Goodwin Procter LLP; (4) Bryan Cave LLP; and (5) Lathrop & Gage LLP.  Second, the trial court's decision on the issues of liability and damages in *Tussey* was essential to support the court's valid and binding final judgment in that action.

## II.     **JURISDICTION AND VENUE**

12.     Subject matter jurisdiction in this district is proper pursuant to 28 U.S.C. § 1331(e)(1) and ERISA § 502(e)(1).  The claims asserted here are brought as a class action under Federal Rule of Civil Procedure 23.

13.     Venue is proper in this district pursuant to ERISA § 502(e)(2) because this District is where the breaches took place and where one or more of the Defendants reside or may be found.

## III.     **THE PARTIES**

### A.     **The Plaintiffs**

14.     Timothy M. Kelley ("Kelley") is a former participant in both the Avanade, Inc. 401(k) Retirement Plan ("Avanade Plan") and the Hewlett-Packard Company 401(k) Plan ("HP Plan").  Kelley resides in North Dakota.  Kelley was an active participant in the Avanade Plan

from approximately February 2008 to July 2010.  He was an active participant in the HP Plan from approximately February 2007 to January 2008.

15.     Jamie A. Fine ("Fine") is and has been a participant in the Delta Airlines 401(k) Plan ("Delta Plan") since on or about 1997.  Fine resides in Georgia.

16.     Patricia Boudreau ("Boudreau") is a participant in the Bank of America 401(k) Plan ("BOA Plan").  Boudreau resides in Massachusetts.  Boudreau was an active participant in the BOA Plan from 2005 until June 30, 2013.

17.     Alex Gray ("Gray") is a participant in the EMC Corporation 401(k) Plan ("EMC Plan").  Gray resides in Massachusetts.  Gray has been an active participant in the EMC Plan since 2008.

18.     Bobby Negron ("Negron") is a participant in the Safety Insurance Company 401(k) Plan ("Safety Insurance Plan").  Negron resides in Massachusetts.  Negron has been an active participant in the Safety Insurance Plan since 2006.

19.     Korine Brown ("Brown") is a participant in the General Motors Personal Savings Plan ("GM Plan").  Brown resides in New York State.  She has been an active participant in the GM Plan since 2007.

20.     Columbia Air Services, Inc. ("Columbia") is a Connecticut corporation with its principal place of business in Groton, Connecticut.  Columbia has at all material times been the sponsor and administrator for the Columbia Group of Companies 401(k) Retirement Savings Plan ("Columbia Plan").

B.     **The Defendants**

21.     FMR LLC ("FMR") is the parent company of all the various "Fidelity" entities named herein, all of which are wholly-owned subsidiaries of FMR.  FMR is a limited liability

company that has its executive offices located in Boston, Massachusetts. It is a privately-owned company and one of the largest mutual fund and financial services companies in the world. Through its subsidiaries, FMR provides a full range of products and services for institutional investors worldwide.

22.     Fidelity Management Trust Company ("FMTC") is a Massachusetts corporation with its headquarters in Boston, Massachusetts. FMTC is a trust company and manages assets for over 500 institutional clients worldwide, with more than $175.5 billion in trusts and other assets under management as of June 30, 2012. FMTC is a wholly-owned subsidiary of FMR. As trustee, FMTC is, by definition, a fiduciary to the Plans.

23.     Fidelity Management & Research Company ("FMRC") is a wholly-owned subsidiary of FMR and an affiliate of FMTC. FMRC is a registered investment company that serves as the leading asset manager and investment advisor for the Plans' investment accounts. FMRC has three divisions, two of which are located in Boston, Massachusetts. FMRC has over one trillion dollars under its administration and management.

24.     Fidelity Investments Institutional Operations Company, Inc. ("FIIOC") is a wholly-owned subsidiary of FMR and an affiliate of FMTC and FMRC. FIIOC provides trust services, recordkeeping and information management services for employee benefit plans. FIIOC serves as an agent to FMTC and is located in Boston, Massachusetts.

## IV.   THE PLANS

25.     The Plans are employee benefit plans within the meaning of ERISA §§ 3(3) and 3(2)(A). The purpose of the Plans is to provide retirement benefits to Plan Participants.

