UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____ )
                                        )
IN RE FIDELITY ERISA                    )        Civil Action No. 13-10222-DJC
FLOAT LITIGATION                        )
                                        )        **ORAL ARGUMENT REQUESTED**
                                        )
_____ )


**MEMORANDUM IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

Joseph F. Savage, Jr. (BBO# 443030)
Alison V. Douglass (BBO# 646861)
Abigail K. Hemani (BBO # 650721)
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
Tel: 617-570-1000

Brian D. Boyle (*pro hac vice*)
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC, 20006
Tel: 202-383-5300


Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

    A.    The Parties And 401(k) Plans ........................................... 3

    B.    The Float Process ............................................................. 4

ARGUMENT ....................................................................................................... 6

I.    SUPPLEMENTAL MOTIONS AND STANDARD OF REVIEW ..................... 6

II.    FLOAT IS NOT A PLAN ASSET UNDER THE FACTS ALLEGED IN THE COMPLAINT ............................................................................. 7

    A.    Depository Float Is Not A Plan Asset .................................... 8

        1.    The Plans Owned Shares in the Investment Options, Not the Float Used To Pay for Them ................................... 8

        2.    The Depository Account Was Registered to the Investment Options ................................................ 10

    B.    Redemption Float Is Not A Plan Asset Either ......................... 11

        1.    Plaintiffs Had No Right to Interest on Uncashed Redemption Checks ................................................ 11

        2.    The Redemption Account Was Likewise Registered to the Investment Options ........................................ 12

III.    THE COURT CAN AND SHOULD HOLD ON THIS MOTION TO DISMISS THAT PLAINTIFFS HAVE FAILED TO STATE A CLAIM .......... 15

    A.    Plan-Asset Status May Be Resolved On A Motion To Dismiss .............. 15

    B.    Plaintiffs' Claim That Fidelity's Use Of Float Income To Pay Float Bank Account Fees Was A "Misappropriation" Of Plan Assets Is Similarly Ripe For Dismissal .................................... 16

        1.    The Eighth Circuit's Conclusion that Float Was Not a Plan Asset Makes Irrelevant Any Inquiry Into the Trust Agreements' Assignment of Responsibility for Bank Fees ......... 16

        2.    Even if Float Were a Plan Asset, the Use of Float To Defray Bank Fees Would Have Been Consistent with the Plans' Trust Agreements ............................................ 17

        3.    If, Indeed, It Were Necessary To Consult "Agreements Outside the Complaint" To Resolve Plaintiffs' Bank Fee Claim, Plaintiffs' Class Allegations Would Have To Be Stricken ................................................ 19

CONCLUSION .................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
824 F. Supp. 2d 1164 (C.D. Cal. 2011) ........................................................ 6

*Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*,
941 F.2d 561 (7th Cir. 1991) .................................................................. 10

*Butler v. Deutsche Bank Trust Co. Ams.*,
748 F.3d 28 (1st Cir. 2014) ........................................................... 7, 8, 16

*Christensen v. Harris County*,
529 U.S. 576 (2000) ............................................................................ 14

*Coleman v. Pension Ben. Guar. Corp.*,
196 F.R.D. 193 (D.D.C. 2000) .................................................................. 6

*Curran v. Cousins*,
509 F.3d 36 (1st Cir. 2007) .................................................................... 17

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
725 F.3d 406 (3d Cir. 2013) .................................................................. 13

*Faber v. Metro. Life Ins. Co.*,
648 F.3d 98 (2d Cir. 2011) .......................................................... 8, 13, 16

*FTC v. Innovative Mktg., Inc.*,
654 F. Supp. 2d 378 (D. Md. 2009) ........................................................... 6

*George v. Kraft Foods Global, Inc.*,
641 F.3d 786 (7th Cir. 2001) ................................................................. 15

*In re Luna*,
406 F.3d 1192 (10th Cir. 2005) ................................................................ 8

*Leadsinger, Inc. v. BMG Music Publ'g*,
512 F.3d 522 (9th Cir. 2008) ................................................................. 15

*Mass. Delivery Ass'n v. Coakley*,
797 F. Supp. 2d 164 (D. Mass. 2011) ..................................................... 2, 7

*Merrimon v. UNUM Life Ins. Co. of Am.*,
845 F. Supp. 2d 310 (D. Me. 2012) ......................................................... 13

*Mogel v. UNUM Life Ins. Co. of Am.*,
540 F. Supp. 2d 258 (D. Mass. 2008) ...................................................... 13

*Mogel v. UNUM Life Ins. Co. of Am.*,
547 F.3d 23 (1st Cir. 2008) .......................................................... 12, 13, 14

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax
Fin. Holdings Ltd.*,
886 F. Supp. 2d 328 (S.D.N.Y. 2012) ...................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
632 F.3d 762 (1st Cir. 2011) ........................................................................ 20

*SEC v. Pentagon Capital Mgmt.*,
844 F. Supp. 2d 377 (S.D.N.Y. 2012) ........................................................ 9

*Silva v. Encyclopedia Britannica Inc.*,
239 F.3d 385 (2001) ...................................................................................... 6

*Tussey v. ABB, Inc.*,
No. 06-04305-CV-NKL, 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012) ........................ passim

*Tussey v. ABB, Inc.*,
746 F.3d 327 (8th Cir. 2014) ....................................................................... passim

*Wilson v. HSBC Mortg. Servs., Inc.*,
744 F.3d 1 (1st Cir. 2014) ........................................................................... 7

**Statutes**

26 U.S.C. § 401(k) ............................................................................................. 3

29 U.S.C. § 1103(c)(1) ...................................................................................... 17

29 U.S.C. § 1104 ............................................................................................... 17

U.C.C. § 3-112(a) ............................................................................................. 12

**Rules & Regulations**

17 C.F.R. § 270.22c-1 ....................................................................................... 9

29 C.F.R. § 2510.3-102(a)(1) ........................................................................... 11

Fed. R. Civ. P. 12(b)(6) ............................................................................ 6, 7, 20

