**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE FIDELITY ERISA FLOAT LITIGATION | CIVIL ACTION NO. 13-10222-DJC |

**FIRST AMENDED CONSOLIDATED COMPLAINT**

## I.    INTRODUCTION

1.      This Consolidated Complaint concerns fiduciary self-dealing that violates the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

2.      The Plaintiffs bring this class action on behalf of the ERISA retirement plans in which they are or have been participants or fiduciaries to recover investment earnings wrongfully taken by the Defendants from Plaintiffs' retirement plans and a host of similarly-situated ERISA retirement plans (collectively, "Plans").

3.      The Defendants (referred to collectively herein as "Fidelity" or "Defendants") caused certain of the Plans' assets to be deposited on an interim basis in accounts ("Deposit Accounts") before Defendants invested or disbursed monies as directed by the Plans. Plan funds in the Deposit Accounts earned interest, generally via investment in overnight securities. This interest is often referred to as "float." Float is a plan asset because the principal from which it is earned is a plan asset. Fidelity was the trustee for the Plans and their assets. It exercised authority or control over the investment of the Plans' assets in Deposit Accounts and over the float earned thereon. Accordingly, Fidelity was a fiduciary for the Plans with respect to float. As a fiduciary, Fidelity was prohibited from dealing with float for itself or for the benefit of another and was

required to deal with float with prudence and unflagging loyalty to the Plans. Fidelity instead used the float for itself and for the benefit of others.

4.      First, Fidelity misappropriated the Plans' float to pay trust and record-keeping and/or banking fees that Fidelity was contractually obligated to pay. Each time Fidelity used the Plans' float to pay these fees, Fidelity used the Plans' assets for its own benefit. Fidelity engaged in repeated self-dealing transactions and breaches of duty in violation of ERISA §§ 404 and 406 and Department of Labor Regulations, 29 C.F.R. § 2550.

5.      Second, Fidelity misappropriated the Plans' float and gave it to other Fidelity clients. Each time Fidelity gave the Plans' float to its other customers, Fidelity used the Plans' assets for the benefit of its other customers. Fidelity engaged in repeated transactions for the benefit of others and breaches of duty in violation ERISA §§ 404 and 406 and Department of Labor Regulations, 29 C.F.R. § 2550.

6.      Fidelity also concealed these ERISA violations. As explained further below, Mr. Duane Napier told Plaintiffs that in 1996, when Napier worked for Fidelity, he reported to his supervisor that Fidelity was improperly withholding float owed to several retirement plans. Napier's manager responded by warning Napier not to speak about Fidelity's float-skimming practices to others and threatening his career. Napier's Declaration (Exhibit 1 hereto) details this concealment by Defendants.

7.      Plaintiffs bring this action to recover the float interest Fidelity improperly took from Plaintiffs and the members of the proposed nationwide class in violation of ERISA.

## II.   JURISDICTION AND VENUE

8.      Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331(e)(1) and

ERISA § 502(e)(1). The claims asserted here are brought as a class action under Federal Rule of

Civil Procedure 23.

9.      Venue is proper in this district pursuant to ERISA § 502(e)(2) because this

District is where the breaches took place and where one or more of the Defendants reside or may

be found.

## III.   THE PARTIES

### A.   The Plaintiffs

10.     Timothy M. Kelley ("Kelley") is a former participant in both the Avanade, Inc.

401(k) Retirement Plan ("Avanade Plan") and the Hewlett-Packard Company 401(k) Plan ("HP

Plan"). Kelley resides in North Dakota. Kelley was an active participant in the Avanade Plan

from approximately February 2008 to July 2010. He was an active participant in the HP Plan

from approximately February 2007 to January 2008.

11.     Jamie A. Fine ("Fine") is and has been a participant in the Delta Airlines 401(k)

Plan ("Delta Plan") since on or about 1997. Fine resides in Georgia.

12.     Patricia Boudreau ("Boudreau") is a participant in the Bank of America 401(k)

Plan ("BOA Plan"). Boudreau resides in Massachusetts. Boudreau was an active participant in

the BOA Plan from 2005 until June 30, 2013.

13.     Alex Gray ("Gray") is a participant in the EMC Corporation 401(k) Plan ("EMC

Plan"). Gray resides in Massachusetts. Gray has been an active participant in the EMC Plan since

2008.

14.     Bobby Negron ("Negron") is a participant in the Safety Insurance Company 401(k) Plan ("Safety Insurance Plan"). Negron resides in Massachusetts. Negron has been an active participant in the Safety Insurance Plan since 2006.

15.     Korine Brown ("Brown") is a participant in the General Motors Personal Savings Plan ("GM Plan"). Brown resides in New York State. She has been an active participant in the GM Plan since 2007.

