*EXHIBIT 1*

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Timothy M. Kelley; and Jamie A. Fine; *and all others similarly situated,*<br><br>   Plaintiffs,<br><br>vs.<br><br>Fidelity Management and Trust Company; Fidelity Management and Research Company; Fidelity Investments; and John Does 1-25,<br><br>   Defendants. | CIVIL ACTION NO. 13-10222<br><br>CLASS ACTION COMPLAINT |

---

### DECLARATION OF DUANE NAPIER

---

I, Duane Napier, hereby declare as follows:

1. I am Business Solution Architect employed by Avanade, Inc. I reside Springboro, Ohio.

2. I started working for Fidelity Investments in 1993. In 1996, I moved to the Emerging Corporate Markets ("ECM") division, which handled retirement plans under $15 million, of Fidelity Institutional Retirement Services Co. ("FIRSCO"). I was part of the Implementation unit, which was responsible for transitioning retirement plan accounts from other custodians to the Fidelity platform. My title was Implementation Associate Project Manager. I left Fidelity in December 1996.

3. ECM established and transitioned 'small company retirement plans' to the Fidelity platform. During 1996, I handled the implementation/conversion of plans to the Fidelity platform.

1

On any given day, money wires flowed in to be credited to retirement plan accounts.

4. I had been trained by Fidelity that wired funds from client accounts pending investment in plan investment options, were invested in interest bearing accounts, which interest was credited to individual participant accounts within the given retirement plan. (The accounts had names such as L-GUY, K-GUY, and Z-GUY "GUY Accounts".) The interest was specified as the seven-day average yield of the selected money market fund for the cash account.

5. One of my retirement plan transition clients who had recently converted to Fidelity complained to me that the plan should receive credit for the interest generated while the wired funds were not invested. I, as I had been trained to do, informed the client that all interest generated on plan funds pending investment had been credited to the plan's participants. Nevertheless, I decided to investigate the matter. I reviewed many electronic records and discovered that wired funds were held by Fidelity before being deposited in the GUY Accounts was in fact earning interest that was not credited to retirement plans and their respective participants.

6. I began by referring to the posted daily mil rate (reflecting the true daily interest rate on which the seven-day average rate discussed above is based) and calculated what that client should have earned since the day the funds had been wired. I then compared the amount the client should have earned to what it had actually received and observed, a substantial discrepancy that led me to believe there were several days missing.

7. I then learned the date the client had sent the wire and compared it to the date the funds first appeared in the GUY Account. There was a three-day difference.

8. I asked my project managers and my manager Maria Pour about the date discrepancies. They explained to me this was just the process and that the so-called Automated Clearing House often took three days to clear a wire before the money was received by Fidelity. I was told this was normal procedure.

9. I reported to the client that it was the practice for wired funds to be held in suspense prior to being received by Fidelity. The client did not accept that answer. The client provided me with evidence that it had received a confirmation that Fidelity had received the wire and the date it was wired. I obtained the wire details from the client and then contacted Fidelity's internal wire services department.

10. Fidelity's wire department verified that Fidelity had received the funds on the same day that the client had wired the funds. The wire department also verified that the transaction history reflected that the funds were not deposited in the GUY Account until three days after Fidelity received the funds. The wire department also verified that the amount deposited in the GUY Account for the client was the same amount as had been wired by the client and that the remaining balance, i.e., the interest earned for three days remained in the Fidelity bank account in which the client's funds had been held for three days. The amount matched the daily mil rate that I had calculated. The individual whom I spoke to told me that the accumulated interest on the Fidelity bank account was transferred to another Fidelity account on a periodic basis.

11. I then audited all of the clients that I had transitioned as well as a couple of clients from another colleague. In almost every case, the same thing had occurred, namely interest earned on client funds between the client wire date and date of deposit into a GUY Account was not credited to the client, but kept in a Fidelity bank account.

12. I went to my manager, Mrs. Maria Pour, with these findings. I laid out all the facts for her, including detailed documentation for my accounts. I gave her all the documentation. She asked me if I had told anyone else. I told her I had mentioned it to one other person.

13. She then asked about the score I received in my last review, which I found disconcerting. I told a "4" (which was a perfect score under the system then in effect). She told me that I would not be receiving a raise or a bonus. Then she told me to forget everything I had found

3

about the interest earned between the wire date and deposit in the GUY Accounts. She then said she could tell I was very "dejected" because I would not be getting a bonus or raise. She added she would hate it if a file were placed in my personnel folder that stated I was so upset and dejected that I was making up stories about Fidelity's practices and sowing discord in the organization. She paused, and then continued, saying if I continued to talk about this I would not go anywhere in this organization, it could be grounds for dismissal, and that I would never work in this industry again. I asked if she was talking about "corporate black-ball." She responded, that she wouldn't use that phrase, but if it made me feel better about the situation, I should go right ahead.

14. I was very disheartened by Mrs. Pour's response. I thought I had done the ethical thing in investigating and reporting what I viewed as a serious financial problem for Fidelity's clients. I decided to resign and called her the next morning to do so. I left a voice mail tendering my resignation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed February 18, 2013 in Columbus, Ohio

*Duane Napier*