UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____  )
                                   )
IN RE FIDELITY ERISA               )        Civil Action No. 13-10222-DJC
FLOAT LITIGATION                   )
                                   )        **ORAL ARGUMENT REQUESTED**
                                   )
_____  )


**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT**

Joseph F. Savage, Jr. (BBO# 443030)
Alison V. Douglass (BBO# 646861)
Abigail K. Hemani (BBO # 650721)
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
Tel: 617-570-1000

Brian D. Boyle (*pro hac vice*)
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC 20006
T: 202-383-5300


Attorneys for Defendants

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 5

I.      401(K) PLAN ADMINISTRATION AND "FLOAT" ............................................. 5

II.     THE *TUSSEY* DECISIONS, AND THE EVOLUTION OF PLAINTIFFS' CLAIMS ...... 7

III.    THE OPERATIVE COMPLAINT ........................................................................... 8

ARGUMENT ....................................................................................................................... 9

I.      PLAINTIFFS' CLAIMS  FAIL AS A MATTER OF LAW. ............................................ 9

    A.      Plaintiffs' Claims Fail as a Matter of Law because Fidelity Is Not an ERISA Fiduciary as to Float, and Float Is Not a Plan Asset. ..................................9

    B.      Plaintiffs' Claim that Fidelity Violated ERISA by Using Float Income To Pay Bank Fees Fails as a Matter of Law..................................................17

II.     PLAINTIFFS' CLAIMS ARE TIME-BARRED............................................................ 19

III.    PLAINTIFFS LACK STANDING TO PURSUE THEIR CLASS CLAIMS. ................. 20

CONCLUSION..................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Beddall v. State Street Bank*,
    137 F.3d 12 (1st Cir. 1998) ...................................................................................9

*Butler v. Deutsche Bank Trust Co. Ams.*,
    748 F.3d 28 (1st Cir. 2014) ...................................................................................9

*David v. Alphin*,
    704 F.3d 327 (4th Cir. 2013) ...............................................................................19

*Fuller v. Suntrust Banks, Inc.*,
    744 F.3d 685 (11th Cir. 2014) .............................................................................19

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ...............................................................................13

*Merrimon v. Unum Life Ins. Co. of Am.*,
    758 F.3d 46 (1st Cir. 2014) ...........................................2, 3, 4, 9, 10, 11, 12, 14, 16

*Mogel v. Unum Life Ins. Co. of Am.*,
    547 F.3d 23 (1st Cir. 2008) ...........................................................................15, 16

*Pension Ben. Guaranty Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) ..................................................................................9

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011) ................................................................................20

*Tibble v. Edison Int'l*,
    729 F.3d 1110 (9th Cir. 2013) .............................................................................19

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) ...........................................................1, 2, 7, 11, 12, 13, 15

*Tussey v. ABB, Inc.*,
    No. 2:06-cv-04305, 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012) .......................7, 8, 14, 15

*Vander Luitgaren v. Sun Life Assurance Co. of Canada*,
    --- F.3d ---, 2014 WL 4197947 (1st Cir. Aug. 26, 2014) .........................2, 9, 10, 12

STATUTES

29 U.S.C. § 1101(b)(1) (ERISA § 401) ..................................................................13, 14

29 U.S.C. § 1104(a) (ERISA § 404(a))............................................................................8

29 U.S.C. § 1104(a)(1)(A)(ii) (ERISA § 404(a)(1)(A)) ..................................................18

29 U.S.C. § 1104(a)(1)(A)(ii) (ERISA§ 404(a)(1)(A)(ii)) ..............................................5

29 U.S.C. § 1106 (ERISA § 406)..............................................................................8, 9

**OTHER AUTHORITIES**

Department of Labor Adv. Op. 93-24..............................................................................17

Department of Labor Field Assistance Bulletin 2002-3 ..................................................17

Richard B. Hagedorn & Henry Baily, Brady on Bank Checks (rev. ed. A.S. Pratt 2012) ............11

Statement of Additional Information, Fidelity Contrafund. "Transfer and Service Agent
    Agreements" (Mar. 1, 2014) (available at
    http://www.sec.gov/Archives/edgar/data/24238/000071858114000008/main.htm#cft3
    02944) ....................................................................................................................14

U.C.C. § 3-112(a) (2002).............................................................................................11

Defendants Fidelity Management Trust Company, Fidelity Management and Research Company and Fidelity Investments Institutional Operations Company, Inc. (collectively, "Defendants," and collectively or individually, "Fidelity") submit this Memorandum in Support of Their Motion To Dismiss Plaintiffs' Second Amended Consolidated Complaint (the "Complaint") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

This is now the fourth iteration of Plaintiffs' complaint in this case.  In the current Complaint, Plaintiffs continue to pursue claims for breach of fiduciary duty and prohibited transactions under ERISA §§ 404 and 406, but they have now limited the scope of their claims to Fidelity's "Redemption Float" practices.  "Redemption Float" (hereafter "Float") is the cash held to pay checks sent to 401(k) plan participants who have withdrawn funds from their 401(k) accounts.  Plaintiffs argue, in essence, that income earned on Float between the time Fidelity cuts a withdrawal check and the time the participant cashes it belongs to the 401(k) plans.  In other words, the premise of the Complaint is that Float is an asset belonging to the 401(k) plan—an ERISA "plan asset"—and, thus, that any interest earned on Float also belongs to the plan.  But, earlier this year, three separate circuit court decisions—including two decisions by the First Circuit—flatly rejected ERISA claims in contexts that are either identical to or indistinguishable from this case.  Those decisions make clear that income earned on Float does not belong to the 401(k) plans, and that Fidelity has no obligation—fiduciary or otherwise—to give it to them.  Accordingly, Plaintiffs' ERISA claims fail as a matter of law.