26.     The Plans are "defined contribution" or "individual account" plans within the meaning of ERISA § 3(34), in that they provide for individual accounts for each Participant and

for benefits based solely on the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's account.  Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account.  The Plans are typical 401(k) retirement plans similar to those offered by employers throughout the country.

27.     A number of services may be provided to defined contribution retirement plans in order for them to operate.  Such services include investment management, consulting and financial advice concerning investment selection and monitoring, record-keeping to keep track of employee contributions and accounts, custodial or trust services to hold and invest plan assets, and communications to Participants to advise and educate Participants regarding the operation of the plan and investment of plan assets.

28.     The Plans entered into Trust Agreements with Fidelity to establish trusts to hold Plan assets.

29.     Under the Trust Agreements, FMTC agreed to accept all of the duties of trustee. In particular, FMTC agreed to open and maintain a trust account for each Plan and an individual account for each participant in the Plans, accept contributions on behalf of participants in the Plans, invest and reinvest Plan assets and hold securities owned by the Plan in accordance with the terms of the Plans.

30.     Fidelity's Trust Agreements with the Plans generally provided that FMTC would charge only three types of fees to the Plans:  (1) an asset-based fee based on a percentage of plan assets held in a particular Plan investment which is based on a portion of the mutual fund expense ratio that is known as revenue sharing, (2) an administrative fee that is a fixed dollar rate per plan participant (also known as a "hard-dollar" payment), and (3) fees for individual

participant services such as loans.  The Defendants were not authorized to receive any other consideration for fees and expenses.

31.     The Trust Agreement at issue in *Tussey* was the same as the Plans' Trust Agreements in all material respects:

- All Trust Agreements specified that FMTC would hold the assets of the trust funds for the exclusive benefit of plan participants and beneficiaries, and for the defraying of reasonable plan expenses.

- All Trust Agreements specified that FMTC was acting as a directed trustee of the Plan Administrator.

- All Trust Agreements gave FMTC broad powers to sell, exchange, or otherwise dispose of any of the assets of the trust fund.

- All Trust Agreements detailed the services that FMTC would perform and specified the fees that FMTC would charge for the services it provided.

- None of the Trust Agreements included any language including float income among permissible fees or otherwise authorizing Defendants to appropriate the float income for their own or any other purposes.

## V.     **THE DEFENDANTS' FIDUCIARY STATUS**

32.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent that "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or

has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i).

33.     Defendant FMTC is a fiduciary of the Plan. As the Trustee, FMTC had "authority or control respecting management or disposition of [plan] assets." Based on a review of the Columbia Plan, the Trust Agreements provide that FMTC had the power, *inter alia,* "to sell, lease, convert, redeem, exchange, or otherwise dispose of all or any part of the assets constituting the Trust Fund," to "employ such agents and counsel as may be reasonably necessary in collecting, managing, administering, investing, distributing and protecting the Trust Fund or the assets thereof and to pay them reasonable compensation," and "generally to exercise any of the powers of an owner with respect to all or any part of the Trust Fund." The Trust Agreements also stated that "[t]he Trustee . . . and ***any other fiduciary*** shall discharge their duties under the Plan and this Trust Agreement solely in the interests of Participants and their Beneficiaries in accordance with the requirements of ERISA" (emphasis added). As principal for its agent, FIIOC, FMTC was and is a fiduciary concerning the abuses of FIIOC alleged below.

34.     Defendant FIIOC is a fiduciary of the Plan. As the agent for FMTC, FIIOC established, managed and maintained the Depository Account and the Redemption Account described herein, and used its discretionary authority and control to transfer Plan Assets to the REPO account, and to use float income to pay FMTC's bank fees and/or benefit investment accounts not held exclusively by the Plan. Accordingly, it had authority or control over the management or disposition of Plan Assets. The *Tussey* court specifically found that the structure set up by the Fidelity entities gave FIIOC discretionary control over Plan Assets. *Tussey,* 2012 WL 1113291, at *32.