Fed. R. Civ. P. 12(g) ......................................................................................... 6

Fed. R. Civ. P. 12(h)(2) .................................................................................... 6

**Other Sources**

DOL Adv. Op. 92-02A (Jan. 17, 1992) ........................................................... 8

DOL Adv. Op. 93-24A (Sept. 13, 1993) .................................................... 14, 15

DOL Field Assistance Bulletin 2002-3 (Nov. 5, 2002) ............................. 14, 15

DOL Information Letter (Aug. 11, 1994) ........................................................ 14

FASB ASC 962-205-45-1 ................................................................................ 9

FASB ASC 962-325-25-1 ................................................................................ 9

Richard B. Hagedorn & Henry Baily,
*Brady on Bank Checks* (rev. ed. A.S. Pratt 2012) ...................................... 12

## INTRODUCTION

This is a copycat action based on the since-reversed trial court decision in *Tussey v. ABB, Inc.*[1] Each of plaintiffs' three causes of action asserts that defendants (collectively, "Fidelity") violated the Employee Retirement Income Security Act ("ERISA") based entirely on a single conclusion of law reached by the *Tussey* district court: that money known as "[f]loat income" was a "Plan asset[]"—that is, an asset belonging to the ABB, Inc. ("ABB") 401(k) plan. 2012 WL 1113291, at *34. From that legal conclusion, the *Tussey* district court reasoned that Fidelity violated ERISA by (1) distributing the float income to the plan's investment options, rather than to the plan itself; and (2) using that income to pay bank fees incurred by the float bank accounts. *Id.* at *34-35; *see* Consolidated Complaint ("Compl.") ¶¶ 38, 70-73, 81-83, 90.

The present complaint is based exclusively on the district court record in *Tussey*, and, based on the "findings of fact," "conclusions of law," and "trial record" in that case, it contends that Fidelity violated ERISA "in the same way" as in *Tussey*. Compl. ¶¶ 6-7; *compare, e.g., id.* ¶¶ 41, 44, *with* 2012 WL 1113291, at *34-35.[2] Plaintiffs also allege—and although Fidelity disputes this point, on this motion it is obliged to assume—that "[t]he Trust Agreement at issue in *Tussey* was the same as the [putative class] Plans' Trust Agreements in all material respects." Compl. ¶ 31. Aside from seeking to pursue a class action, therefore, plaintiffs have alleged everything in *Tussey* and nothing more.

The complaint, accordingly, defeats itself: on March 19, 2014, the U.S. Court of Appeals for the Eighth Circuit reversed the very conclusion of law on which plaintiffs' claims depend, based on the very facts plaintiffs have borrowed for their allegations here. The court of appeals

---

[1] No. 06-04305-CV-NKL, 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012), *rev'd*, 746 F.3d 327 (8th Cir. 2014).

[2] Indeed, the complaint still asserts that Fidelity is subject to collateral estoppel by the now-reversed *Tussey* district court decision. Compl. ¶ 11.

explicitly agreed with Fidelity that "'[f]loat was not a plan asset,'" and thus that the ABB plan

had no right to receive income earned on that float.  746 F.3d at 340.  The court therefore held as

a matter of law that the facts before it—the same facts pled here—established no violation of

ERISA.  *Id.*  That decision was correct, and there is no contrary authority.  For the same reasons

the trial decision in *Tussey* was reversed, this complaint should be dismissed with prejudice.

There is no point in proceeding through costly discovery and a trial to adjudicate factual

allegations that raise no concern under ERISA.[3]

## FACTUAL BACKGROUND

Although Fidelity disputes many of the complaint's factual allegations,[4] for purposes of

this motion, those allegations—as well as the facts established by undisputed documents central

to, or incorporated by reference into, the complaint—are assumed to be true.  *See Mass. Delivery

Ass'n v. Coakley*, 797 F. Supp. 2d 164, 168 n.2 (D. Mass. 2011), *rev'd on other grounds*, 671

F.3d 33 (1st Cir. 2012).  Those allegations are as follows:

---

[3] In *Tussey*, Fidelity also argued that, even assuming float were a plan asset, the agreement between Fidelity and the ABB plan allowed Fidelity to use the plan's assets to pay bank fees and other fees associated with account administration.  The court of appeals did not reach that issue because it correctly concluded that float was not a plan asset; as a result, the plan had no legitimate interest in whether the float income was used to defray bank fees or for any other purpose.  *See Tussey*, 746 F.3d at 340 (because float was not a plan asset, "the district court erred in finding Fidelity breached its fiduciary duty of loyalty by paying the expenses on the float accounts and distributing the remaining float to the investment options").  The same is true here.  *See infra* pp.17-18.

[4] For example, Fidelity disputes the allegation that the "thousands of Plans throughout the country" that plaintiffs purport to represent have materially the same trust agreements.  Compl. ¶¶ 2, 30-31, 62.  It would indeed be very surprising if the thousands of agreements Fidelity reached over a period of decades with plans ranging from "mom and pop" shops to the likes of General Motors and Bank of America would be materially the same.  Indeed, plaintiffs themselves have begun to shy away from this allegation, recently asserting that this motion is premature because "the issue of whether float income is a plan asset is a factual issue based on agreements outside of the scope of the complaint" on which plaintiffs purportedly need discovery.  Joint Status Report, No. 13-cv-10222-DJC, No. 98 at 2 (June 16, 2014) ("Joint Status Report").