16.     Columbia Air Services, Inc. ("Columbia") is a Connecticut corporation with its principal place of business in Groton, Connecticut. Columbia has at all material times been the sponsor and administrator for the Columbia Group of Companies 401(k) Retirement Savings Plan ("Columbia Plan").

**B.     The Defendants**

17.     Fidelity Management Trust Company ("FMTC") is a Massachusetts corporation with its headquarters in Boston, Massachusetts. FMTC is a trust company and manages assets for over 500 institutional clients worldwide, with more than $175.5 billion in trusts and other assets under management as of June 30, 2012. As trustee, FMTC is, by definition, a fiduciary to the Plans.

18.     Fidelity Management & Research Company ("FMRC") is an affiliate of FMTC. FMRC is a registered investment company that serves as the leading asset manager and investment advisor for the Plans' investment accounts. FMRC has three divisions, two of which are located in Boston, Massachusetts. FMRC has over one trillion dollars under its administration and management.

19.     Fidelity Investments Institutional Operations Company, Inc. ("FIIOC") is an affiliate of FMTC and FMRC. FIIOC provides trust services, recordkeeping and information

management services for employee benefit plans. FIIOC serves as an agent to FMTC and is located in Boston, Massachusetts.

## IV.    THE PLANS

20.     The Plans are employee benefit plans within the meaning of ERISA §§ 3(3) and 3(2)(A). The purpose of the Plans is to provide retirement benefits to Plan Participants.

21.     The Plans are "defined contribution" or "individual account" plans within the meaning of ERISA § 3(34), in that they provide for individual accounts for each Participant and for benefits based solely on the amount contributed to those accounts plus any income, expenses, gains and losses, and forfeitures of accounts of other Participants which may be allocated to such Participant's account. Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account. The Plans, then, are typical 401(k) retirement plans similar to those offered by employers throughout the country.

22.     A number of services may be provided to defined contribution retirement plans in order for them to operate. Such services include investment management, consulting and financial advice concerning investment selection and monitoring, record-keeping to keep track of employee contributions and accounts, custodial or trust services to hold and invest plan assets, and communications to Participants to advise and educate Participants regarding the operation of the plan and investment of plan assets.

23.     The Plans entered into Trust Agreements with Fidelity to establish trusts to hold Plan assets.

24.     Under the Trust Agreements, FMTC agreed to accept all of the duties of trustee. In particular, FMTC agreed to open and maintain a trust account for each Plan and an individual trust account for each participant in the Plans; accept contributions on behalf of participants in

the Plans; and invest and reinvest Plan assets and hold Plan assets including assets in the Deposit

Accounts and float earned thereon, all in accordance with the terms of the Plans.

25.     Fidelity's Trust Agreements with the Plans provide that FMTC would charge

only three types of fees to the Plans: (1) an asset-based fee based on a percentage of plan assets

held in a particular Plan investment, (2) an administrative fee that is a fixed dollar rate per plan

participant (also known as a "hard-dollar" payment), and (3) fees for individual participant

services such as loans. Defendants were not authorized to receive any other consideration for

fees and expenses for managing the Deposit Accounts or other Plan assets.

26.     The Plans' Trust Agreements are substantially the same in all material respects:

- All Trust Agreements specified that FMTC would hold the assets of the trust funds, including in Deposit Accounts, for the exclusive benefit of plan participants and beneficiaries, and for the defraying of reasonable plan expenses.

- All Trust Agreements specified that FMTC was acting as a directed trustee of the Plan Administrator.

- All Trust Agreements gave FMTC broad powers to invest, retain, sell, exchange, or otherwise dispose of any of the assets of the trust fund, including funds in the Deposit Accounts.

- All Trust Agreements detailed the services that FMTC would perform and specified the fees that FMTC would charge for the services it provided.

- None of the Trust Agreements included any language that includes float income among permissible fees or otherwise authorizes Defendants to appropriate float income for their own or any other purposes.

## V.   DEFENDANTS' FIDUCIARY STATUS

27.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under

§ 402(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is

a fiduciary to the extent that "(i) he exercises any discretionary authority or discretionary control

respecting management of such plan or exercises any authority or control respecting

management or disposition of its assets, (ii) he renders investment advice for a fee or other

compensation, direct or indirect, with respect to any moneys or other property of such plan, or

has any authority or responsibility to do so, or (iii) he has any discretionary authority or

discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i).