The first decision, *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014), *reh'g denied* Order at 3, No. 12-2060 (8th Cir. May 20, 2014), concerned precisely the same Float practices that Plaintiffs challenge here.  The *Tussey* district court held that Fidelity violated ERISA by failing to pay income earned on Float to the ABB plan—a holding that prompted Plaintiffs to file the

1

instant copycat lawsuit on behalf of a class of "thousands" of other 401(k) plans serviced by Fidelity.  Compl. ¶ 49.  Indeed, the allegations in the Complaint in this case are pulled directly from the district court's findings of fact in *Tussey*.  But the Eighth Circuit has now reversed that decision.  With respect to Redemption Float—the only type of Float at issue in the current Complaint—the Eighth Circuit held that ordinary notions of property rights determine whether an asset is a "plan asset," and that, under such ordinary notions, "the funder of [a] check owns the funds in the checking account until the check is presented, and thus is entitled to any interest earned." *Tussey*, 746 F.3d at 340.  Because the *Tussey* plaintiffs did not establish that the plan was "'the funder of the check' or the owner of the funds in the [funding bank] account," the Eighth Circuit held that "the Plan had no right to float income from that account." *Id*.  On the identical facts alleged here, the same result follows.  Plaintiffs allege that Fidelity "owned and controlled" the bank accounts that funded the checks.  Compl. ¶ 33(g).  They do not, and could not, allege that these accounts were owned by the plans or even that they were registered on the plans' behalf.  Accordingly, under *Tussey*, Plaintiffs fail to state a claim.

Moreover, in the past three months the First Circuit has issued two decisions that are directly on point and that require dismissal here:  *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46 (1st Cir. 2014); and *Vander Luitgaren v. Sun Life Assurance Co. of Canada*, --- F.3d ---, 2014 WL 4197947 (1st Cir. Aug. 26, 2014).  In those cases, the First Circuit considered the applicability of ERISA §§ 404 and 406 to life insurers that issue insurance policies to ERISA-regulated employee welfare benefit plans.  (When life insurance policies are used to fund benefits under an employee benefit plan, the policy is governed by ERISA.)  In both cases, when a claim was approved, the life insurers set up a checking account, called a "retained asset account," for the beneficiary, credited that account with the value of the claim, and sent the

beneficiary a checkbook that she could use to draw down on the account at her discretion.  The insurer selected an interest rate to pay the beneficiary on the account and kept the rest of the interest earned for itself.  Beneficiaries brought suit, alleging that the insurers violated ERISA by not paying over to the ERISA plans all interest earned on the life insurance proceeds between the time each retained asset account was established and the time the beneficiary wrote herself a check and withdrew all of the assets credited to the account.  The First Circuit rejected this argument and dismissed the plaintiffs' claims.

According to the First Circuit, the defendants in *Merrimon* and *Vander Luitgaren* could not possibly have breached any fiduciary duties under ERISA by keeping the interest earned on the life insurance proceeds because, at the time that interest was earned, the defendants were no longer acting as fiduciaries.  As the court explained, "once the insurer fulfilled [its contractual] requirements, its duties as an ERISA fiduciary ceased."  *Merrimon*, 758 F.3d at 59.   In those cases, the governing contracts required (or permitted) the insurers to pay death benefits by establishing the retained asset accounts.  Accordingly, once the insurer had complied with its contractual duties by establishing those accounts, it had "fully discharged its fiduciary duties," and the only remaining relationship was "between the insurer and the beneficiar[ies]," and "in the nature of a debtor-creditor relationship, governed not by ERISA but by state law."  *Id.* at 58. The same reasoning applies here:  Fidelity's contracts with the plans permit it to pay withdrawals by sending checks.  Once Fidelity cuts a check to a withdrawing participant, it has "fully discharged its fiduciary duties" with respect to the withdrawn assets.  *Id*. at 59.  From that point forward, the only remaining relationship is between Fidelity and the individual making the withdrawal, and that relationship is "in the nature of a debtor-creditor relationship, governed not

by ERISA but by state law." *Id.* at 58.  As in the First Circuit cases, Fidelity cannot breach

ERISA fiduciary duties if its fiduciary relationship has terminated.

The First Circuit decisions in *Merrimon* and *Vander Luitgaren* also rejected plaintiffs'

argument that defendants were impermissibly "self-dealing in plan assets" because, as the court

explained, the retained funds were not plan assets at all.  *Id*. at 56.  Like the Eighth Circuit in

*Tussey*, the First Circuit looked to ordinary notions of property rights to determine whether an

asset is a "plan asset," and, applying such ordinary notions, it concluded that the funds in the

insurers' accounts that were used to pay death benefits belonged to the insurers and, then

eventually, to the beneficiaries:  At no point in time did these funds belong to the plans.  As

explained by Judge Selya, these funds were not "transmogrified into plan assets when they

[were] credited to a beneficiary's account."  Again, the same reasoning applies here:  The

Complaint alleges that, before the withdrawals, the funds were owned by the mutual funds—not

the plan—and that, when the withdrawals were made and the checks were cut, the bank accounts

on which the checks were drawn were "owned and controlled" by Fidelity.  To paraphrase Judge

Selya, there is no magic ERISA "transmogrification" that turns someone else's assets into plan

assets.  Here, as in *Merrimon* and *Vander Luitgaren*, the plans' lack of ownership is fatal to

Plaintiffs' claims:  As the First Circuit recognized, because the plans do not own the funds used

to pay the benefits (or to fund the withdrawals), they have no right to any income earned on

those funds.