35.     Defendant FMRC is a fiduciary of the Plan by virtue of its discretionary management and control over Plan Assets transferred to the FICASH program.  FMRC exercised discretion in choosing securities as overnight investments for plan assets.  As the *Tussey* court held, FMRC "is a fiduciary to the Plan to the extent it manages Plan assets in FICASH as it exercises discretionary authority and control when it invests Plan assets in various overnight securities."  *Id.* at *34.

## VI.     THE DEFENDANTS' FIDUCIARY DUTIES

36.     ERISA imposes on all plan fiduciaries the duty of loyalty—that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries. . . ."  ERISA § 404(a)(1).

37.     ERISA § 406(b)(1) prohibits a fiduciary from dealing with assets of a plan for its own interest or account.  The Department of Labor has indicated, in both Advisory Opinion 93-24A and in Field Assistance Bulletin 2002-3, that a trustee's use of float income for its own benefit constitutes a prohibited transaction, unless the trustee (1) disclosed the float to the independent plan fiduciary at the time the trustee was retained, (2) openly negotiated with the independent plan fiduciary to retain float income as part of its overall compensation, and (3) was not in a position to affect the amount of its float compensation, as it would, for example, if it had "broad discretion over the duration of the float."  FAB 2002-3.  In particular, even if there is a disclosure, the service provider may not use the float to cause "a plan to pay additional fees to the provider."  *Id.*  The Department of Labor's advisory opinions and field assistance bulletins are publicly available documents designed to provide guidance to the regulated community,

including ERISA fiduciaries such as the Defendants, and the Defendants knew or should have known of their requirements.

## VII.   THE DEFENDANTS' VIOLATIONS OF ERISA

38.    The Defendants' ERISA violations arise from (1) their practice of appropriating the float income earned on Plan assets to pay banking fees that would otherwise be paid by Fidelity, and (2) their practice of investing float income generated by the Plans' assets for the benefit of investors other than the participants in the Plans.    These processes are further described below.

39.    Plan Participants and the Participants' employers make contributions to the Plans, which are Plan assets.  These contributions are deposited into an account known as the Fidelity Participant Recordkeeping System Depository Account or a similar account under the Defendants' control.

40.    Once the Defendants receive funds from the Plans, they are processed through a dedicated transfer process that the Defendants have established.  At all relevant times during this process, the Defendants maintain discretionary control over the Plans' assets.

## A.    The Contribution Process

41.    Funds coming from Plan sponsor contributions flowed generally according to the following process:

       a.    Fidelity transferred contributions to the Fidelity Participant Recordkeeping System Depository Account (the "Depository Account") twice per day, typically at 1:00 pm and 4:00 pm.  The contributions were transferred to an account known as the consolidated repurchase agreement account ("REPO Account"), which was held at Deutsche Bank.  These funds were pooled or co-mingled in the REPO Account with funds from other Fidelity accounts.

       b.    Any contributions made after 4:00 pm were held in the Depository Account overnight.

c.      Once funds were transferred to the REPO Account, they were transferred to the FICASH Program ("FICASH"). The FICASH Program was not an account, but a process that invested in secured overnight vehicles. FICASH was managed by FMRC.

d.      The following day, the principal in FICASH was returned to the REPO Account.

e.      After that, the funds were returned back into the Depository Account.

f.      And finally, the Defendants moved funds into the actual investment options selected by Plan participants.

42.      The flow of funds for participant contributions was similar:

a.      Participants' contributions were first transferred into a regional bank account.

b.      The next day, these contributions were transferred into the Depository Account.

c.      Later on the same day, the funds were moved into one of three investment concentration accounts and then reflected in the books of the individual investment options.

43.      Any portion of the float income not used by the Defendants to make unauthorized payments of bank fees was invested in investment options (which were Fidelity or non-Fidelity mutual funds) in such a way that the remaining float income credited to a mutual fund benefitted all mutual fund investors, and was not credited only to the mutual fund accounts of the Plans and Plans Participants whose contributions generated the float income.