A.      **The Parties And 401(k) Plans**

Most of the named plaintiffs in this case are individuals (current or former employees) who participate, or have participated, in seven different employer-sponsored 401(k) plans ("Plans" or "Plan").  Compl. ¶¶ 14-19; *see* 26 U.S.C. § 401(k).  The other plaintiff is a corporate employer that sponsors an eighth Plan.  Compl. ¶ 20.  Employees who choose to participate in 401(k) plans make contributions to the plans from their salaries or wages.  *See generally Tussey*, 2012 WL 1113291, at *1; *Tussey*, 746 F.3d at 330-31; 26 U.S.C. § 401(k).  Employers often make additional contributions on participants' behalves, and together those contributions are allocated to individual participants' accounts within the plans.  *Id.*  Most of these 401(k) plans are participant-directed; plan sponsors select a lineup of investment options from which participants may choose for the investment of their accounts.  *See id.*; Compl. ¶ 43.  Often these investment options are mutual funds, although a variety of other investment vehicles are found in 401(k) plans as well.  (For ease of reference, this motion refers to the mutual funds and other investment vehicles offered in the Plans as the "investment options.")  As a legal matter, the Plans themselves own the shares of the investment options, on behalf of the participants.  *See Tussey*, 746 F.3d at 332.

Operation of a 401(k) plan requires a multitude of administrative services, including processing participants' contributions into the plan's investment options and facilitating withdrawals therefrom.  *See* Compl. ¶ 27.  Employers (on behalf of their plans) may contract with service providers like Fidelity to perform those administrative services.  Where Fidelity also serves as trustee to the plan, the contracts governing the terms under which Fidelity performs these services are typically referred to as "trust agreements."  *Id.* ¶¶ 27-31, 41, 44; *Tussey*, 2012 WL 1113291, at *1.

**B.  The Float Process**

As noted above, plaintiffs' complaint expressly incorporates the "findings of fact and conclusions of law" made by the *Tussey* trial court, relies on the "*Tussey* trial record," and alleges that "[t]he Trust Agreement at issue in *Tussey* was the same as [the putative class] Plans' Trust Agreements in all material respects."  Compl. ¶¶ 6, 7, 31.  Based on those materials, the Eighth Circuit recounted the process through which Fidelity handled float:

> When a Plan participant or ABB made a contribution to the Plan, Fidelity processed the contribution to the Plan investment option designated by the participant and credited the participant's account with shares in that investment option based on the closing share price on the date of the contribution.  ***The Plan became the owner of the selected investment option as of the date the contribution was made and the order was placed, entitling the Plan to any dividends or any other change in the fund that day.***  The contribution flowed into a depository account held at Deutsche Bank for the benefit of the Plan investment options.  For logistical reasons, the contribution could not be distributed to the investment option until the next day.  Money sitting in the depository account overnight before it is distributed to the Plan investment options is often described as "float."[]
>
> As is common practice for such accounts, Fidelity temporarily transferred the funds from the depository account overnight to secured investment vehicles to earn interest often called "float interest" or "float income."  The following day Fidelity transferred the principal back to the depository account.  Fidelity used the float income to pay fees on float accounts before allocating the remaining income to each investment option choosing to receive it in proportion to the option's share of the overnight account balance.  The float income benefitted all the shareholders of the investment option receiving it.

746 F.3d at 332 (footnote omitted) (emphasis added); *accord Tussey*, 2012 WL 1113291, at *32-34; Compl. ¶¶ 6, 7, 41, 43, 49.

The critical point with respect to so-called "depository float" (float on money used to purchase shares in investment options) is the one highlighted in the paragraph above:  on the very same day that a contribution is made, the Plan becomes the owner of the shares that the money was spent to purchase.  As the owner of the shares on Day 1, the Plan receives all of the

benefits of ownership on Day 1, including any gains on the fund and any dividends paid. 746 F.3d at 332. The claim rejected in *Tussey*—and repeated by plaintiffs here—is that the Plans were entitled to own both the shares they bought and the money that had already been spent to purchase those shares. *Id.* at 339-340.

The process at the back end, when participants made withdrawals from their account, was similar. As the Eighth Circuit explained, this "'redemption' float" consisted of:

> the money withdrawn from a Plan investment option by a participant requesting payment by check while the check remains uncashed. [The participant-requested] [d]isbursements are transferred to a redemption account held for the benefit of the investment options and treated in a similar manner to depository float, subject to federal and state tax withholding.

746 F.3d at 332 n.4; *accord* Compl. ¶¶ 44, 49; *Tussey*, 2012 WL 1113291, at *33. In other words, when a participant requested a withdrawal, the money went from the investment option from which shares were sold into *the bank account of the investment options*. Participants then received, at their option, either an electronic transfer of funds from that account or a check mailed to them that was supported by the funds in that bank account. Compl. ¶ 44. In banking terms, the investment options' account was the payor and the participant was the payee on such a check. Plaintiffs' claim regarding "redemption float" is that the Plans were entitled to the interest earned on the bank account funds underlying these checks for the period that they remained uncashed.

Finally, as the Eighth Circuit expressly concluded, "Fidelity did not receive the float or float interest." *Tussey*, 746 F.3d at 332; *see id.* at 332 n.4; *accord Tussey*, 2012 WL 1113291, at *33-34 (float income was paid to the banks for bank account fees and "*[a]ny* remaining float" income was distributed to the investment options) (emphasis added).

**ARGUMENT**

**I.     SUPPLEMENTAL MOTIONS AND STANDARD OF REVIEW**

Rule 12(g), Fed. R. Civ. P., permits a party to file a second motion to dismiss under Rule 12(b)(6) based on a defense that was not "available to the party" at the time of its "earlier motion." That is the case here. As explained above, this motion is based upon the Eighth Circuit's recent reversal of the legal conclusion on which each of plaintiffs' causes of action is premised—the trial court's ruling that float under Fidelity's system was a plan asset. The Eighth Circuit's decision was not issued until March 19, 2014, after Fidelity's initial motion to dismiss, and the *Tussey* plaintiffs' petition for rehearing was not denied until May 20, 2014.