28.     Defendant FMTC is a fiduciary of the Plan. As the Trustee, FMTC had "authority

or control respecting management or disposition of [plan] assets." Based on a review of the

Columbia Plan, a form or prototype plan used by Fidelity for hundreds of 401K plan accounts,

the Trust Agreements provide that FMTC had the duty and/or power, among other things, to

"open and maintain a trust account for the Plan," "to accept and hold" in the trust account

participant contributions, "to invest" the Trust Fund in Permissible Investments, to "retain

uninvested cash," including in Deposit Accounts, "to sell, lease, convert, redeem, exchange, or

otherwise dispose of all or any part of the assets constituting the Trust Fund," to "employ such

agents and counsel as may be reasonably necessary in collecting, managing, administering,

investing, distributing and protecting the Trust Fund or the assets thereof and to pay them

reasonable compensation," and "generally to exercise any of the powers of an owner with respect

to all or any part of the Trust Fund." The Trust Agreements also stated that "[t]he Trustee . . . and

***any other fiduciary*** shall discharge their duties under the Plan and this Trust Agreement solely in

the interests of Participants and their Beneficiaries in accordance with the requirements of

ERISA" (emphasis added). FMTC, as principal for its agent FIIOC, was and is a fiduciary concerning the violations alleged below.

29.     Defendant FIIOC is a fiduciary of the Plan. As the agent for FMTC, FIIOC established, managed and maintained the Deposit Accounts, including the Depository Account and the Redemption Account described herein, and used its discretionary authority and control to transfer Plan Assets to the REPO account and use float income to pay FMTC's bank fees and/or benefit investment accounts not held exclusively by the Plan. Accordingly, it had authority or control over the management or disposition of Plan Assets.

30.     Defendant FMRC is a fiduciary of the Plan by virtue of its discretionary management and control over Plan Assets transferred to the FICASH program. FMRC exercised discretion in choosing securities as overnight investments for plan assets.

## VI.     DEFENDANTS' FIDUCIARY DUTIES

31.     ERISA imposes on all plan fiduciaries the duty of loyalty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." ERISA § 404(a)(1).

32.     ERISA § 406(b)(1) prohibits a fiduciary from dealing with assets of a plan for its own interest or account. The Department of Labor has indicated, in both Advisory Opinion 93-24A and in Field Assistance Bulletin 2002-3, that a trustee's use of float income for its own benefit constitutes a prohibited transaction unless the trustee (1) disclosed the float to the independent plan fiduciary at the time the trustee was retained, (2) openly negotiated with the independent plan fiduciary to retain float income as part of its overall compensation, and (3) was not in a position to affect the amount of its float compensation, as it would, for example, if it had

"broad discretion over the duration of the float." FAB 2002-3. In particular, even if there is a float-related disclosure, the service provider may not use the float to cause "a plan to pay additional fees to the provider." *Id.* The Department of Labor's advisory opinions and field assistance bulletins are publicly available documents designed to provide guidance to the regulated ERISA community, including ERISA fiduciaries such as the Defendants, and the Defendants knew or should have known of these requirements.

## VII.   DEFENDANTS' VIOLATIONS OF ERISA

33.     The Defendants' ERISA violations arise from (1) their practice of appropriating float earned on Plan assets to pay banking fees that Fidelity was required to pay, and (2) their practice of misappropriating float income for the use of clients other than the participants in the Plans. These processes are further described below.

34.     The Plans' assets earned float in two ways relevant to this lawsuit: when plans first became a Fidelity trust client, and when plans and participants sold Fidelity mutual funds.

35.     First, when a retirement plan begins its trust relationship with Fidelity, among the first tasks is to deposit the plan assets with Fidelity pending investment in the various investment funds selected for the plan. It often takes several days, or even longer, from the date Fidelity receives the initial deposit until a new client's plan assets are invested in the selected funds. A large plan starting a new trust relationship with Fidelity might deposit hundreds of millions of dollars with Fidelity initially. Until the new client money is invested in the selected investment funds, Fidelity collects float on the money and uses the float first to pay Fidelity's banking fees and then gives away the remainder to other clients by crediting the float to its own mutual funds.

36.     All Plans that executed a trust agreement with Fidelity suffered from Fidelity's misappropriation of float at the outset of the trust relationship pending investment in selected investment funds.