These three decisions by the First and Eighth Circuits preclude Plaintiffs' claim that

Fidelity violated ERISA by failing to pay Float interest to the plans.  They also preclude

Plaintiffs' subsidiary argument that Fidelity violated ERISA by using Float interest to pay fees

charged by third-party banks on the accounts used to fund the withdrawal checks.  Because Float

4

is not an asset of the plans, it is not the plans' concern whether Float interest is used to pay bank account fees or for any other purpose.  Even if Float were a plan asset, however, Plaintiffs' argument that Fidelity should not have used Float to pay bank account fees still would fail.  ERISA makes clear that a fiduciary can use plan assets for the purpose of "defraying reasonable expenses of administering the plan."  ERISA § 404(a)(1)(A)(ii), 29 U.S.C. § 1104(a)(1)(A)(ii).  And, as Plaintiffs admit in their Complaint, "all" of the trust agreements between Fidelity and the plans authorized Fidelity to use plan assets for precisely that purpose.  *See* Compl. ¶ 25 ("All Trust Agreements specified that [Fidelity] would hold the assets of the trust" for, among other things, "the defraying of reasonable plan expenses").  So if, as Plaintiffs allege, Float were a plan asset, then the fees paid on these bank accounts would be precisely the type of expense for which Plaintiffs concede plan assets could be used.

Finally, for the reasons addressed at length in Fidelity's motion to dismiss Plaintiffs' prior complaint—on which this Court heard argument on June 18, 2014—Plaintiffs' claims are barred by ERISA's six-year statute of repose and its three-year statute of limitations, and the seven named Plaintiffs lack constitutional standing to raise claims on behalf of any of "thousands" of plans in the purported class other than their own.  *See* Mem. in Supp. of Mot. to Dismiss Pls.' Consolidated Compl. [Dkt. No. 83].

## FACTUAL BACKGROUND

## I.     401(K) PLAN ADMINISTRATION AND "FLOAT"

A 401(k) plan is a defined contribution plan offered as a benefit by many employers (or plan "sponsors") in order to help their employees save for retirement.  Employees who elect to participate in a 401(k) plan ("participants") typically can decide how the contributions to their individual 401(k) accounts will be distributed among the various mutual funds and other

investment options made available under the plan.[1]  The sponsor or administrator of a 401(k)

plan often engages a service provider like Fidelity to perform recordkeeping and other

administrative services for the plan.  Plans also engage trustees to hold plan assets.  The

recordkeeper and the trustee are often—but not invariably—the same company.  When Fidelity

is engaged to act as a plan trustee, it enters into a contract with the plan sponsor or administrator,

generally referred to as a "trust agreement."  Compl. ¶ 22.

Plaintiffs allege that, the day after a participant makes a request to withdraw funds from

his 401(k) account, Fidelity sells the participant's mutual fund shares and transfers the proceeds

to a "redemption bank account."  *Id.* ¶ 33(a), (b).  If a participant has requested an electronic

disbursement, then the funds are wired from the redemption bank account to the participant's

bank account.  Otherwise, the funds are transferred to a "disbursement bank account"

(collectively with the "redemption bank account," the "Bank Accounts"), and a check is sent to

the participant from that account.  *Id.* ¶ 33(f), (g).[2]  Until the participant cashes his or her check,

the funds necessary to cover the check are held in the Bank Accounts.  *Id.* ¶ 33(g).  The money in

the Bank Accounts is referred to as Float, and the interest earned on this money during the period

that the participants' checks remain uncashed is referred to as "Float income."

Plaintiffs allege that, at all relevant times, the Bank Accounts were "registered to Fidelity

Operations" and "owned and controlled by Fidelity."  *Id.*  ¶ 33(a), (g).  They do not allege that

these accounts were owned by, registered to, or registered for the benefit of the plans or their

participants.  Nor could they have made such an allegation in good faith:  As found by the

district court in *Tussey*, each of the Bank Accounts was "registered to Fidelity Operations *for the*

---

[1]        Because the majority of investment options made available to plan participants are mutual funds
(investment companies registered under the Investment Company Act of 1940), throughout this memorandum
Fidelity uses the terms "mutual fund" and "investment option" interchangeably.

[2]        Further details about the steps allegedly involved in the redemption process are set forth in in paragraph 33
of Plaintiffs' Complaint.

*benefit of the [mutual funds and other] investment options*" whose shares were being redeemed—and not on behalf of or for the benefit of the plans. *Tussey v. ABB, Inc.*, No. 2:06-cv-04305, 2012 WL 1113291, at*33 (W.D. Mo. Mar. 31, 2012) (emphasis added).

## II.    THE *TUSSEY* DECISIONS, AND THE EVOLUTION OF PLAINTIFFS' CLAIMS

The named Plaintiffs in this case are six plan participants and one plan administrator who filed four separate actions in this Court after the district court's decision in *Tussey*. In each case, Plaintiffs challenged the same Float practices that were held unlawful by the *Tussey* district court. On December 27, 2013, these cases were consolidated, and on February 7, 2014, Plaintiffs filed their initial "Consolidated Complaint" ("Cons. Compl."). In the Consolidated Complaint, Plaintiffs purported to bring claims on behalf of a class of "thousands" of ERISA retirement plans "for which Fidelity has served as trustee or service provider." Cons. Compl. ¶¶ 2, 61, 62. Plaintiffs' Consolidated Complaint expressly incorporated the *Tussey* district court's findings of fact and conclusions of law, and then asserted that Fidelity should be "foreclosed . . . from re-litigating the liability and damages issues that were decided against it in *Tussey*." *Id.* ¶¶ 6, 11. In other words, Plaintiffs sought a *pro forma* determination of liability as to thousands of different 401(k) plans based entirely on the District Court's decision in *Tussey*.

On March 7, 2014, Fidelity filed a motion to dismiss, arguing that Plaintiffs' claims were barred by the applicable statutes of repose and limitations, and that the seven named Plaintiffs lacked standing to bring claims on behalf of the thousands of plans in the putative class other than their own. That motion was fully briefed and argued before the Court on June 18, 2014.