**B.**    **The Disbursement Process**

44.      During the Class Period, when Plan Participants withdrew funds from their account, disbursements of Plan assets were triggered. The withdrawals were received by Participants after the following general sequence:

a.      The day after withdrawals were triggered, funds moved from the relevant investment option account into a redemption bank account. The

12

redemption bank account was held at Deutsche Bank, and was registered to Fidelity Operations for the benefit of the investment options.

b. Later that same day, the IRS was paid on any withdrawals that were taxable, and any remaining balances were transferred to the REPO Account.

c. Once funds reached the REPO Account, they were transferred to FICASH.

d. The following day, after remaining with FICASH overnight, the principal of those funds was transferred back to the redemption bank account.

e. Depending on state tax remittance schedules, state taxes were then paid.

f. Either on or after the same day that the redemption bank account received funds back from the FICASH program, funds were electronically disbursed from the redemption bank account to Participants who were set up to receive electronic disbursements.

g. For Participants who did not receive an electronic disbursement, funds were transferred from the redemption bank account to a disbursement bank account at Deutsche Bank. The disbursement bank account then issued a check to those Participants.

h. Finally, Participants receive funds after they cash or deposit their checks.

i. As with the contribution processes described above, Fidelity retained some portion of the float income generated during the disbursement process for itself and the remainder was credited to mutual funds, not to the individual Participants who were taking a disbursement. Unlike contributions, however, Participants taking a disbursement no longer had an interest in the amount of the disbursement taken from the mutual funds. Thus, the entirety of float income earned on their disbursements was used to pay Fidelity or to invest in mutual funds.

## C.    The Exchange Process

45.    During the Class Period, the flow of funds for exchanges between investment options, as from, for example, "Investment Option A" to "Investment Option B" was as follows:

a. The day after a trade is placed, funds moved to the Depository Account from the corresponding investment concentration account for Investment Option A.

        b.      Funds then moved from the Depository Account to the corresponding investment concentration account for Investment Option B.

46.     Because only the amount of the contribution or redemption principal was transferred back to the Depository Account following an overnight holding, interest was also earned on the income that remains in FICASH.

47.     As used herein, the term "float" or "float income" refers to both (a) the interest earned on the contribution or distribution principal and (b) interest on the income remaining in FICASH.

48.     All of the accounts in the processes described above incurred bank expenses. Because maintaining these accounts was integral to the services Fidelity rendered to the Plans and Plan Participants, such bank expenses were part of Fidelity's ordinary operating expenses for recordkeeping and administering the Plans.

49.     Except for the REPO Account's expenses, the bank expenses described above were paid or offset by the interest earned in the accounts. For example, interest earned by the Depository Account was credited to the account to offset expenses of the account. Any remaining expenses were paid to the extent that float interest was earned in FICASH on funds that came from the Depository Account.

50.     Thus, Fidelity used float income to pay bank expenses that were operating expenses for recordkeeping and administering the Plans and that should have been paid by Fidelity.

51.     By using the float income to pay their own operating expenses, the Defendants diverted Plan assets and engaged in self-dealing. The Defendants diverted float income from the Plaintiffs' plans, and from the proposed class of Plans. Further, the Defendants had already been

paid for such trustee and administration services through revenue sharing arrangements with mutual funds and other sources as provided in its trust agreements.

52.     Following the payment of the Defendants' operating expenses, any remaining float interest was then distributed *pro rata* among various investment funds, rather than to the specific Plan Participants or beneficiaries whose contributions and withdrawals generated the float income in the first place.  As a result, interest generated by the Plans' assets was not used solely for the benefit of the Plans' Participants and beneficiaries.

53.     Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . ."  ERISA § 3(21)(A).  This definition does not depend on payment or nonpayment of a fee to such a person.  29 C.F.R. § 2510.3-101(a)(2) ("[A]ny person who exercises authority or control respecting the management or disposition of such underlying [plan] assets, and any person who provides investment advice with respect to such assets for a fee . . . is a fiduciary of the investing plan.").

54.     Thus, although the Defendants were not paid any fee for running FICASH, they nevertheless are fiduciaries to the Plan because they exercised authority or control over the Plans' assets in FICASH by directing such assets to be used to pay bank fees and to be invested in various overnight securities.

55.     The Plaintiffs had no knowledge of the Defendants' ERISA breaches and violations until shortly before the institution of these now-consolidated actions.