Even if this defense were not newly available, moreover, the First Circuit has held that Rule 12(h)(2) exempts Rule 12(b)(6) motions from the consolidation provisions of Rule 12(g), and such motions "may be raised at any time in the proceedings before disposition on the merits." *Silva v. Encyclopedia Britannica Inc.*, 239 F.3d 385, 387-88 (2001). Plaintiffs do not deny that Fidelity ultimately may file this motion but assert it must wait until "the pleadings are closed." Plaintiffs' Letter to Court, No. 13-cv-10222-DJC, No. 97 at 2 (June 11, 2014) ("Pls.' Letter"). That contention is contrary to "the substantial amount of case law" permitting supplemental, pre-answer Rule 12(b)(6) motions where, as here, "they have not been filed for the purpose of delay, where entertaining the motion would expedite the case, and where the motion would narrow the issues involved." *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1175 (C.D. Cal. 2011) (quotation omitted) (to proceed otherwise would "contradict[] … Rule 1's mandate that the Rules[] 'should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding'"); *accord, e.g.*, *FTC v. Innovative Mktg., Inc.*, 654 F. Supp. 2d 378, 383-84 (D. Md. 2009) (consideration of second motion "especially warranted" where it addresses intervening precedent); *Coleman v. Pension*

6

*Ben. Guar. Corp.*, 196 F.R.D. 193, 196-97 (D.D.C. 2000) (citing decisions of "many courts" permitting successive motions).

In resolving a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the court "take[s] all facts pled, as well as all reasonable inferences to be drawn therefrom, in the light most favorable to the non-movant." *Butler v. Deutsche Bank Trust Co. Ams.*, 748 F.3d 28, 32 (1st Cir. 2014). At the same time, the court "disregard[s] statements or allegations that are merely conclus[ions]" of law. *Wilson v. HSBC Mortg. Servs., Inc.*, 744 F.3d 1, 7 (1st Cir. 2014) (internal quotations omitted). In addition to plaintiffs' allegations, the court may consider facts established by documents central to, or incorporated by reference into, the complaint; matters of public record; and matters of which the Court may take judicial notice—which in this case include the district court record and court of appeals' decision in *Tussey*. *See id.*; *Mass. Delivery*, 797 F. Supp. 2d at 168 n.2. Where, as here, a "complaint states no legally cognizable claim for relief," it should be dismissed. *Butler*, 748 F.3d at 30.

## II.     FLOAT IS NOT A PLAN ASSET UNDER THE FACTS ALLEGED IN THE COMPLAINT

Plaintiffs' complaint falls under the weight of its own reliance on the trial record and decision in *Tussey*. Each of plaintiffs' three causes of action depends entirely on the *Tussey* trial court's legal conclusion that, under the circumstances alleged here, float income was a plan asset.[5] If float earnings were not an asset of the plans, then the uses to which those earnings were put is of no concern to the plans. Yet after plaintiffs filed and consolidated their complaints, the Eighth Circuit reversed the *Tussey* court's plan asset ruling, and did so on the

---

[5] *See* Compl. ¶ 38 (alleged "ERISA violations arise from (1) [Fidelity's] practice of appropriating the float income earned on plan assets to pay banking fees that would otherwise be paid by Fidelity, and (2) their practice of investing float income generated by the Plans' assets for the benefit of investors other than the participants in the Plans"); *accord id.* ¶¶ 2-3, 9-10, 33-5, 37-40, 44, 51-54, 70-71, 73, 78, 80-83 (relying on assertion that float belonged to Plans).

same record that forms the basis for this suit.  746 F.3d at 332, 339-40; *see* Compl. ¶¶ 6-7, 38, 31, 73, 84.  The complaint accordingly must be dismissed.  *See generally Butler*, 748 F.3d at 32 (affirming dismissal after observing, among other things, that the court in a previous opinion "ha[d] previously considered, and found wanting, [the] precise challenge" raised in earlier case).

## A.     Depository Float Is Not A Plan Asset

As repeatedly stated by the Secretary of Labor and several courts of appeals, "plan assets" are to be defined "consistently with ordinary notions of property rights."  *Tussey*, 746 F.3d at 339; *see, e.g., Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 106 (2d Cir. 2011); *In re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005); *see also, e.g.*, Department of Labor ("DOL") Advisory Op. 92-02A (Jan. 17, 1992).  Plaintiffs' complaint falls under the Eighth Circuit's application of those ordinary notions to conclude that depository float was not a plan asset under the same facts alleged here; Fidelity therefore "did not breach any fiduciary duties with respect to the depository account."  *Tussey*, 746 F.3d at 339-40.  The court of appeals' decision reversing the trial court opinion on which plaintiffs exclusively rely was correct for multiple reasons.

### 1.     *The Plans Owned Shares in the Investment Options, Not the Money That Had Already Been Spent To Pay for Them*

First, float income was generated only *after* the Plans had already received their shares in the selected investment options.  As the Eighth Circuit explained:  as of 4:00 p.m. on the day the employer and the participants made contributions for investment, the Plans (on behalf of the participants) "became the owner[s]" of shares in "the selected investment option[s]," and were entitled to "the full benefit of ownership" of those shares, including any dividends or subsequent capital gains.  *Id.* at 332, 339; *see Tussey*, 2012 WL 1113291, at *32.

That the purchases are effective on the same date that the contribution is made is established in the trust agreement, *see* Decl. of Alison V. Douglass (June 30, 2014) Ex. 1 at §

4(d)(i) (Trust Agreement between Asea Brown Boveri Inc. and Fidelity Management Trust

Company (May 1, 1995) (hereinafter "ABB Trust Agreement")), and, indeed the finality and

irrevocability of those purchases as of 4:00 p.m. on that date is established by both federal

securities law and general accounting principles.  The Investment Company Act requires that

mutual fund purchase and redemption orders be executed at the price "next computed" after the

order is placed.  17 C.F.R. § 270.22c-1.  Unlike stocks, the value of which can change from

moment to moment, mutual funds are required to price once daily, *id.*, and by nearly uniform

market practice the pricing takes place when the stock exchanges close each day at 4:00 p.m.