37.     Second, during the Class Period, when Plan Participants withdrew funds from their Plan accounts, disbursements of Plan assets were triggered. The withdrawals were received by Participants after the following general sequence:

a.     The day after withdrawals were requested by Participants and investments were "sold," funds moved from the relevant investment option account into a redemption bank account. The redemption bank account was held at Deutsche Bank, and was registered to Fidelity Operations.

b.     Later that same day, the IRS was paid on any withdrawals that were taxable, and any remaining balances were transferred to the REPO Account.

c.     Once funds reached the REPO Account, they were immediately transferred to FICASH, an interest bearing account owned and controlled by Fidelity.

d.     The following day, after remaining with FICASH overnight, the principal of those funds was transferred back to the redemption bank account. The interest earned in the FICASH account was not transferred back to the REPO account as alleged below.

e.     Depending on state tax remittance schedules, state taxes were then paid.

f.     Either on or after the same day that the redemption bank account (the "Redemption Account") received funds back from the FICASH account, withdrawn funds were electronically disbursed from the redemption bank account to Participants who were able to receive electronic disbursements.

g.     For Participants who did not receive an electronic disbursement, withdrawn funds were transferred from the redemption bank account to an interest bearing disbursement bank account at Deutsche Bank owned and controlled by Fidelity. The disbursement bank account then issued a check to those Participants in the amount of the withdrawal but not including any interest. Participants receive the funds after they cash or deposit their checks.

h.    Fidelity retained some portion of the float income generated during the disbursement process for itself, and the remainder was credited to mutual funds – not to the Plans and their respective Participants who made the redemption. Thus, the entirety of float income earned on Participant withdrawals was taken by Fidelity for the benefit of itself or other clients.

38.    As used herein, the term "float" refers to both (a) the interest earned on amounts in the disbursement bank accounts pending the cashing of Participant checks and (b) interest amounts in the FICASH account.

39.    All of the accounts in the processes described above are Deposit Accounts that incurred bank expenses. Because maintaining these accounts was integral to the services Fidelity rendered to the Plans and Plan Participants, such bank expenses were part of Fidelity's ordinary operating expenses for recordkeeping and administering the Plans.

40.    Thus, Fidelity used float income to pay bank expenses that were operating expenses for administering Plan assets – and that should have been paid by Fidelity itself.

41.    By using the float income to pay their own operating expenses, Defendants diverted Plan assets and engaged in self-dealing in violation of ERISA. Defendants had already been paid for such trustee and administration services through revenue sharing arrangements with mutual funds and other sources as provided in its trust agreements.

42.    Following the payment of the Defendants' operating expenses, any remaining float interest was then distributed *pro rata* among various investment funds, rather than to the specific Plan Participants or beneficiaries whose redemptions generated the float income. As a result, interest generated by the Plans' assets was not used solely for the benefit of the Plans' Participants and beneficiaries.

43.    Under controlling First Circuit ERISA precedent, sums due plan participants "remain plan assets subject to [Fidelity's] fiduciary obligations until actual payment." *Mogel v.*

*Unum Life Ins. Co. of Am.*, 547 F.3d 23, 26 (1st Cir. 2008). Thus, when Fidelity liquidates a participant's holdings in an investment option—a redemption—the cash proceeds remain plan assets "until the check to the beneficiary is actually presented to the plan for payment through the banking system." *Id.* (quotation and citation omitted). Any interest on the cash proceeds, therefore, is also a plan asset. *Id.* at 26 n. 6.

44.     Further, with respect to new plan clients, money deposited with Fidelity for investment in selected funds remained a plan asset until Plans began to experience investment returns in the selected funds.

45.     Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." ERISA § 3(21)(A). This definition does not depend on payment or nonpayment of a fee to such a person. 29 C.F.R. § 2510.3-101(a)(2) ("[A]ny person who exercises authority or control respecting the management or disposition of such underlying [plan] assets, and any person who provides investment advice with respect to such assets for a fee . . . is a fiduciary of the investing plan.").

46.     Thus, the Defendants are fiduciaries to the Plans because they exercised authority or control over the Plans' assets in FICASH by directing such assets to be used to pay bank fees and to be invested in various overnight securities. Further, FMTC was the trustee for the accounts and for the Plans.

47.     The Plaintiffs had no knowledge of the Defendants' ERISA breaches and violations until shortly before the institution of these now-consolidated actions.

## VIII.     <u>FIDELITY CONCEALED ITS VIOLATIONS OF ERISA</u>

48.     Duane Napier is a Business Solution Architect employed by Avanade, Inc. (*See*

Exhibit 1 at ¶ 1.)

49.     Napier began working for Fidelity Investments in 1993. In 1996, he moved to the

Emerging Corporate Markets ("ECM") division, which handled retirement plans under $15

million, of Fidelity Institutional Retirement Services Co. ("FIRSCO"). (*Id*. at ¶ 2.) He was part

of the Implementation unit, which was responsible for transitioning retirement plan accounts

from other custodians to the Fidelity platform. (*Id*.) His title was Implementation Associate

Project Manager. (*Id*.) He left Fidelity in December 1996. (*Id*.)