On March 19, 2014, shortly after Fidelity filed its motion to dismiss, the Eighth Circuit reversed the district court's decision in *Tussey*, and, on May 20, 2014, the *Tussey* plaintiffs' petition for rehearing was denied. *See Tussey*, 746 F.3d 327, *reh'g denied* Order at 3, No. 12-2060 (8th Cir. May 20, 2014). In light of the Eighth Circuit's ruling, on June 30, 2014, Fidelity

filed a second motion to dismiss, arguing that Plaintiffs' allegations (which were based entirely on the district court's findings in *Tussey*) necessarily failed as a matter of law.  Instead of opposing that motion, on July 21, 2014, Plaintiffs filed a First Amended Consolidated Complaint, and later (by consent) a Second Amended Consolidated Complaint.  The operative Complaint now challenges only Fidelity's Redemption Float practices; Plaintiffs no longer challenge the manner in which Fidelity handled Float income generated when processing contributions to 401(k) plans.  But the allegations concerning Fidelity's Redemption Float practices still track the findings made by the *Tussey* district court, *see* Compl. ¶¶ 32-38; *Tussey*, 2012 WL 1113291, at *32-34; and Plaintiffs continue to advance the legal conclusions adopted by the district court in *Tussey* that were expressly rejected by the Eighth Circuit.  Compl. ¶ 32.

## III.    THE OPERATIVE COMPLAINT

In Count I, Plaintiffs claim that Fidelity has violated its fiduciary duties under ERISA § 404(a), 29 U.S.C. § 1104(a), by (1) using Float income to cover bank fees charged on the Bank Accounts used to process withdrawal checks, and (2) allowing the remainder of the Float income to go to the mutual funds in which plan participants invested, instead of directly to the plans.  *See* Compl. ¶¶ 56-63.  (Notably, Plaintiffs do *not* allege that Fidelity has taken any of the float income for itself.)  In Count II, Plaintiffs claim that Fidelity has engaged in "prohibited transactions" in violation of ERISA § 406, 29 U.S.C. § 1106, by crediting Float income towards "banking fees above and beyond the fees authorized in the trust agreements between the Plans and Fidelity."  *Id.* ¶ 4; *see also id.* ¶¶ 64-75.  Both of these claims are premised on two assumptions:  (1) that Float is a "plan asset," and (2) that Fidelity is acting as a fiduciary when it handles Float.  Because these assumptions are incorrect, Plaintiffs' claims necessarily fail.

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS  FAIL AS A MATTER OF LAW.

In resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "take[s] all facts pled, as well as all reasonable inferences to be drawn therefrom, in the light most favorable to the non-movant."  *Butler v. Deutsche Bank Trust Co. Ams.*, 748 F.3d 28, 32 (1st Cir. 2014).[3]  Where a "complaint states no legally cognizable claim for relief," it must be dismissed.  *Id.* at 30.[4]  And that is precisely the case here.

### A.   Plaintiffs' Claims Fail as a Matter of Law because Fidelity Is Not an ERISA Fiduciary as to Float, and Float Is Not a Plan Asset.

Within the past three months, the First Circuit has issued two decisions that are controlling, and that require dismissal of Plaintiffs' claims.  In *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46 (1st Cir. 2014); and *Vander Luitgaren v. Sun Life Assurance Co. of Canada*, --- F.3d ---, 2014 WL 4197947 (1st Cir. Aug. 26, 2014), beneficiaries of life insurance policies offered as a component of employee benefit plans (and thus covered by ERISA) filed suit against the life insurers, alleging that the insurers' handling of death benefits violated the fiduciary duty provisions in ERISA § 404 and the prohibited transaction provisions in ERISA § 406—precisely the same violations charged here.  Both lawsuits challenged the method by which the insurers paid death benefits (*i.e.*, the money owed to the designated beneficiary upon the insured's death).  In each case, when a claim for death benefits was approved the insurers set up a bank account,

---

[3]       In addition to Plaintiffs' allegations, the Court may consider facts established by documents central to, or incorporated by reference into, the complaint; matters of public record; and matters of which the Court may take judicial notice.  *See Beddall v. State Street Bank*, 137 F.3d 12, 17 (1st Cir. 1998).

[4]       The Court's mandate under Rule 12(b)(6) to dismiss claims that have not been properly pleaded is particularly important here, because "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times."  *Pension Ben. Guaranty Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (internal quotation marks and citations omitted).  As explained by the Second Circuit, in such circumstances "Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure, as interpreted in *Twombly* and *Iqbal*, help to prevent settlement extortion—using discovery to impose asymmetric costs on defendants in order to force a settlement advantageous to the plaintiff regardless of the merits of his suit."  *Id.*

called a "retained asset account," for the beneficiary and credited that account with the value of the life insurance proceeds; instead of sending the beneficiary a check, the insurer sent the beneficiary a checkbook that she could use to draw down on the account.  The insurer selected an interest rate to pay the beneficiary on the account and then kept the rest of the interest earned for itself.  It was undisputed there, as here, that the plaintiffs were entitled to the money, and that they could access it any time by writing and cashing a check.  But, so long as the beneficiaries let the checks sit on the shelf, the insurers kept the retained funds in their general accounts and continued to earn interest on them.

In both *Merrimon* and *Vander Luitgaren*, beneficiaries claimed that the insurers breached fiduciary duties under ERISA by profiting off of the life insurance proceeds from the time the retained asset accounts were established until the beneficiaries utilized the checkbooks to close out the accounts.  In both cases, these ERISA claims were flatly rejected.  According to the First Circuit, the defendants could not possibly have breached any fiduciary duty by keeping the interest earned on the life insurance proceeds during this period because, once the accounts were established, the defendants ***no longer had any fiduciary duties*** to breach.  The court explained that a fiduciary's obligations under ERISA end once it has "discharge[d] its fiduciary duties" in accordance with the governing contracts.  *Merrimon*, 758 F.3d at 58.  In *Merrimon*, the relevant agreements provided that the defendant would pay the death benefit owed by "mak[ing] available to the beneficiary a retained asset account."  *Id*. (emphasis omitted).  And, in *Vander Luitgaren*, the relevant documents gave the insurer the option of paying a death benefit in this way.  *Vander Luitgaren*, 2014 WL 4197947, at *4.  As soon as the defendants established the retained asset account as the plan required (or as it permitted), their "duties as an ERISA fiduciary ceased."  *Merrimon*, 758 F.3d at 59.  ERISA was no longer even implicated; from that

10

point forward, what the defendants may or may not have owed to the beneficiary was a function

of state law.  *Id.* at 58-59.  And because the defendant in each case "***was not acting as an ERISA***

***fiduciary***" when the income at issue was generated, its decision to keep some of that income for

itself could not give rise to liability under ERISA.  *Id.* at 58 (emphasis added).