## VIII.   REMEDIES FOR BREACHES OF FIDUCIARY DUTIES

56.   ERISA § 502(a)(2) provides that a civil action for breach of fiduciary duty for relief under ERISA § 409 may be brought by a participant, beneficiary, or fiduciary of a plan.

57.   ERISA § 409 requires "any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate," which is actionable under ERISA § 502(a)(3).

58.   The Plaintiffs are participants, beneficiaries or fiduciaries of the Plans and are therefore entitled to bring suit on behalf of the Plans seeking relief from the Defendants in the form of:

   a.   A monetary payment to the Plans to make good to the Plans the loss of benefits to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA §§ 409(a) and 502(a)(2);

   b.   Injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(3);

   c.   Disgorgement of profits earned thereon as a result of prohibited transactions;

   d.   Reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), the common fund doctrine, and other applicable law;

   e.   Taxable costs and interest on these amounts, as provided by law; and such other legal and equitable relief as may be just and proper; and

   f.   Such other legal or equitable relief as may be just and proper.

59.   Under ERISA, each Defendant is jointly and severally liable.

## IX.   CLASS ACTION ALLEGATIONS

60.   ERISA §§ 409(a) and 502(a)(2) authorize ERISA plan participants, beneficiaries and fiduciaries to sue in a representative capacity for losses suffered by plans as a result of

16

breaches of fiduciary duty.  Pursuant to that authority, the Plaintiffs bring this action as a class

action under Federal Rule of Civil Procedure 23.  The Plaintiffs seek to restore losses to the

Plans for which the Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2).

61.    **Class Definition**.  The Plaintiffs bring this action as a class action pursuant to

Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure

on behalf of the following Class the "Class"):

> Employee benefit plans covered by the Employee Retirement
> Income Security Act of 1974 subject to Internal Revenue Code §§
> 401(a), (k), for which Fidelity has served as trustee or service
> provider during the period of February 1, 2007 to the present ("the
> Class Period").

Excluded from the Class is the ABB PRISM Plan that was the subject of the litigation in *Tussey*

*v. ABB, Inc.*, *et al.*, Case No. 06-04305-CV-NKL, in the U.S. District Court for the Western

District of Missouri, Central Division.

62.    **Numerosity**.  The members of the Class are so numerous that joinder of all

members is impracticable.  While the exact number of Class members is unknown to the

Plaintiffs at this time and can only be ascertained through appropriate discovery, the Plaintiffs

believe that the Class includes thousands of Plans throughout the country.  Moreover, Fidelity

Trust's website indicates that over 500 clients, with assets in excess of $260 billion, use its

"custom trustee services." *See* http://institutional.fidelity.com.

63.    **Commonality**.  The claims of the Plaintiffs and the Class originate from the same

misconduct and violations of ERISA.  Proceeding as a class action is particularly appropriate

here because Fidelity uniformly applied its system for processing contributions and

disbursements for the Plans, and, therefore, the Defendants' self-dealing in violation of ERISA's

prohibited transaction provision has affected all Plans in the same manner.  Furthermore,

common questions of law and fact exist for all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

      a.      Whether the Defendants are fiduciaries under ERISA;

      b.      Whether the Defendants engaged in a prohibited transaction under ERISA § 406(b)(1) by utilizing float income for its own purposes to pay or offset bank expenses;

      c.      Whether float income is an asset of the Plans;

      d.      Whether the Defendants breached their fiduciary duties by receiving excessive compensation and/or converting Plan assets to their own use;

      e.      Whether the Defendants breached their fiduciary duties by failing to credit float income in full to the Plans;

      f.      Whether the Defendants breached their fiduciary duties by diverting to other investors float income that should have been included in the Plans;

      g.      Whether the Defendants' acts proximately caused losses to the Plans;

      h.      Whether the Class is entitled to damages and injunctive relief;

      i.      Whether the *Tussey* Court's legal determination that Fidelity violated ERISA by retaining float income has claim preclusion or issue preclusion effect as to the Defendants;

      j.      Whether Defendants' conduct is permitted based upon any prohibited transaction exemption or other authority.