*See SEC v. Pentagon Capital Mgmt.*, 844 F. Supp. 2d 377, 419 (S.D.N.Y. 2012), *aff'd in relevant*

*part*, 725 F.3d 279 (2d Cir. 2013).  This is a strict rule:  an investor may not, for example, place a

purchase order before 4:00 p.m. and then cancel the purchase after 4:00 p.m.  *See id.* at 418.

Thus, once a purchase order is placed, the investor owns the shares at that day's 4:00 p.m. price,

and gets the benefit of any price rise and any dividends (along with the risk of any price decline)

from that time forward.  In addition, generally accepted accounting principles established by the

Financial Accounting Standards Board ("FASB") likewise mandate that ERISA-governed plans

prepare financial statements under a method that "requires that purchases and sales of securities

be recorded on a trade-date basis."  FASB ASC 962-325-25-1; *id.* 962-205-45-1.  As of 4:00

p.m., therefore, contributed money had not only been transferred to an account owned by

investment options, it had been transferred irrevocably.

As the Eighth Circuit recognized in *Tussey*, "[o]nce the Plan became the owner of the

[investment-option] shares, it was no longer also the owner of the money used to purchase

them."  *Tussey*, 746 F.3d at 340.  The Seventh Circuit reached a similar conclusion when it

considered a plan that received the benefits of ownership a week before the plan's money

ultimately reached the investment option in question (an annuity).  *Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569 (7th Cir. 1991).  The court held that where the plan's administrator got the benefit of annuity ownership (interest) "from the day that the funds were received," the plan had no claim to also receive "the value of the float" earned on that money.  *Id.* at 564-65, 569.  That principle applies here, as well:  plaintiffs' Plans owned the investment-option shares on the date contributions were made, and thus cannot claim income from the float thereafter.  There is no "ordinary notion of property rights" in which a purchaser is entitled to own both the item he has purchased (such as mutual fund shares) and the money he has irrevocably spent to purchase it.  *See Tussey*, 746 F.3d at 339 (finding "persuasive" "Fidelity's appeal to basic property rights").[6]  By the time float interest was generated, the Plans owned the investment option shares; they did not own the float.

2.      *The Depository Account Was Registered to the Investment Options*

Another fact established (and undisputed) in *Tussey* that mandates this same conclusion is that Plan contributions used to purchase investment option shares were held not in an account owned by the Plans, but rather an account that was registered on behalf of the *investment options*. *Tussey*, 2012 WL 1113291, at *32.  This, of course, was a two-way street for the investment options.  While it entitled them to the interest earned on the account, it also meant that they bore all of the risk of loss—a risk from which the Plans were protected.  That risk was not academic

---

[6] A plan and a service provider could, of course, choose a different arrangement under which the plan is permitted to simultaneously own shares and enjoy the benefits of the money used to purchase them.  Any sale on credit reflects such a "buy now, pay later" arrangement.  But plaintiffs have not alleged any such agreement here.  Rather, they assert their Plans' trust agreements are materially identical to the ABB Trust Agreement, *see* Compl. ¶¶ 30-31, which provided that the purchase of investment options was made, and shares exchanged, on the day the contribution was received.  *See* ABB Trust Agreement § 4(d)(i); *see also Tussey*, 746 F.3d at 339-40 (holding that, under "circumstances of this case," Plan lacked right to depository account float).

or hypothetical:  during the putative class period here, which encompassed the financial crisis, over 400 banks failed.  *See* Fed. Deposit Ins. Bank Corp., Failed Bank List, http://www.fdic.gov/ bank/individual/failed/banklist.html (June 24, 2014).  Because the Plans did not own the depository account, however, they were insulated from the risk of losing the account funds due to bank failure—or from theft or mistake.  The Plans cannot now retroactively be entitled to earnings from an account for which they never bore the risk of loss in the first instance.  *See Tussey*, 746 F.3d at 340 (concluding that "the Plan investment options held the property rights in the depository float and were entitled to the float income").[7]

### B.  Redemption Float Is Not A Plan Asset Either

#### 1.  *Plaintiffs Had No Right to Interest on Uncashed Redemption Checks*

As the Eighth Circuit concluded in *Tussey*, Plaintiffs' copycat allegations provide no basis to conclude that "the Plan had any rights in the redemption account balance."  *Tussey*, 746 F.3d at 340.  When a participant requested a withdrawal from his Plan account, shares of the investment options in his account were redeemed and the proceeds deposited in *the investment options'* redemption account.  The participant was thereafter sent (at his option) either an electronic wire of the funds or a check written on redemption account assets.  Compl. ¶ 44; *Tussey*, 2012 WL 1113291, at *33-34.  Until the check was cashed, the participant did not yet own the funds supporting it and had no right to collect interest.  Indeed, as a matter of black-

---

[7] The dissent in *Tussey* did not dispute the majority's conclusion that "basic principles of property law" confirm that depository float is not a plan asset.  746 F.3d at 341 (Bye, J., dissenting).  The dissent instead believed those principles were "not persuasive in light of" a DOL regulation, 29 C.F.R. § 2510.3-102(a)(1), which declares that contributions to a plan are deemed to be plan assets as of the date they can be understood as segregated from the employer's account.  *See* 746 F.3d at 341 (Bye, J., dissenting).  The question here, as in *Tussey*, however, is not when contributions *become* plan assets, but rather whether they *remain* plan assets after they are exchanged for investment-option shares and deposited in the investment options' depository account.  The DOL regulation does not address that question, much less answer it.

letter commercial law, the payee of an uncashed check has no title in or right to interest on checking account funds. *See Tussey*, 746 F.3d at 340; U.C.C. § 3-112(a); Richard B. Hagedorn & Henry Baily, *Brady on Bank Checks* ¶ 4.05 (rev. ed. A.S. Pratt 2012) ("Because delivery of an ordinary, uncertified check is only conditional payment … the check vests no title or interest in the payee on deposit in the drawer's bank account and the check is deemed revocable by the drawer until it is paid."). Participants, therefore, had no claim to the redemption float.