50.     The ECM division at FIRSCO established and transitioned 'small company

retirement plans' to the Fidelity platform. During 1996, Duane handled the

implementation/conversion of plans to the Fidelity platform. (*Id*. at ¶ 3.) On any given day,

money wires flowed in to be credited to retirement plan accounts through that program. (*Id*.)

51.     Napier had been trained by Fidelity that wired funds from client accounts pending

investment in plan investment options were invested in interest bearing accounts, which interest

was to be credited to individual participant accounts within the given retirement plan. (*Id*. at ¶ 4.)

(The accounts had names such as L-GUY, K-GUY, and Z-GUY "GUY Accounts".) (*Id*.) The

interest was specified as the seven-day average yield of the selected money market fund for the

cash account. (*Id*.)

52.     One of Napier's retirement plan transition clients that had recently converted to

Fidelity complained to Napier that the plan should receive credit for the interest generated while

the wired funds were not invested. (*Id*. at ¶ 5.) Napier informed that Fidelity client that it was his

understanding that all interest generated on plan funds pending investment had been credited to

the plan's participants. (*Id*.) Nevertheless, Napier decided to investigate the matter. (*Id*.) He reviewed many electronic records and discovered that wired funds held by Fidelity before being deposited in the GUY Accounts were in fact earning interest that was not credited to Fidelity client retirement plans and their respective participants. (*Id*.)

53.     Napier began his investigation by referring to the posted daily mil rate (reflecting the true daily interest rate on which the seven-day average rate discussed above is based) and calculated what that Fidelity client should have earned since the day the funds had been wired. (*Id*. at ¶ 6.) He then compared the amount the client should have earned to what it had actually received and observed a substantial discrepancy that led him to believe there were several days of funds missing. (*Id*.)

54.     He then learned the date that the client had sent the wire and compared it to the date the funds first appeared in the GUY Account. There was a three day difference. (*Id*. at ¶ 7.)

55.     Napier asked his project managers and his manager Maria Pour about the date discrepancies. (*Id*. at ¶ 8.)  They explained to him "this was just the process" and that the so-called Automated Clearing House often took three days to clear a wire before the money was received by Fidelity. (*Id*.) He was told this was normal procedure at Fidelity. (*Id*.)

56.     Napier then reported to his client that it was the practice for wired funds to be held in suspense prior to being received by Fidelity. (*Id*. at ¶ 9.) The client did not accept that answer. (*Id*.) The client provided Napier with evidence that it had received a confirmation that Fidelity had received the wire and the date it was wired. (*Id*.) Napier obtained the wire details from the client and then contacted Fidelity's internal wire services department. (*Id*.)

57.     Fidelity's wire department verified that Fidelity had received the funds on the same day that the client had wired the funds. (*Id*. at ¶ 10.) The wire department also verified that

the transaction history reflected that the funds were not deposited in the GUY Account until three days after Fidelity received the funds. (*Id*.) The wire department also verified that the amount deposited in the GUY Account for the client was the same amount that had been wired by the client and that the remaining balance, *i.e.*, the interest earned for three days, remained in the Fidelity bank account in which the client's funds had been held for those three days. (*Id*.) The amount matched the daily mil rate that Napier had calculated. (*Id*.) The Fidelity wire department individual whom Napier spoke to told him that the accumulated interest on the Fidelity bank account was transferred to another Fidelity account on a periodic basis. (*Id*.)

58.     Napier then audited all of the clients that he had transitioned to Fidelity as well as a couple of clients from another Fidelity colleague. (*Id*. at ¶ 11.) In almost every case, the same thing had occurred: namely interest earned on Fidelity client funds between the client wire date and date of deposit into a GUY Account was not credited to the client, but kept in a Fidelity bank account. (*Id*.)

59.     Napier raised these findings with his manager, Mrs. Maria Pour. (*Id*. at ¶ 12.) He laid out all the facts for her, including detailed documentation of the accounts. (*Id*.) She asked Napier if he had told anyone else about his findings. (*Id*.) He told her he had mentioned it to one other person. (*Id*.)

60.     The Fidelity manager then asked about the score Napier received in his last review (as it turns out, he received the highest available score). (*Id*. at ¶ 13.) The Fidelity manager told Napier that he would not be receiving a raise or a bonus. (*Id*.) She told Napier to forget everything he had found about the interest earned between the wire date and deposit in the GUY Accounts. (*Id*.) The Fidelity manager said she could tell Napier was very "dejected" because Napier would not be getting a bonus or raise. (*Id*.) She threatened to put a note in

Napier's personnel file saying Napier was so upset and dejected that he was making up stories about Fidelity's practices and sowing discord in the organization. (*Id.*) The Fidelity manager said that if Napier spoke about float again, he would not go anywhere within the organization, it could be grounds for dismissal, and that he would never work in this industry again. (*Id.*)

61.     Napier was very disheartened by Mrs. Pour's response. (*Id.* at ¶ 14.) Napier thought he had done the ethical thing in investigating and reporting what he viewed as a serious financial problem for Fidelity's clients. (*Id.*) Napier decided to resign and called the Fidelity manager the next morning to do so, leaving a voice mail to that effect for Ms. Pour. (*Id.*)

## IX.     REMEDIES FOR VIOLATIONS OF ERISA

62.     ERISA § 502(a)(2) provides that a civil action for breach of fiduciary duty for relief under ERISA § 409 may be brought by a participant, beneficiary, or fiduciary of a plan.