      The same logic applies here.  As the Columbia Air Service Agreement makes clear,

Fidelity's duty is to "process all approved withdrawals and mail distribution checks, or remit

distributions as direct deposits to Participants."  *See* Ex. 2 (Columbia Air Serv. App'x D ¶ 1(c))

at FID-FLOAT-00011847.[5]  As soon as the check issues (or the direct deposit is made), there is

nothing else that Fidelity is required to do.  So, under the reasoning in *Merrimon* and *Vander*

*Luitgaren*, once Fidelity cuts the check, its "duties as an ERISA fiduciary cease[]."  *Merrimon*,

758 F.3d at 59.  From that point forward, what Fidelity owes to the withdrawing individual is a

function of state law.  And, under state common law, it is beyond dispute that the payee of an

uncashed check has no title in or right to interest on checking account funds.  *See Tussey*, 746

F.3d at 340; U.C.C. § 3-112(a) (2002); Richard B. Hagedorn & Henry Baily, Brady on Bank

Checks ¶ 4.05 (rev. ed. A.S. Pratt 2012).

      If anything, the case for dismissal is even stronger here than it was in *Merrimon* and

*Vander Luitgaren*.  In those cases, the First Circuit held that a fiduciary could discharge its

fiduciary duties by sending out a checkbook that a beneficiary could then use, at her election, to

withdraw the death benefits to which she was entitled.  But, unless and until the beneficiary

actually wrote out a check to herself, brought the check to the bank and cashed it, the funds

remained with the insurer.  Here, Fidelity did not simply send the participants a checkbook—it

---

[5]     Fidelity has selected the Columbia Air plan as an example because Plaintiffs themselves expressly rely on the Columbia Air plan documents in the Complaint. *See* Compl. ¶ 27.  But as Plaintiffs are aware (because Fidelity has produced all of the operative agreements for each of their plans), Fidelity's agreements with each of the eight plans, while different in many respects, contain similar provisions concerning the requirements for processing a withdrawal.

sent them an ***actual check*** for the full amount due.  If, as the First Circuit held, giving a plaintiff

a *checkbook* constitutes "immediate and unfettered access to the promised benefit" sufficient to

discharge a fiduciary duty, *Vander Luitgaren*, 2014 WL 4197947, at *5, then it certainly follows

that sending a *check* is equally acceptable.  And that is precisely what Fidelity did here.  Once

the check was cut, Fidelity's fiduciary obligations were over.[6]

Although the absence of any fiduciary duty requires dismissal, there is another,

independent reason why Plaintiffs' claims fail:  Float is not an ERISA plan asset.  As explained

in *Merrimon* and *Vander Luitgaren*, and as the Eighth Circuit held in *Tussey* on facts identical to

those alleged here, a fiduciary is only required to pay over income to a plan if the assets on

which that income is earned are "plan assets."  If those funds do not belong to the plan, then the

plan has no right to any income earned, under ERISA or otherwise.  To determine whether assets

are "plan assets"—*i.e.*, whether they belong to the plan—both the First Circuit and the Eighth

Circuit looked to ordinary notions of property rights.  *Merrimon*, 758 F.3d at 56 (quoting United

States Dep't of Labor Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993));

*Vander Luitgaren*, 2014 WL 4197947, at *3; *Tussey*, 746 at 340.  And, in all three cases, the

courts concluded that the relevant assets—the life insurance proceeds in the First Circuit cases,

and the Float in *Tussey*—did not belong to the plans.

As the First Circuit explained, before a beneficiary filed a claim for death benefits, the

plan had a property interest in the insurance policy itself, but it did not have a property interest in

the insurers' general funds that might someday be used to pay those death benefits.  *Merrimon*,

---

[6]     Additionally, the facts alleged in this case are weaker for Plaintiffs than the facts in *Merrimon* and *Vander Luitgaren* because, in those cases, the insurers actually kept a portion of the interest earned for themselves, whereas in this case Plaintiffs do not allege that Fidelity retained any Float income for itself—instead, they allege that Fidelity used this income to cover related third-party bank fees, and that Fidelity distributed any remaining Float income among the investment options in which plan participants invested.  *See* Compl. ¶¶ 36, 38; *Tussey*, 746 F.3d at 332 ("Fidelity did not receive the float or float interest.").

758 F.3d at 56 (citing 29 U.S.C. § 1101(b)(2)).  In other words, what the plan owned was the

insurance policy; the premium payments and other cash in the insurer's bank account belonged

to the insurer, not to the plans.  The court explained that, after the claim was approved and the

retained asset account was established, the beneficiary had rights vis-à-vis the account, but

nothing converted those rights into rights of the plan.  *Id*.  Indeed, it would defy both "case law

and common sense" to suggest "that funds held in an insurer's general account are somehow

transmogrified into plan assets when they are credited to a beneficiary's [retained asset]

account."  *Id*.  Put differently, establishment of the retained asset account did not magically

transform funds that belong to the insurer into funds that belong to the plan.  Instead, those funds

remained property of the insurer until the beneficiary wrote herself a check and withdrew them.

*Id*.  And, once that happened, those funds belonged to the beneficiary—not to the plans.  *Id.*

("[A] beneficiary's assets are not plan assets.").