      64.    **Typicality.** The claims asserted by the Plaintiffs on behalf of the their plans are typical of the claims of the members of the Class because the Plaintiffs' plans and members of the Class sustained injury arising out of the Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein. The Plaintiffs' claims are also typical of the claims of the members of the Class inasmuch as the Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), and, thus, the Plaintiffs' claims on behalf of the Plans are not only typical of, but identical to, the claims of Class members. If cases were

brought and prosecuted individually, each member of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

65.     **Adequacy.** The Plaintiffs will fairly and adequately protect the interests of the members of the Class.  The Plaintiffs have retained counsel competent with experience in class action and ERISA litigation.  The Plaintiffs and the plans they represent have no interests antagonistic to or in conflict with those of the Class.

66.     **Rule 23(b)(1)(A) & (B) Requirements.**  Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for the Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

67.     **Rule 23(b)(2) Requirements.**  Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

68.     **Rule 23(b)(3) Requirements.**   Certification under Rule 23(b)(3) is also appropriate because common questions of law and fact clearly predominate over any questions affecting only individual members. Predominance is highlighted by the testimony of the witness for Fidelity during the *Tussey* trial indicating that Fidelity's system for processing contributions,

distributions and transfers was the same for all of its plan clients.  Moreover, a class action is superior to the other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT ONE – BREACH OF FIDUCIARY DUTY

69.     The Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

70.     Interest and income earned from plan assets are themselves plan assets, and, thus, the float income was a Plan asset.

71.     The Defendants owe to the Plans, its participants and beneficiaries extensive fiduciary duties including, without limitation:

   a.     To perform duties with the utmost loyalty and fidelity to the Plans and their participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

   b.     To ensure, at all times, that Plans' assets shall be held for the exclusive purposes of providing benefits to Plan Participants and their beneficiaries;

   c.     To ensure, at all times, that the Plans avoid prohibited transactions;

   d.     To track and account for all transactions involving the Plans and Plans' assets so as to ensure that Plans assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA.

72.     The Defendants breached their fiduciary obligations to the Plans by using the float income to defray the Defendants' expenses.

20

73.     The Defendants also breached their fiduciary obligation of loyalty to the Class by failing to earmark the float income for the benefit of the Plans.  Those portions of the float income that were not used to defray the Defendants' expenses were credited to the relevant investment options, and thus benefited all investors in those options.  As the *Tussey* court held, "[b]ecause Plan assets were distributed to investment options neither 'for the exclusive purpose of . . . providing benefits to participants and their beneficiaries,'  nor to defray administration costs for the Plan's benefit, Fidelity Research and Fidelity Trust breached their fiduciary duties of loyalty to the Plan." *Tussey*, 2012 WL 1113291, at *35.

74.     As a consequence of the Defendants' breaches, the Plans have suffered financial losses and damages equal to the amount of the float income together with any amounts that could have been earned thereon.

75.     Pursuant to ERISA §§ 409 and 502(a), the Defendants are personally liable to make good to the Plans for the losses they experienced as a result of the Defendants' breaches of fiduciary duty.

76.     Pursuant to ERISA § 502(a)(3), the Court should also award equitable relief to the Class.

## COUNT TWO – PROHIBITED TRANSACTIONS

77.     The Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

78.     ERISA § 406(a)(1) provides that a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . ."

ERISA defines a "party in interest" to include "any fiduciary (including, but not limited to, any . . . trustee)." ERISA § 3(14)(H).

79.    As discussed above, the Defendants were at all relevant times ERISA fiduciaries with respect to the Plans. Thus, each was a "party in interest" pursuant to ERISA § 3(14)(H).

80.    The Defendants' use of the Plans' float income to pay the Defendants' bank fees is a plan transaction within the meaning of ERISA § 406(a)(1).

81.    The Defendants knew or should have known that, by using plan assets to pay the Defendants' bank fees for accounts such as the Depository Account and the REPO Account, it was using Plan assets to indirectly benefit the Defendants, each of whom was a "party in interest." Accordingly, the Defendants engaged in a prohibited transaction under ERISA § 406(a)(1).

82.    Additionally, ERISA § 406(b)(1) prohibits a fiduciary from dealing with the assets of a plan for its own interest or account.