> 2.    *The Redemption Account Was Likewise Registered to the Investment Options*

Any suggestion that *the Plans* owned the money while *participants'* checks remained uncashed is even more far-fetched. Plaintiffs have alleged not a single fact suggesting that the Plans themselves were the payors of those checks. On the contrary, the redemption account was registered on behalf of the investment options. Compl. ¶ 44; *Tussey*, 2012 WL 1113291, at *33. The investment options bore the risk attendant to ownership of that account—of bank failure, fraud, or defalcation—and were accordingly entitled to the full benefits of account ownership, including the account's earnings. There is no "ordinary notion of property rights" under which a party that bore no risks of owning an account can retroactively demand the earnings on that account. *See supra* pp.10-11.

None of the authorities on which plaintiffs have relied is to the contrary. To begin, the plaintiffs are simply wrong in their assertion that "the Eighth Circuit's decision in *Tussey* conflicts with the First Circuit's decision in *Mogel v. Unum Life Ins. Co. of Am.*, 547 F.3d 23 (1st Cir. 2008)." Pls.' Letter at 2. *Mogel* turned on an insurer's radically different method for paying group life insurance proceeds and, accordingly, addressed an entirely inapposite set of facts. In *Mogel*, instead of sending the beneficiary a check for the lump sum due, as Fidelity does with participant redemptions, the defendant insurance company established a so-called "security

account" and sent the beneficiary a checkbook he could use to write checks on that "account" at his discretion. The First Circuit concluded that the establishment of the security account was not the same as the "lump sum payment" called for by the insurance policy itself: "the euphemistically named 'Security Account,' accompanied with a checkbook, was no more than an IOU *which did not transfer the funds to which the beneficiaries were entitled out of the plan assets*." 547 F.3d at 27 (emphasis added). The court explained that its decision depended on "[t]he difference between delivery of a check and a checkbook"—precisely the difference between that case and plaintiffs' case here. *Id.* at 26 (quoting *Mogel v. UNUM Life Ins. Co. of Am.*, 540 F. Supp. 2d 258, 262 (D. Mass. 2008)). There is no dispute that, by contrast, Fidelity promptly sends each participant a check or electronic transfer for his full redemption.

Plaintiffs therefore err in characterizing *Mogel* as holding that "sums owed to plan participants are plan assets subject to fiduciary duties until the participant actually cashes the check and any interest earned pending presentment of the check is also a plan asset." Pls.' Opp. to Mot. to Dismiss at 5. *Mogel* concluded that delivery of the checkbook (rather than a check) could support a claim in that case only because it contravened the specific terms of the plan documents at issue: the defendant "retained and invested death benefits *presently due beneficiaries under [the] ERISA plan*" instead of issuing the required lump-sum payments. 547 F.3d at 26 (emphasis added); *see Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 428 (3d Cir. 2013) ("[W]e do not read *Mogel* as holding the retained assets were plan assets."); *Faber*, 648 F.3d at 106-07 (agreeing with DOL that *Mogel* "is better understood as predicated on the fact . . . that the insurer failed to abide by plan terms"). Indeed, the court in *Merrimon v. UNUM Life Insurance Company of America* specifically observed that *Mogel*'s holding "did *not* require the First Circuit to find that the sums due to those plaintiffs were plan assets." 845 F. Supp. 2d

310, 318-19 (D. Me. 2012) (emphasis added).  Because *Mogel* did not consider or resolve either the facts or the legal issues presented by this case, it cannot salvage plaintiffs' claims.

The DOL informal guidance materials on which plaintiffs and the *Tussey* dissent rely are likewise inapposite, *see* Compl. ¶ 37 (citing DOL Adv. Op. 93-24A (Sept. 13, 1993) and DOL Field Assistance Bulletin 2002-3 (Nov. 5, 2002)); *Tussey*, 746 F.3d at 341 (Bye, J., dissenting) (citing a DOL Information Letter (Aug. 11, 1994), http://www.dol.gov/ebsa/regs/ILs/ il081194.html ("1994 Info. Letter")).  Those documents, as the complaint and dissent themselves suggest, focus solely on circumstances where a service provider *retains* income earned on a float account.  *Tussey*, 746 F.3d at 341 (Bye, J., dissenting) (information letter "stat[es] self-dealing is improper with respect to retaining earnings on float"); *see* DOL Adv. Op. 93-24 (considering whether trust company's "receipt of income from the 'float' on benefit checks" was a prohibited transaction); 1994 Info. Letter (addressing "prohibited self-dealing by banks"); DOL Field Assistance Bulletin 2002-3 (describing potential considerations where "service provider will be retaining 'float'").  In this case, however, as the Eighth Circuit stated, "Fidelity did not receive the float or float interest."  *Tussey*, 746 F.3d at 332; *accord Tussey*, 2012 WL 1113291, at *32- 33.[8]

Moreover, because each DOL source was focused on the distinct, inapposite issue of float retention, none of them answers the separate, dispositive question here:  under what

---

[8] In any case, the DOL materials are not entitled to the deference accorded to formal regulations.  *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in formats such as opinion letters are entitled to respect ... but only to the extent that those interpretations have the power to persuade.") (internal quotation and citation omitted)).  Also, it is notable that the DOL, which appeared in *Tussey* as amicus curiae, took no position in its amicus brief on the float issues in the case.  *See* Br. for the Sec'y of Labor as Amicus Curiae Supporting Plaintiffs-Appellees, *Tussey v. ABB, Inc.*, No. 12-2056 (8th Cir. June 17, 2013). Having chosen to participate as an amicus, DOL's failure to even address float in its brief speaks volumes.

circumstances is a float bank account a plan asset in the first place? *See* DOL Adv. Op. 93-24

(Trust Company did not dispute funds in account were "plan assets" before checks written);

DOL Field Assistance Bulletin 2002-3 (following up on Advisory Opinion and Information

Letter).[9]   That question is, as other DOL guidance provides, answered by ordinary notions of

property rights, and those notions all establish that float here was not a plan asset as a matter of

law.  *See Tussey*, 746 F.3d at 339-40.