63.     ERISA § 409 requires "any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate," which is actionable under ERISA § 502(a)(3).

64.     Plaintiffs are participants, beneficiaries or fiduciaries of the Plans and are therefore entitled to bring suit on behalf of the Plans seeking relief from the Defendants in the form of:

   a.     A monetary payment to the Plans to make good to the Plans the loss of benefits to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA §§ 409(a) and 502(a)(2);

   b.     Injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(3);

   c.     Disgorgement of profits earned thereon as a result of prohibited transactions;

d.     Reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), the common fund doctrine, and other applicable law;

e.     Taxable costs and interest on these amounts, as provided by law; and such other legal and equitable relief as may be just and proper; and

f.     Such other legal or equitable relief as may be just and proper.

65.     Under ERISA, each Defendant is jointly and severally liable.

## X.   CLASS ACTION ALLEGATIONS

66.     ERISA §§ 409(a) and 502(a)(2) authorize ERISA plan participants, beneficiaries and fiduciaries to sue in a representative capacity for losses suffered by plans as a result of breaches of fiduciary duty. Pursuant to that authority, the Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23. The Plaintiffs seek to restore losses to the Plans for which the Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2).

67.     **Class Definition**. The Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class the "Class"):

> Employee benefit plans covered by the Employee Retirement Income Security Act of 1974 subject to Internal Revenue Code §§ 401(a), (k), for which Fidelity has served as trustee or service provider from January 1, 1996 to the present ("the Class Period").

Excluded from the Class is the ABB PRISM Plan that was the subject of the litigation in *Tussey v. ABB, Inc.*, *et al.*, Case No. 06-04305-CV-NKL, in the U.S. District Court for the Western District of Missouri, Central Division.

68.     **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to the Plaintiffs at this time and can only be ascertained through appropriate discovery, the Plaintiffs

believe that the Class includes thousands of Plans throughout the country. Moreover, Fidelity Trust's website indicates that over 500 clients, with assets in excess of $260 billion, use its "custom trustee services." *See* http://institutional.fidelity.com.

69.     **Commonality**. The claims of the Plaintiffs and the Class originate from the same misconduct and violations of ERISA. Proceeding as a class action is particularly appropriate here because Fidelity uniformly applied its system for processing contributions and disbursements for the Plans, and, therefore, the Defendants' self-dealing in violation of ERISA's prohibited transaction provision has affected all Plans in the same manner. Furthermore, common questions of law and fact exist for all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

a.     Whether the Defendants are fiduciaries under ERISA;

b.     Whether the Defendants engaged in a prohibited transaction under ERISA § 406(b)(1) by using float for its own purposes to pay or offset bank expenses;

c.     Whether float is an asset of the Plans;

d.     Whether the Defendants breached their fiduciary duties by receiving excessive compensation and/or converting Plan assets to their own use;

e.     Whether the Defendants breached their fiduciary duties by failing to credit float in full to the Plans;

f.     Whether the Defendants breached their fiduciary duties by diverting to other investors float income that should have been included in the Plans;

g.     Whether the Defendants' acts proximately caused losses to the Plans;

h.     Whether the Class is entitled to damages and injunctive relief;

i.     Whether Defendants' conduct is permitted based upon any prohibited transaction exemption or other authority.

70.     **Typicality.** The claims asserted by the Plaintiffs on behalf of the their plans are typical of the claims of the members of the Class because the Plaintiffs' plans and the members of the Class sustained injury arising out of the Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein. The Plaintiffs' claims are also typical of the claims of the members of the Class inasmuch as the Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), and, thus, the Plaintiffs' claims on behalf of the Plans are not only typical of, but identical to, the claims of Class members. If cases were brought and prosecuted individually, each member of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

71.     **Adequacy.** The Plaintiffs will fairly and adequately protect the interests of the members of the Class. The Plaintiffs have retained competent counsel with experience in class action and ERISA litigation. The Plaintiffs and the plans they represent have no interests antagonistic to or in conflict with those of the Class.