        The same analysis applies here.  Before a participant requests a withdrawal from his

401(k) account, the plan has a property interest in the ***shares*** of the mutual funds in which the

participant has invested; but the plan does not have a property interest in the mutual funds'

underlying assets.  *See* 29 U.S.C. § 1101(b)(1) ("[i]n the case of a plan which invests in any

security issued by a [mutual fund]," the plan's assets "shall be deemed to include such security

but shall not, solely by reason of such investment, be deemed to include any assets of such

[mutual fund]" itself).[7]  Indeed, the Complaint acknowledges as much, stating that, prior to the

withdrawal request, the funds are held in an account belonging to the "relevant investment

option."  Compl. ¶ 33(a).  So, just as an ERISA plan that buys life insurance owns the life

insurance policy, an ERISA plan that buys mutual funds owns the mutual fund shares.  *See*

---

[7]        *See also Tussey*, 746 F.3d at 340 ("[o]nce the Plan became the owner of the shares, it was no longer also owner of the money used to purchase them"); *Hecker v. Deere & Co.*, 556 F.3d 575, 584 (7th Cir. 2009) (holding that "assets of the mutual funds" in which Plans invest "are not assets of the Plans").

*Merrimon*, 758 F.3d at 56.  In neither case does the plan get to "look through" its investment and also claim ownership of the underlying assets.[8]

After a plan participant makes a withdrawal request, the mutual fund shares are redeemed from his 401(k) account, and the proceeds are transferred from one of the "investment option accounts" to the Bank Accounts, which, according to Plaintiffs, are "registered to Fidelity Operations" and "owned and controlled by Fidelity."  Compl. ¶33(a), (g).[9]  The participant is then sent a check or wire, and, when payment is made by check, the funds remain in the Bank Accounts until the participant takes the check to the bank and cashes it.  *Id.*  Again, Plaintiffs allege that the Bank Accounts are registered to, and owned by, Fidelity.  They do not—and could not—allege that these accounts are owned by the plans, or that they are registered to, or on behalf of the Plans.[10]  So, just like in *Merrimon* and *Vander Luitgaren*, the ERISA plans do not own the relevant funds before the withdrawal, and they do not own them afterwards.  And, as the First Circuit made clear, a fiduciary cannot possibly violate ERISA by failing to turn over to a plan income earned on funds that belong to someone else.

---

[8]     While 29 U.S.C. § 1101(b)(1) does not apply to non-mutual fund investments (which account for a small percentage of the Float in dispute here), that does not alter the result.  Assets in Bank Accounts that allegedly are registered to, and owned by, Fidelity are not owned by the plans, irrespective of whether those assets have been redeemed from a mutual fund or from a non-mutual fund investment vehicle.

[9]     "Fidelity Operations" is defendant Fidelity Investments Institutional Operations Company, Inc., the transfer agent for the Fidelity family of mutual funds and a corporate affiliate of defendant Fidelity Management Trust Company, the directed trustee for the plans.  Compl. ¶¶ 28, 29; *see, e.g.,* Statement of Additional Information, Fidelity Contrafund.  "Transfer and Service Agent Agreements" (Mar. 1, 2014) (disclosing transfer agent agreement) (available at http://www.sec.gov/Archives/edgar/data/24238/000071858114000008/main.htm#cft302944).

[10]     In *Tussey*, the District Court held that the relevant Bank Accounts were, in fact, "registered to Fidelity Operations *for the benefit of the investment options*."  *Tussey*, 2012 WL 1113291, at *3 (emphasis added).  In their initial Consolidated Complaint, Plaintiffs embraced this finding.  *See* Cons. Compl. [Dkt. No. 67] ¶ 44 (a) ("The redemption bank account was held at Deutsche Bank, and was registered to Fidelity Operations for the benefit of the investment options.").  But in their more recent amended complaints—filed after the Eighth Circuit's reversal in *Tussey*—they have truncated the relevant language to state only that the relevant Bank Accounts were "registered to Fidelity Operations."  Compl. ¶33(a).  If this was an effort at selective pleading, it cannot help Plaintiffs' cause, because Plaintiffs do not allege—and, given the *Tussey* findings, could not in good faith allege—that these accounts were owned by, registered to, or registered for the benefit of the plans or their participants.

Finally, if the First Circuit's holdings in *Merrimon* and *Vander Luitgaren* were not enough, in *Tussey* the Eighth Circuit applied precisely the same reasoning embraced by the First Circuit to precisely the same facts alleged in this copycat Complaint; and it concluded that Float is not a plan asset.  As explained by the Eighth Circuit, under ordinary notions of property rights, "the funder of [a] check owns the funds in the checking account until the check is presented, and thus is entitled to any interest earned."  *Tussey*, 746 F.3d at 340.  Because the evidence in *Tussey* established that the Bank Accounts were "registered [by Fidelity] for the benefit of the investment options"—and not by or for the benefit of the plans—the *Tussey* plaintiffs could not "establish the Plan as 'the funder of the check' or the owner of the funds in the [funding bank] account."  *Id*.   Accordingly, the Eighth Circuit concluded that "the Plan had no right to float income from that account."  *Id*.

Again, the same reasoning applies here:  Plaintiffs allege that the Bank Accounts that funded the withdrawal checks were "registered to Fidelity Operations" and that Fidelity "owned and controlled" these accounts.  Compl. ¶ 33.  They do ***not*** allege that these accounts were owned by the plans or even that they were registered by Fidelity on the plans' behalf.[11] Accordingly, under the Eighth Circuit's reasoning in *Tussey*, Float was not a plan asset, and neither the Plaintiffs nor their plans were entitled to Float income—under ERISA or otherwise.

In their Complaint, Plaintiffs reference several authorities, all of which predate *Tussey*, *Merrimon* and *Vander Luitgaren*, and none of which can rescue their claims.  Most notably, Plaintiffs cite an earlier First Circuit decision, *Mogel v. Unum Life Ins. Co. of Am.*, 547 F.3d 23 (1st Cir. 2008), which they suggest supports the proposition that "sums due plan participants

---

[11]      As noted above, Plaintiffs could not have made such allegations, because they know full well from the evidence and findings in *Tussey* that during the relevant time period those accounts were registered to Fidelity for the benefit of the mutual funds and other investment options—and not for the benefit of the plans.  *See* Note 10, *supra*; *Tussey*, 2012 WL 1113291, at *33.