83.    The float income retained by the Defendants, or used to benefit Defendants by payment of their operating expenses, consisted of interest earned from Plan assets. The returns from investing Plan assets in overnight securities are Plan assets, and each Defendant is a fiduciary.

84.    The Defendants violated ERISA § 406(b)(1) by using the float income in their own interests by defraying their own administrative expenses. As the *Tussey* court held, "float income is being used to pay Fidelity Trust's operating expenses for recordkeeping and administering the Plan. This means that Fidelity Trust is earning more income than the Trust Agreement provides . . . ." *Tussey*, 2012 WL 1113291, at *3.

85.     The Department of Labor's Field Assistance Bulletin 2002-3 indicates that a financial service provider's use of float income for its own benefit constitutes a prohibited transaction under ERISA § 406(b)(1) unless the practice is disclosed and openly bargained-for at the time the service provider is retained, and even then, only where the agreement does not permit the service provider to affect (and in particular increase) the amount of its float compensation.   The Defendants here (1) did not disclose the float income, (2) did not negotiate for extra compensation in the form of the float income, or provide the Plans with information sufficient to understand the Defendants' compensation, and (3) had discretion to use the float income to pay themselves excessive compensation.   FAB 2002-3, therefore, confirms that the Defendants' actions constitute prohibited transactions under ERISA § 406(b)(1).

86.     As a result of the prohibited transactions engaged in by the Defendants, the Plans suffered losses in the form of the interest income retained by or applied for the benefit of the Defendants and the return they would have realized on that income had it been prudently invested for their benefit by the Defendants.

87.     Pursuant to ERISA §§ 409, 502(a)(2) and 502(a)(3), the Defendants are liable to personally make good to the Plans the damages sustained by them.

88.     Pursuant to ERISA § 502(a)(3), the Court should also award equitable relief to the Class.

## COUNT THREE – CO-FIDUCIARY LIABILITY

89.     The Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

90.     **Knowledge of a Breach and Failure to Remedy**:   ERISA § 405(a)(3) imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has

knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.   Each Defendant knew of the breaches by the other fiduciaries and made no reasonable efforts to remedy those breaches.

91.    **Knowing Participation in a Breach**: ERISA § 405(a)(1) imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.   As alleged above, each of the Defendants were intimately involved in the process of generating and improperly disbursing the float income, and, thus, knowingly participated in the improper management of that investment by the other Defendants.

92.    **Enabling a Breach**: ERISA § 405(a)(2) imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach. FMTC enabled the breach by engaging FIIOC and FMRC for purposes of effectuating transfers, contributions and distributions from plans.

93.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Class lost millions of dollars of retirement savings.

94.    Pursuant to ERISA §§ 409, 502(a)(2) and 502(a)(3), the Co-Fiduciary Defendants are liable to make good to the Plans for the losses caused by their breaches of fiduciary duty alleged in this Count and to provide other equitable relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment as follows:

A.    A determination that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, and appointing the Plaintiffs as class representatives;

B.      A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      A Declaration that the Defendants, and each of them, breached ERISA fiduciary duties owed to the Plans;

D.      An Order compelling the Defendants to make good to the Plans all losses resulting from the Defendants' breaches of fiduciary duty and prohibited transactions;

E.      Imposition of a constructive trust on any amounts by which the Defendants were unjustly enriched at the expense of the Plans;

F.      An Order awarding damages to the Plans, with interest as provided by law;

G.      An Order enjoining the Defendants from any further violations of their ERISA fiduciary obligations;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) or as provided by law;

J.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants; and

K.      Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs demand a jury trial on all claims so triable.

Dated: February 7, 2014                     Respectfully submitted,

                                            /s/ Bradford S. Babbitt
                                            Bradford S. Babbitt, BBO # 566390
                                            Craig A. Raabe
                                            Elizabeth R. Leong
                                            **ROBINSON & COLE LLP**
                                            280 Trumbull Street
                                            Hartford, Connecticut 06103-3597
                                            Telephone: (860) 275-8200
                                            Facsimile:  (860) 275-8299
                                            Email:  bbabbitt@rc.com
                                                    craabe@rc.com
                                                    eleong@rc.com