## III.   THE COURT CAN AND SHOULD HOLD ON THIS MOTION TO DISMISS THAT PLAINTIFFS HAVE FAILED TO STATE A CLAIM

Finally, plaintiffs have suggested, without citing any authority, that this motion is

premature because: (1) "whether float income is a plan asset is a mixed question of fact and law

that cannot be decided on a motion to dismiss"; and (2) the issues in this case, including

plaintiffs' claim that Fidelity "misappropriated" plan assets when it used float income to pay

bank fees on the float accounts, require assessment of "agreements outside the scope of the

complaint."  Pls.' Letter at 2; Joint Status Report at 2.  Neither of those arguments has merit.

### A.   Plan-Asset Status May Be Resolved On A Motion To Dismiss

To begin, even assuming plaintiffs are correct that plan-asset status is a mixed question of

fact and law, nothing prevents the court from resolving such a question on a motion to dismiss.

*See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) ("Fair use is a

mixed question of law and fact" but "may be considered on a motion to dismiss, which requires

the court to consider all allegations to be true"); *Plumbers, Pipefitters & MES Local Union No.

392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 337 (S.D.N.Y. 2012)

---

[9] The same is true of *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 801 (7th Cir. 2001), which does not address the question whether and when float qualifies as a plan asset. Rather, the decision was premised on the fact that the float in that case was composed of "funds that remained on deposit . . .  pending clearance of a check written on Plan assets." *Id.* at 800.

("'mixed question of law and fact'" was not "immune from analysis at the motion to dismiss

stage" (citation omitted)).  In fact, the Second Circuit in *Faber* granted a defendant's motion to

dismiss an ERISA complaint after concluding the monies at issue were not plan assets.  648 F.3d

at 106-07.  Where, as here, the only facts plaintiffs allege, taken as true, are insufficient to

support a cognizable claim, the complaint must be dismissed.  *Butler*, 748 F.3d at 30.

> **B.** **Plaintiffs' Claim That Fidelity's Use Of Float Income to Pay Float Bank Account Fees Was A "Misappropriation" Of Plan Assets Is Similarly Ripe For Dismissal**

Plaintiffs also suggest that "agreements outside the scope of the complaint" (Joint Status

Report at 2) must be examined before the Court may resolve this motion.  That contention

appears to center on plaintiffs' "misappropriation" claim—the allegation that Fidelity violated

ERISA because the Plans' trust agreements purportedly prohibited using plan assets to pay bank

fees.  Compl. ¶¶ 70-72.  Plaintiffs are again mistaken: the "bank fee" claim fails as a matter of

law for at least two reasons that materials outside the *Tussey* record cannot change.

> 1. *The Eighth Circuit's Conclusion that Float Was Not a Plan Asset Makes Irrelevant Any Inquiry Into the Trust Agreements' Assignment of Responsibility for Bank Fees*

First, plaintiffs' claim of misappropriation fails because it depends on the contention that

the assets allegedly "misappropriated" belonged to the Plans to begin with.  *See*, *e.g.*, Compl. ¶

38.  As explained above, the Eighth Circuit correctly held that float was *not* a plan asset.

Because the float income did not belong to the Plans, the utilization of those earnings was not the

Plans' concern.  *See Tussey*, 746 F.3d at 340 (because float was not "a Plan asset," the *Tussey*

trial court "erred in finding Fidelity breached its fiduciary duty of loyalty by paying the expenses

on the float accounts and distributing the remaining float to the investment options").

Moreover, as noted previously, the bank accounts that held the float were registered for

the benefit of the *investment options,* and, accordingly, the investment options received the

income earned on those accounts.  The income they received was net of the bank fees needed to

generate that income.  In other words, plaintiffs' cry of "misappropriation" boils down to the

unexceptionable fact that the investment options receiving the earnings from the float accounts

also paid the bank fees on those accounts.

2.   *Even if Float Were a Plan Asset, the Use of Float To Defray Bank Fees Would Have Been Consistent with the Plans' Trust Agreements*

Even if float were a plan asset, the ABB Trust Agreement expressly authorized Fidelity

to use Plan-related funds to pay banking and similar administrative fees.  This is, of course,

consistent with ERISA.  Although the Eighth Circuit had no need to reach this issue because it

correctly concluded that float was not a plan asset, ERISA expressly provides that a fiduciary

may use the "'assets of a plan'" for the purpose of "'defraying reasonable expenses of

administering the plan.'"  *Tussey*, 2012 WL 113291, at *35 (quoting 29 U.S.C. § 1103(c)(1)); *see*

29 U.S.C. § 1104 ("a fiduciary shall discharge his duties with respect to a plan … for," among

other things, "defraying reasonable expenses of administering the plan").  That is, even if one

assumes arguendo that the float process was part of the Plans' administration, then ERISA would

have permitted the direct expenses associated with that administration to be charged to the Plans.

Under the ABB Trust Agreement—which plaintiffs allege to be "material[ly]" the

"same" as the agreements in this action, Compl. ¶ 31—Fidelity would have been expressly

authorized to charge bank fees stemming from Plan transactions to the Plans themselves.  *See*

ABB Trust Agreement §§ 1, 4(k)(vii), 6.[10]  The section of the ABB Trust Agreement that

---

[10] The ABB Trust Agreement is properly before the Court on this motion to dismiss: it is part of the *Tussey* "trial record" on which the complaint is based and is both described in the complaint and central to plaintiffs' claims. *Id.* ¶¶ 6, 7, 30-31, 84 (relying on ABB Trust Agreement and *Tussey* district court's interpretation of that agreement); *see Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007) (court may consider "documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint") (alteration in original).

governs "Compensation and Expenses" explicitly provides that "[a]ll expenses of the Trustee relating directly to the acquisition and disposition of investments constituting part of the Trust ... shall be a charge against and paid from the appropriate Plan participants' accounts."  ABB Trust Agreement § 6.  Section 4(k)(vii) of that Agreement further provides that Fidelity may "pay … reasonable expenses and compensation from the Trust" for "legal, accounting, clerical, and other assistance."  *Id.* § 4(k)(vii).  And Section 1 provides that assets in the ABB Plan consist of contributions made by participants "less the payments that are made by the Trustee as provided herein," confirming Fidelity's authority to deduct from Plan assets payments for the expenses specified in §§ 4 and 6.  *Id.* § 1.  Plaintiffs have identified nothing in their Plans' trust agreements dictating otherwise.