72.     **Rule 23(b)(1)(A) & (B) Requirements.** Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for the Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

73.     **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

74.     **Rule 23(b)(3) Requirements.** Certification under Rule 23(b)(3) is also appropriate because common questions of law and fact clearly predominate over any questions affecting only individual members. Predominance is highlighted by the testimony of the witness for Fidelity during the *Tussey* trial indicating that Fidelity's system for processing contributions, distributions and transfers was the same for all of its plan clients. Moreover, a class action is superior to the other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.     CLAIMS FOR RELIEF

### COUNT ONE – BREACH OF FIDUCIARY DUTY

75.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

76.     Interest and income earned from plan assets are themselves plan assets, and, thus, float was a Plan asset.

77.     The Defendants owe to the Plans, their participants and beneficiaries extensive fiduciary duties including, without limitation:

20

a.      To perform duties with the utmost loyalty and fidelity to the Plans and their participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

b.      To ensure, at all times, that Plan assets shall be held for the exclusive purposes of providing benefits to Plan Participants and their beneficiaries;

c.      To ensure, at all times, that the Plans avoid prohibited transactions;

d.      To track and account for all transactions involving the Plans and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with Plan Documents and ERISA.

78.     The Defendants breached their fiduciary obligations to the Plans by using the float income for themselves to defray their own expenses.

79.     The Defendants also breached their fiduciary obligation of loyalty to the Class by giving float belonging to the Plans to other Fidelity clients.

80.     As a consequence of the Defendants' breaches, the Plans have suffered financial losses and damages equal to the amount of the float income together with any amounts that could have been earned thereon.

81.     Pursuant to ERISA §§ 409 and 502(a), the Defendants are personally liable to make good to the Plans for the losses the Plans experienced as a result of the Defendants' breaches of fiduciary duty.

82.     Pursuant to ERISA § 502(a)(3), the Court should also award equitable relief to the Class.

## COUNT TWO – PROHIBITED TRANSACTIONS

83.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

84.     ERISA § 406(a)(1) provides that a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . .

21

transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." ERISA

defines a "party in interest" to include "any fiduciary (including, but not limited to, any . . .

trustee)." ERISA § 3(14)(A).

85.     As discussed above, the Defendants were at all relevant times ERISA fiduciaries

with respect to the Plans. Thus, each was a "party in interest" pursuant to ERISA § 3(14)(H).

86.     The Defendants' use of the Plans' float income to pay the Defendants' bank fees

is a plan transaction within the meaning of ERISA § 406(a)(1).

87.     The Defendants knew or should have known that, by using plan assets to pay the

Defendants' bank fees for accounts such as the Depository Account and the REPO Account, they

were using Plan assets to indirectly benefit themselves, and each of them was a "party in

interest." Accordingly, the Defendants engaged in a prohibited transaction under ERISA

§ 406(a)(1).

88.     Additionally, ERISA § 406(b)(1) prohibits a fiduciary from dealing with the

assets of a plan for its own interest or account.

89.     The float retained by the Defendants, or used to benefit Defendants by payment of

their operating expenses, consisted of interest earned from Plan assets. The returns from

investing Plan assets in overnight securities are Plan assets, and each Defendant is a fiduciary.

90.     The Defendants violated ERISA § 406(b)(1) by using the float in their own

interests by defraying their own administrative expenses.

91.     The Department of Labor's Field Assistance Bulletin 2002-3 indicates that a

financial service provider's use of float income for its own benefit constitutes a prohibited

transaction under ERISA § 406(b)(1) unless the practice is disclosed and openly bargained-for at

the time the service provider is retained, and even then, only where the agreement does not

permit the service provider to affect (and in particular increase) the amount of its float compensation. The Defendants here (1) did not disclose the float income, (2) did not negotiate for extra compensation in the form of the float income, or provide the Plans with information sufficient to understand the Defendants' compensation, and (3) had discretion to use the float income to pay themselves excessive compensation. FAB 2002-3, therefore, confirms that the Defendants' actions constitute prohibited transactions under ERISA § 406(b)(1).

92.     As a result of the prohibited transactions engaged in by the Defendants, the Plans suffered losses in the form of the interest income retained by or applied for the benefit of the Defendants and the return the Plans would have realized on that income had it been prudently invested for their benefit by the Defendants.

93.     Pursuant to ERISA §§ 409, 502(a)(2) and 502(a)(3), the Defendants are liable to personally make good to the Plans the damages they sustained.