'remain plan assets subject to [Fidelity's] fiduciary obligations until actual payment.'"  Compl. ¶ 39 (quoting *Mogel*, 547 F.3d at 26).  But this proposition was squarely rejected by the First Circuit in *Merrimon* and *Vander Luitgaren*.  Instead, as explained by Judge Selya, once a fiduciary has done all that he is required to do under the governing contracts, his duties are discharged.  Judge Selya recognized that, although *Mogel* also involved the payment of death benefits by establishing a retained asset account, the critical difference between *Mogel*, on the one hand, and *Merrimon* and *Vander Luitgaren*, on the other, was that "*Mogel* involved a plan that contained a ***specific directive*** to pay beneficiaries in a lump sum"—and did not authorize the insurer to distribute proceeds through a retained asset account.  *Merrimon*, 758 F.3d at 56-57 (emphasis added).  Because the insurer in *Mogel* "had not paid the policy proceeds in a manner permitted by the plan documents," the establishment of the retained asset account did not terminate its ERISA fiduciary duties.  *Id.* at 57.  This case is entirely unlike *Mogel*—and exactly like *Merrimon* and *Vander Luitgaren*:  Plaintiffs do not, and could not, allege that the trust agreements or other governing plan documents required Fidelity to do anything other than to "process all approved withdrawals and mail distribution checks, or remit distributions as direct deposits to Participants."  *See* Ex. 2 (Columbia Air Serv. Ag. App'x D ¶ 1(c)) at FID-FLOAT-00011847.  And that is precisely what Fidelity is alleged to have done.[12]

Plaintiffs also cite in their Complaint two documents issued by the Department of Labor ("DOL").  *See* Compl. ¶ 31 (citing DOL Adv. Op. 93-24A (Sept. 13, 1993) and DOL Field Assistance Bulletin 2002-3 (Nov. 5, 2002)).  But these documents, which are respectively twenty-one and twelve years old, provide only advisory guidance concerning the types of disclosures that must be made when (1) the Float at issue is a plan asset, and (2) the service

---

[12]   Moreover, the First Circuit expressly noted in *Mogel* that its holding depended on "[t]he difference between delivery of a check and a checkbook"—precisely the difference between that case and this one.  *Mogel*, 547 F.3d  at 26 (quoting *Mogel v. Unum Life Ins. Co. of Am.*, 540 F. Supp. 2d 258,  262 (D. Mass. 2008)).

provider retains Float income for itself.  *See* DOL Adv. Op. 93-24 (considering whether trust company's "receipt of income from the 'float' on benefit checks" was a prohibited transaction); DOL Field Assistance Bulletin 2002-3 (describing potential considerations where "service provider will be retaining 'float'").  Here, neither is true:  (1) under *Merrimon*, *Vander Luitgaren* and *Tussey*, the Float at issue plainly is not a plan asset; and (2) Fidelity does not retain any of the Float income for itself—instead, as alleged by Plaintiffs, the Float income is used to cover related Bank Account fees, and any remaining income goes to the investment options.  *See Tussey*, 746 F.3d at 332 ("Fidelity did not receive the float or float interest"); Compl. ¶¶ 36, 38.

*     *     *

In short, the First Circuit's holdings in *Merrimon* and *Vander Luitgaren* apply squarely to this case, and they require dismissal as a matter of law.  As the Eighth Circuit already concluded in *Tussey*, Float is not a plan asset, and Fidelity had no obligation—fiduciary or otherwise—to distribute income earned on Float to the plans.  For this reason, both counts of Plaintiffs' complaint should be dismissed.

### B.     Plaintiffs' Claim that Fidelity Violated ERISA by Using Float Income To Pay Bank Fees Fails as a Matter of Law.

In addition to claiming generally that Fidelity was required to give Float income to the plans, Plaintiffs also allege more specifically that it was improper for Fidelity to use Float income to pay fees charged by third-party banks on the Bank Accounts because, according to Plaintiffs, the bank fees at issue were Fidelity's "own administrative expenses" that Fidelity was required to bear.  Compl. ¶ 71.  Indeed, Count II of the Complaint—Plaintiffs' prohibited transaction claim—is premised entirely on the use of Float income to pay bank fees.  *See* Comp. ¶¶ 67-71.  For the reasons explained above, Plaintiffs' bank fee argument fails because Float is not a plan asset:  if Float and Float income do not belong to the plans, then it is none of the

plans' concern whether Float income is used to pay bank fees or for any other purpose.  Even if Float were a plan asset, however, Plaintiffs' bank fees argument still would fail because the contracts between the plans and Fidelity authorized the use of plan assets to pay related third-party expenses.  And if, as Plaintiffs allege, Float is a plan asset, then the bank fees are clearly just such an expense.

ERISA itself expressly contemplates that plan assets can and will be used to cover reasonable expenses associated with plan administration.  *See* ERISA § 404(a)(1)(A); 29 U.S.C. 1104(a)(1)(A) (providing that ERISA fiduciaries may use plan assets for "defraying reasonable expenses of administering the plan").  Moreover, as the Complaint concedes, the agreements between Fidelity and the plans expressly authorize Fidelity to use plan assets to cover reasonable expenses incurred in connection with plan administration.  *See* Compl. ¶ 25 ("All Trust Agreements specified that [Fidelity] would hold the assets of the trust . . . for the defraying of reasonable plan expenses").  For example, the plan document for the Columbia Air Plan, on which Plaintiffs themselves rely, *see* Compl. ¶ 27, provides in the section titled "Compensation and Expenses of Trustee" that "any and all expenses  . . .  reasonably incurred by the Trustee [*i.e.*, Fidelity] in connection with its duties and responsibilities hereunder shall, unless some or all have been paid by [the plan sponsor], be paid from the Trust."  *See* Hemani Aff. Ex. 1 (Columbia Air Basic Plan Document 14) § 20.12 at FID-FLOAT-00011777; *see also id*. § 20.03 at FID-FLOAT-00011774 (authorizing Fidelity to use plan assets to "defray[] the reasonable expenses of administering the Plan").  If Plaintiffs were correct that Float is a plan asset, then the third-party bank fees incurred in earning Float income would necessarily be "expenses . . . incurred by [Fidelity] in connection with its duties and responsibilities" as Trustee, which may "be paid from the Trust" with plan assets.  *Id.*

18

In short, because Fidelity was expressly authorized to use plan assets to pay for plan expenses, even if Float were a plan asset, Fidelity could not have violated ERISA by using Float income to pay bank fees.