                                            Robert A. Izard
                                            Mark P. Kindall
                                            **IZARD NOBEL LLP**
                                            29 South Main Street, Suite 305
                                            West Hartford, CT  06107
                                            Tel: (860) 493-6292
                                            Fax: (860) 493-6290
                                            Email:  mkindall@izardnobel.com
                                            Email:  rizard@izardnobel.com

                                            *Counsel for Plaintiff Columbia Air Services, Inc.*

                                            Elizabeth A. Ryan
                                            John J. Roddy
                                            **BAILEY & GLASSER LLP**
                                            125 Summer Street
                                            Boston, MA 02110
                                            617-439-6730
                                            Fax: 617-951-3954
                                            Email: eryan@baileyglasser.com
                                                   jroddy@baileyglasser.com

                                            Gregory Y. Porter
                                            **BAILEY & GLASSER LLP**
                                            910 17th Street, NW
                                            Suite 800
                                            Washington, DC 20004
                                            202-543-0226
                                            Email: gporter@baileyglasser.com

Todd M. Schneider
Joshua G. Konecky
Mark T. Johnson
**SCHNEIDER WALLACE COTTRELL**
**KONECKY LLP**
180 Montgomery Street
Suite 2000
San Francisco, CA 94104
415-421-7100
Email: tschneider@schneiderwallace.com
       jkonecky@schneiderwallace.com
       mjohnson@schneiderwallace.com

Garrett W. Wotkyns
Michael C. Mckay
**SCHNEIDER WALLACE COTTRELL**
**KONECKY LLP**
8501 North Scottsdale Road
Suite 270
Scottsdale, AZ 85253
480-428-0142
Email: gwotkyns@schneiderwallace.com

Suyash Agrawal
Jeannie Y. Evans
**AGRAWAL EVANS LLP**
308 W. Erie Street
Suite 502
Chicago, IL 60654
312-448-8800

Joseph C. Peiffer
**FISHMAN HAYGOOD PHELPS WALMSLEY**
**WILLIS & SWANSON**
201 St. Charles Avenue
Suite 4600
New Orleans, LA 70170
504-586-5259

Laura Dunning
Peter J. Mougey
**LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, PA**
316 S. Baylen Street
Suite 600
Pensacola, FL 32502
854-435-7000
Email: ldunning@levinlaw.com
        pmougey@levinlaw.com

Richard S. Frankowski
**THE FRANKOWSKI FIRM, LLC**
231 22nd Street South
Suite 203
Birmingham, AL 35233
205-390-0399
Email:  richard@frankowskifirm.com

Daniel J. Carr
**PEIFFER ROSCA ABDULLAH & CARR, LC**
201 St. Charles Ave.
Suite 4610
New Orleans, LA 70170
504-586-5259

*Counsel for Plaintiffs Timothy M. Kelley and
Jamie A. Fine*

Thomas G. Shapiro
Michelle H. Blauner
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
617-439-3939
Fax: 617 439-0134
Email: tshapiro@shulaw.com
        mblauner@shulaw.com

*Counsel for Plaintiffs Patricia Boudreau, Alex
Gray, Bobby Negron and Korine Brown*

## CERTIFICATE OF SERVICE

I hereby certify that on, February 7, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to registered CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

Daniel J. Carr
**PEIFFER ROSCA ABDULLAH & CARR, LC**
201 St. Charles Ave.
Suite 4610
New Orleans, LA 70170

Suyash Agrawal
Jeannie Y. Evans
**AGRAWAL EVANS LLP**
308 W. Erie Street
Suite 502
Chicago, IL 60654

Joseph C. Peiffer
**FISHMAN HAYGOOD PHELPS WALMSLEY WILLIS & SWANSON**
201 St. Charles Avenue
Suite 4600
New Orleans, LA 70170

Richard S. Frankowski
**THE FRANKOWSKI FIRM, LLC**
231 22nd Street South
Suite 203
Birmingham, AL 35233

Michael C. Mckay
**SCHNEIDER WALLACE COTTRELL KONECKY LLP**
8501 North Scottsdale Road
Suite 270
Scottsdale, AZ 85253

*/s/ Bradford S. Babbitt*
Bradford S. Babbitt