The *Tussey* ruling is not to the contrary.  Although the *Tussey* trial court concluded generally that the use of float income to defray bank fees was inconsistent with the parties' arrangement, the court did not base its ruling on any provision of the ABB Trust Agreement that purportedly was contravened by the bank fee payments, nor did the trial opinion even advert to the applicable provisions of that agreement.  *Tussey,* 2012 WL 1113291, at *33-34.  The trial court had heard extensive trial testimony describing a decade's worth of communications and dealings between ABB and Fidelity.  Whether the court's ultimate conclusion on bank fees was based on parole evidence about the overall relationship or on an interpretation of the agreement (based on the text of the agreement, or the text in context with the testimony) cannot be divined from anything in the opinion, *see Tussey,* 2012 WL 1113291, at *33-34, other than the fact that the text of the agreement is flatly inconsistent with the court's ruling.  Whatever the unstated basis for the trial court's extra-textual ruling, it is clearly irrelevant to this purported class action, which relies solely on the purported text of trust agreements.

18

3.      *If, Indeed, It Were Necessary To Consult "Agreements Outside the Complaint" To Resolve Plaintiffs' Bank Fee Claim, Plaintiffs' Class Allegations Would Have To Be Stricken*

Plaintiffs' eleventh-hour insistence on examining "agreements outside the scope of the complaint" cannot be squared with the complaint itself, which alleges that the putative class "Plans' Trust Agreements" are "the same as" "[t]he Trust Agreement at issue in *Tussey* … in all material respects."  Compl. ¶ 31; *see id.* ¶¶ 2, 62 ("Plans" describes plaintiffs' "proposed class" of "Plans throughout the country").  If the Court—as it must on this motion to dismiss—takes that allegation as true, then there is no need to consult any "agreements outside the scope of the complaint."  The Eighth Circuit had that "material[ly]" "same" ABB Trust Agreement before it when it held as a matter of law that float was not a plan asset under the very circumstances alleged in this complaint.  *Id.* ¶¶ 6, 7, 31.  And the ABB Trust Agreement is itself before this Court.  *Supra* p.17, n.10.  The only question for this Court, therefore, is whether the Eighth Circuit was correct in its ruling.  If it was correct, this case is over.

As noted above, *supra* p.2 n.3, plaintiffs' assertion that there are no material differences among the purported class's trust agreements—agreements that Fidelity entered into with thousands of widely-diverse plans over decades—is remarkable, and plaintiffs' late-breaking suggestion that they need to refer to "agreements outside the complaint" may suggest that they are retreating from that allegation of uniformity.  Indeed, in accordance with Phase I of the parties' agreed-upon document production in this matter, plaintiffs have since June 4, 2014 had copies of a sample of 32 trust agreements between Fidelity and putative class plans, including the agreements for their own Plans.  Despite the obvious differences among those agreements, plaintiffs have not chosen to amend their complaint—and having chosen to stand by their allegation that the agreements are all materially the same, they cannot now object to the Court

taking that allegation as true.  Rather, if plaintiffs wish to argue that the Court should allow plan-by-plan discovery into the agreements between Fidelity and thousands of other plans, they should, at a minimum, be required to amend the complaint to remove their class allegations, and proceed solely on behalf of the Plans of the named plaintiffs.  For if plaintiffs are correct when they assert that "the issue of whether float income is a plan asset is a factual issue based on agreements outside the scope of the complaint," Joint Status Report at 2, then the issue at the heart of this case is one that the named plaintiffs lack standing to assert for a class.  The named plaintiffs have no incentive to prove that agreements entered into by plans in which they did not participate precluded the use of plan assets to pay bank fees, so there is no "identity of issues" such that "the claims of the named plaintiffs necessarily give them—not just their lawyers— essentially the same incentive to litigate the counterpart claims of the class members."

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 770 (1st Cir. 2011).[11]

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed with prejudice.

Dated:  June 30, 2014

---

[11] If this case survives the pending motions, the alleged material uniformity the parties and Court must accept as true for purposes of Rule 12(b)(6) will quickly dissolve in the face of the myriad different relationships Fidelity has established with its thousands of highly-diverse plan clients—differences extending well beyond plan language and including actual knowledge and even damages, given that some Plans were not harmed at all under plaintiffs' theory of the case.  A suit asserting that an entity breached varying agreements with thousands of different partners is a textbook example of a case that cannot be certified as a class.

Respectfully Submitted,


FMR LLC, FIDELITY MANAGEMENT
TRUST COMPANY, FIDELITY MANAGEMENT
AND RESEARCH COMPANY, AND FIDELITY
INVESTMENTS INSTITUTIONAL
OPERATIONS COMPANY, INC.

By their attorneys,

/s/ Alison V. Douglass
Joseph F. Savage, Jr. (BBO# 443030)
Alison V. Douglass (BBO# 646861)
Abigail K. Hemani (BBO # 650721)
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1000
F: 617-523-1231
JSavage@goodwinprocter.com
ADouglass@goodwinprocter.com
AHemani@goodwinprocter.com

Brian D. Boyle (*pro hac vice*)
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC, 20006
T: 202-383-5300
F: 202-383-5414
bboyle@omm.com

## <u>CERTIFICATE OF SERVICE</u>

      I, Alison V. Douglass, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 30, 2014.

/s/ Alison V. Douglass