94.     Pursuant to ERISA § 502(a)(3), the Court should also award equitable relief to the Class.

## COUNT THREE – CO-FIDUCIARY LIABILITY

95.      Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

96.     **Knowledge of a Breach and Failure to Remedy**: ERISA § 405(a)(3) imposes co-fiduciary liability on fiduciary "A" for a fiduciary breach by fiduciary "B" if fiduciary A has knowledge of the breach by fiduciary B, unless fiduciary A makes reasonable efforts under the circumstances to remedy the breach. Each Defendant knew of the breaches by the other fiduciaries and made no reasonable efforts to remedy those breaches.

97.      **Knowing Participation in a Breach**: ERISA § 405(a)(1) imposes liability on fiduciary A for a breach of fiduciary responsibility of fiduciary B with respect to the same plan if fiduciary A participates knowingly in, or knowingly undertakes to conceal, an act or omission of fiduciary B, knowing such act or omission is a breach. As alleged above, each of the Defendants were intimately involved in the process of generating and improperly disbursing the float income, and, thus, knowingly participated in the improper management of that investment by the other Defendants.

98.      **Enabling a Breach**: ERISA § 405(a)(2) imposes liability on fiduciary A if, by failing to comply with ERISA § 404(a)(1) in the administration of the specific responsibilities which give rise to fiduciary status, fiduciary A has enabled fiduciary B to commit a breach. FMTC enabled the breach by engaging FIIOC and FMRC for purposes of effectuating transfers, contributions and distributions from plans.

99.      As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Class lost millions of dollars of retirement savings.

100.      Pursuant to ERISA §§ 409, 502(a)(2) and 502(a)(3), the Co-Fiduciary Defendants are liable to make good to the Plans for the losses caused by their breaches of fiduciary duty alleged in this Count and to provide other equitable relief as appropriate.

## XII.      **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      A determination that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, and appointing Plaintiffs as class representatives;

B.      A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      A Declaration that the Defendants, and each of them, breached ERISA fiduciary duties owed to the Plans;

D.      An Order compelling the Defendants to make good to the Plans all losses resulting from the Defendants' breaches of fiduciary duty and prohibited transactions;

E.      Imposition of a constructive trust on any amounts by which the Defendants were unjustly enriched at the expense of the Plans;

F.      An Order awarding damages to the Plans, with interest as provided by law;

G.      An Order enjoining the Defendants from any further violations of their ERISA fiduciary obligations;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) or as provided by law;

J.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants; and

K.      Granting such other and further relief as the Court may deem just and proper.

## XIII.      <u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand a jury trial on all claims so triable.

Dated: July 21, 2014

Respectfully submitted,

/s/ Gregory Y. Porter
Gregory Y. Porter
**BAILEY & GLASSER LLP**
910 17th Street, NW
Suite 800
Washington, DC 20004
Tel: (202) 463-2101
Fax: (202) 463-2103
Email: gporter@baileyglasser.com

Bradford S. Babbitt (BB 566390)
Craig A. Raabe
Elizabeth R. Leong
**ROBINSON & COLE LLP**
280 Trumbull Street
Hartford, Connecticut 06103-3597
Tel: (860) 275-8200
Fax: (860) 275-8299
Email: bbabbitt@rc.com
        craabe@rc.com
        eleong@rc.com

Elizabeth A. Ryan
John J. Roddy
**BAILEY & GLASSER LLP**
125 Summer Street, Suite 1030
Boston, MA 02110
Tel: (617) 439-6730
Fax: (617) 951-3954
Email: eryan@baileyglasser.com
        jroddy@baileyglasser.com

Robert A. Izard
Mark P. Kindall
**IZARD NOBEL LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email: mkindall@izardnobel.com
        rizard@izardnobel.com

Todd M. Schneider
Mark T. Johnson
**SCHNEIDER WALLACE COTTRELL KONECKY LLP**
180 Montgomery Street
Suite 2000
San Francisco, CA 94104
Tel: (415) 421-7100
Email: tschneider@schneiderwallace.com
        mjohnson@schneiderwallace.com

*Counsel for Columbia Air Services, Inc.*

Thomas G. Shapiro (BB 454680)
Michelle H. Blauner (BB 549049
**SHAPIRO HABER & URMY LLP**
Seaport East
2 Seaport Lane
Boston, MA 02210
Tel: (617) 439-3939
Fax: (617) 439-0134
Email: tshapiro@shulaw.com
        mblauner@shulaw.com

Garrett W. Wotkyns
Michael C. Mckay
**SCHNEIDER WALLACE COTTRELL KONECKY LLP**
8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Email: gwotkyns@schneiderwallace.com

*Counsel for Plaintiffs Patricia Boudreau, Alex Gray, Bobby Negron and Korine Brown*

*Counsel for Plaintiffs Timothy M. Kelley and Jamie A. Fine*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to registered CM/ECF participants.

*/s/ Gregory Y. Porter*
Gregory Y. Porter