## II.   PLAINTIFFS' CLAIMS ARE TIME-BARRED.

As discussed at length in Fidelity's prior motion to dismiss briefing and during the June 18, 2014 oral argument on that motion, Plaintiffs' claims are time-barred under both ERISA's six-year statute of repose and its three-year statute of limitations. *See* Mem. in Supp. of Mot. to Dismiss Pls.' Consolidated Compl. [Dkt. No. 83], at 11-20.

With respect to the repose statute, Plaintiffs have conceded that the challenged system for handling Float was implemented by Fidelity more than six years before any of the Plaintiffs brought suit.[13] And, as three separate circuit courts recently have made clear, where, as here, ERISA claims for breach of fiduciary duty and prohibited transactions challenge a longstanding practice, they must be brought within six years of the decision to implement that practice—even if the practice continues into the repose period. *See Fuller v. Suntrust Banks, Inc.*, 744 F.3d 685, (11th Cir. 2014); *David v. Alphin*, 704 F.3d 327 (4th Cir. 2013); *Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013), *cert. granted*, 573 U.S. ---, 2014 WL 4916188 (Oct. 2, 2014). Moreover, for the reasons previously explained, Plaintiffs' claims are also barred by ERISA's three-year statute of limitations. *See* Mem. in Supp. of Mot. to Dismiss Pls.' Cons. Compl. [Dkt. No. 83], at 20-24.

---

[13]     Although the current Complaint no longer expressly incorporates the *Tussey* court's factual findings— which made clear that the practices at issue dated back until at least 2000, *see* Mem. in Supp. of Mot. to Dismiss Pls.' Cons. Compl. [Dkt. No. 83], at 12—that omission does not defeat Plaintiff's prior concessions on timeliness. To the contrary, in their current Complaint, Plaintiffs still allege that Fidelity has "uniformly applied its system for processing disbursements for the Plans" since at least February 1, 2007—more than six years before Plaintiffs filed the first complaint in this action. Compl. ¶¶ 48, 50.

## III.   **PLAINTIFFS LACK STANDING TO PURSUE THEIR CLASS CLAIMS.**

As explained at length in Defendants' prior motion to dismiss briefing and during oral argument, Plaintiffs lack constitutional standing to assert claims on behalf of any plans other than their own.  *See* Mem. in Supp. of Mot. to Dismiss Pls.' Cons. Compl. [Dkt. No. 83], at 24-28.  The First Circuit held in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.* that named plaintiffs have constitutional standing to bring claims on behalf of a class only if there is an "identity of issues" such that "the claims of the named plaintiffs necessarily give them—not just their lawyers—essentially the same incentive to litigate the counterpart claims of the class members."  632 F.3d 762, 770 (1st Cir. 2011).  And, here, no such incentive exists because Plaintiffs cannot prevail without offering evidence of the specific terms of the agreements between Fidelity and each of the thousands of plan in the putative class—proof that the seven named Plaintiffs have no incentive to offer.

Nothing about the new Complaint changes the standing analysis.  As Plaintiffs have recently conceded on several occasions—including in the operative Complaint—in order to prevail on their claims, they not only need to prove that Float income is a plan asset earned by Fidelity in its fiduciary capacity, they also need to prove that Fidelity was not authorized by its contracts with each plan to distribute plan assets as it (allegedly) distributed Float income.[14]  Thus, although Plaintiffs' claims are cast as ERISA breach of fiduciary duty and prohibited transaction claims, proof of those claims requires evidence that Fidelity's conduct violated the terms of its contract with each plan—proof that the named Plaintiffs have no incentive to offer for thousands of other plans.  Under *Nomura*, Plaintiffs therefore lack class standing.

---

[14]     *See*, *e.g.*, Compl. ¶ 4 (alleging that Fidelity violated ERISA by using Float income to pay "banking fees that Fidelity was contractually obligated to pay"); June 11, 2014 Letter from Plaintiffs to Judge Casper [DKT No. 97], at 2 (arguing that Plaintiffs' claims "depend[] in part on the terms of recordkeeping, trust, and other agreements between Defendants and the retirement plans in the class"); June 16, 2014 Joint Status Report [Dkt. No. 98], at 2 (asserting that Plaintiffs' claims turn on the terms of "agreements outside of the scope of the complaint").

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  October 3, 2014

Respectfully Submitted,


FIDELITY MANAGEMENT
TRUST COMPANY, FIDELITY MANAGEMENT
AND RESEARCH COMPANY, AND FIDELITY
INVESTMENTS INSTITUTIONAL
OPERATIONS COMPANY, INC.

By their attorneys,

/s/ Alison V. Douglass
Joseph F. Savage, Jr. (BBO# 443030)
Alison V. Douglass (BBO# 646861)
Abigail K. Hemani (BBO # 650721)
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1000
F: 617-523-1231
JSavage@goodwinprocter.com
ADouglass@goodwinprocter.com
AHemani@goodwinprocter.com


Brian D. Boyle (*pro hac vice*)
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC 20006
T: 202-383-5300
F: 202-383-5414
bboyle@omm.com

## <u>CERTIFICATE OF SERVICE</u>

I, Alison V. Douglass, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 3, 2014.

<u>/s/ Alison V. Douglass</u>