UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
IN RE FIDELITY ERISA                )          Civil Action No. 13-10222-DJC
FLOAT LITIGATION                     )
                                                    )
                                                    )
_____ )

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT

Robert A. Izard (*pro hac vice*)
Mark P. Kindall (*pro hac vice*)
Izard Nobel LLP
29 South Main Street, Suite 215
West Hartford, CT 06107

Todd M. Schneider (*pro hac vice*)
Joshua G. Konecky (*pro hac vice*)
Mark T. Johnson (*pro hac vice*)
Scheider Wallace Cottrell
Konecky LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104

Garrett W. Wotkyns (*pro hac vice*)
Michael C. Mckay
Scheider Wallace Cottrell
Konecky LLP
8501 North Scottsdale Road
Suite 270
Scottsdale, AZ 85253

Gregory Y. Porter (*pro hac vice*)
Bailey & Glasser LLP
910 17th Street, NW
Suite 800
Washington, DC 20004

John J. Roddy (BBO 424240)
Elizabeth A. Ryan (BBO 549632)
Bailey & Glasser LLP
125 Summer Street, Suite 1030
Boston, MA 02110

Bradford S. Babbitt (BBO 566390)
Craig A. Raabe (*pro hac vice*)
Elizabeth R. Leong (*pro hac vice*)
Robinson & Cole, LLP
280 Trumbull St.
Hartford, CT 06103-3597

Thomas G. Shapiro (BBO 454680)
Michelle H. Blauner (BBO 549049)
SHAPIRO HABER & URMY LLP
Seaport East
2 Seaport Lane
Boston, MA 02210

*Attorneys for Plaintiffs*

## Table of Contents

INTRODUCTION......................................................................................................................1

FACTUAL ALLEGATIONS ......................................................................................................2

ARGUMENT.............................................................................................................................4

    Legal Standard....................................................................................................................4

    Cash Proceeds from the Sale of Plan-Owned Mutual Fund Shares Are Plan Assets. ........5

    Fidelity Was Not Entitled to Use Float Income to Pay Bank Fees ...................................12

    Plaintiffs' Claims Are Timely............................................................................................15

    Plaintiffs Have Article III Standing. Their Ability to Represent Plans Other Than
    Their Own Is an Issue for Class Certification, Not a Motion to Dismiss. ........................16

CONCLUSION.........................................................................................................................18

## INTRODUCTION

Fidelity[1] is the trustee for all of the Plans' assets. These assets include mutual fund shares owned by the Plans, cash from the sale of those shares, and the interest earned on that cash. Fidelity cannot use its powers as trustee to take the Plans' cash assets, deposit those assets in its own interest-bearing accounts, and take that interest for itself.

Fidelity says that because it took money from the Plans' and put it in bank accounts ("Deposit Accounts") controlled by Fidelity, the money does not belong to the Plans while it is in those accounts and can be used by Fidelity for its own benefit. This "we stole it fair and square" theory cannot stand. More specifically, Fidelity argues that cash proceeds from the sale of mutual fund shares owned by the Plans and held in trust by Fidelity are not Plan assets simply because Fidelity diverted the cash proceeds to interest-bearing accounts owned and controlled by Fidelity and its mutual funds instead of putting the money in trust accounts for the benefit of the Plans. None of the agreements with the Plans permit this. And ownership of the *accounts* is irrelevant. Transferring plan assets into an account that is not owned by a plan does not magically transform the plan assets into property belonging to the owner of the account. If that were true, any custodian of plan assets could embezzle plan funds with impunity simply by taking money from the plan's account and putting it in its own accounts. That is not the law.

As to statute of limitations, Fidelity simply adopts its prior argument, but fails to address two important developments since the last round of briefing. First, the Supreme Court's decision in *CTS Corp. v. Waldburger*, 134 S.Ct. 2175 (2014), establishes that regardless of whether ERISA's limitations period is a statute of repose or a statute of limitations, the accrual rules laid out by the Supreme Court dictate that Plaintiffs' claims here are timely. Second, the Supreme Court granted *certiorari* in

---

[1] Except where it is necessary to elucidate the relationships between the particular Fidelity affiliates, references to Fidelity mean all defendants in the lawsuit.

the *Tibble v. Edison International*, 729 F.3d 1110 (9th Cir. 2013), on the limitations holding on which

Fidelity's motion depends. *See Tibble v. Edison Int'l*, 2014 WL 4916188 (S.Ct. Oct. 2, 2014). Thus,

whether *Tibble* (and the other two similar cases cited by Fidelity) is good law is very much in doubt.

Finally, Fidelity's argument that Plaintiffs "lack Article III standing "to assert claims on

behalf of any plans other than their own" fails because Plaintiffs have pleaded specific economic

injuries and seek monetary relief to redress those wrongs. Fidelity's argument is at best a premature

class certification argument that should not be decided now. For all of these reasons, Fidelity's

Motion should be denied.

## FACTUAL ALLEGATIONS[2]

1.     The individual Plaintiffs in this case are current and former participants in ERISA governed

retirement plans such as 401(k) plans. Second Amended Consolidated Complaint ("Complaint" or

"Comp.") ¶¶ 9-14. Plaintiff Columbia Air Services, Inc. ("Columbia") is the sponsor and

administrator for the Columbia Group of Companies' 401(k) Retirement Savings Plan ("Columbia

Plan"). Comp. ¶15. Together they bring this action on behalf of a proposed class of ERISA-covered

defined contribution retirement plans subject to Internal Revenue Code §§ 401(a) and (k) for which

Fidelity has served as trustee from February 1, 2007 to the present. Comp. ¶48.

3.     Fidelity Management Trust Company entered into trust agreements with each of the Plans

pursuant to which Fidelity agreed, *in the capacity of Trustee for the Plans*, to open and maintain trust

accounts for the Plans, invest Plan assets in mutual fund shares and hold Plan assets, including funds

in Deposit Accounts, in trust for the benefit of the Plans. Comp. ¶¶ 22-23, 25, 27. In particular,

Fidelity, *in its capacity as trustee*, agreed to open and maintain trust accounts to, among other things,

---

[2] Fidelity's section entitled "Factual Background omits many of the critical allegations of the Complaint that support Plaintiffs' claims and that, as Fidelity concedes, must be accepted as true and, along with all reasonable inferences drawn therefrom, viewed in the light most favorable to Plaintiffs. Defs' Mem. at 9.

"'retain uninvested cash,' including in Deposit Accounts." Comp., ¶ 27. The Deposit Accounts are established, managed and maintained by Fidelity Investments Institutional Operations Company, Inc. ("FIIOC"), *acting in its capacity as agent for the Trustee*, Fidelity. Comp., ¶ 28.

4.      When Fidelity receives a directive to sell mutual fund shares held by a plan, Fidelity sells the mutual fund shares and transfers the cash proceeds to a redemption bank account, then to an interest-bearing account overnight, then, less the interest earned, back to the redemption account. Comp. ¶33(a) – (f). Electronic disbursements or checks are paid to plan participants from the redemption account. Fidelity keeps all of the interest earned during the redemption process. ¶33(f), (g). Fidelity retains some portion of the interest income and credits the remainder to mutual funds, not to the Plans or their respective participants. ¶33 (h).

5.      As the agent for Fidelity, FIIOC used its discretionary authority and control over the proceeds of the sale of Plan's mutual fund shares to transfer those proceeds to the Deposit Accounts. Comp. ¶ 28. Although the proceeds of the sale of plan assets are themselves plan assets, FIIOC, acting on behalf of Fidelity, registered the Deposit Accounts in its own name for the benefit of itself and the mutual funds, exercised control over the accounts for Fidelity's own benefit, and used the interest income from the funds in the account to reimburse Fidelity for bank fees or to benefit investment accounts not held exclusively by the Plans. *Id.*

6.      The trust agreements and other documents governing the Plans and Fidelity's duties and obligations with respect to the Plans do not authorize Fidelity or its agents to deposit Plan assets, including the proceeds of the sale of mutual fund shares owned by the Plans, into non-trust deposit accounts that are not held for the benefit of the Plans. The trust documents specifically direct the trustee to "process all approved withdrawals and mail distribution checks, or remit distributions as direct deposits to Participants." *See,* Ex. 2 to Declaration of Abigail K. Hemani in Support of

Defendant's Motion to Dismiss Plaintiffs' Second Amended Consolidated Complaint (Hermani Decl.)[Dkt. 127-2] (Columbia Air Serv. Ag. App'x D ¶ 1(c)) at FID-FLOAD-00011847.

7.      The compensation Fidelity is entitled to receive for its services is specifically set forth in its agreements with the Plans and does not include Float Income. Comp. ¶ 24. Fidelity's Investment Retirement Plan Service Agreement ("Service Agreement") for the Plans specified the compensation it would receive for providing recordkeeping services to the Plans, including processing distributions for the Plans in accordance with the provisions of the Withdrawal and Loan Services Appendix. Hemani Decl. Ex. 2 [Dkt. 127-2], Article I at FID-FLOAT-00011831; Article II, ¶¶ 9, 11 at FID-FLOAT-00011834-35. The Service Agreement does not even mention Float Income; much less authorize the use of any interest earned on the Plans' assets as further compensation for those services. Maintaining Deposit Accounts used to process withdrawals and distributions was integral to the services Fidelity rendered to the Plans for which it was already being paid through the compensation specified in the Complaint. Comp. ¶¶ 24, 35. Any fees and expenses incurred in the maintenance of such accounts were a part of Fidelity's ordinary operating expenses for recordkeeping and administration of the Plans, and were covered by the fees agreed to by Fidelity and the Plans. *Id.* Moreover, Fidelity did not disclose the use of the Float Income from the deposit accounts or its use to the Plans and did not negotiate for extra compensation for its services in the form of the Float Income. Comp. ¶72.

## ARGUMENT

### Legal Standard

Although the applicable legal standard on a motion to dismiss is well known, it bears repeating in this case, where the motion to dismiss ignores and even contradicts key allegations in the Complaint. As this Court has recently stated:

> In considering a Rule 12(b)(1) motion to dismiss based on lack of standing, the court accepts " 'as true all well-pleaded factual averments in the plaintiff's

> complaint and indulge[s] all reasonable inferences therefrom in his favor.' "
> *Katz v. Pershing, LLC,* 672 F.3d 64, 70–71 (1st Cir.2012) (internal ellipses
> omitted); *Sanchez ex rel. D.R.-S. v. U.S.,* 671 F.3d 86, 92 (1st Cir.2012)
> ("credit[ing] the plaintiff's well-pled factual allegations and draw [ing] all
> reasonable inferences in the plaintiff's favor" under Rule 12(b)(1)); *Warth v.
> Seldin,* 422 U.S. 490, 501–02, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

*Coccoli v. Daprato*, No. CIV.A. 13-12757-MBB, 2014 WL 1908934, at *1 (D. Mass. May 12, 2014). "A

similar standard of review obtains for motions to dismiss under Rule 12(b)(6)." *Katz v. Pershing, LLC*,

672 F.3d 64, 71 (1st Cir. 2012), *citing Nisselson v. Lernout,* 469 F.3d 143, 150 (1st Cir.2006).

### Cash Proceeds from the Sale of Plan-Owned Mutual Fund Shares Are Plan Assets.

Fidelity admits that the Plans have a property interest in the mutual fund shares in which

they invest. Defs' Mem. at 13. The Plans own the mutual fund shares. But Fidelity makes the

illogical and counterfactual argument that the Plans do not have a property interest in the cash

received from the sale of the Plans' mutual fund shares. The cash, according to Fidelity, is not a plan

asset when Fidelity decides to keep the cash in accounts established in its name and the name of its

mutual fund affiliates. This argument contradicts the allegations of the Complaint, which state that

the Plans own all of their assets, whether invested in shares or cash, and that Fidelity is required to

hold all of the Plans' assets in trust for the benefit of the Plans. Factual Allegations, ¶¶ 2, 5-6

(references to Factual Allegations are to the Factual Allegations section of this memorandum above).

The notion that cash proceeds from the sale of Plan assets are not plan assets is so novel and

contrary to common sense that Fidelity files to find any authority on point. Fidelity does not cite any

authority for a rule that transforms plan assets into another person's assets simply because the assets

are deposited in that person's account. Nor do they cite any authority that permits a *trustee* to convert

plan assets to its own use simply by depositing them in a non-trust account for the benefit of

persons other than the plan. If that were allowed, any fiduciary could evade its fiduciary obligations

and make use of plan assets for its own benefit by simply liquidating plan investments and

depositing them into a non-trust account in its name, making ERISA's fiduciary duties meaningless and embezzlement legal.

Consider the interpretive guidance from the United States Department of Labor ("DOL"). In Advisory Opinion 93-24A, the DOL found that a fiduciary's undisclosed use of Float Income generated from accounts on which a benefit check is written to a participant is a prohibited transaction under ERISA § 406(b)(1). It further rejected as inapplicable the trust company's argument that "once a check is written to a participant, corresponding amounts in the General Account cease to be plan assets." As the Advisory Opinion states, the special rules concerning segregation of participant contributions from an employer's general assets "have no application to the question of whether a plan has an interest in an administrative account when plan assets are transferred to the account in support of an outstanding benefit check." This, of course, is exactly the situation here. Plan assets, in the form of the proceeds of the sale of the shares of mutual funds and other investments held by the Plans, continue to be Plan assets while awaiting presentment of the check or transfer of the funds to the Plan Participants, and Fidelity's use of the Float Income earned on those funds for its own benefit is a prohibited transaction.[3]

Despite this guidance, Fidelity cites 29 U.S.C. § 1101(b)(1) for the proposition that the Plans do not have a property interest in the assets owned by a mutual fund, but only in the shares of the mutual fund itself. Defs'.Mem., p. 13. True, but irrelevant. Plaintiffs do not claim that the Plans own the underlying assets of a mutual fund in which they invest or that they own proceeds from the sales of such underlying mutual fund assets. Instead, Plaintiffs claim only that the Plans own the *shares* of the mutual funds in which they invest and therefore the cash proceeds from the sale of those mutual fund *shares*. The cash proceeds of the sale of mutual fund shares owned by the Plans are indisputably

---

[3] Fidelity has no response to the DOL's Advisory Opinion other than to note that it is 21 years old and to assert, erroneously, that the float at issue here is not a plan asset. Defs' Mem. at 17.

Plan assets. And if those cash proceeds earn interest, then that interest, too, is a Plan asset. The terms of the trust documents required Fidelity to hold in trust all plan assets, including cash and interest earned thereon, for the benefit of the Plans. Factual Allegations, ¶¶ 2, 5-6. Thus, Section 1101(b)(1) has nothing whatsoever to do with this lawsuit.

Fidelity also looks to two inapposite cases in which the First Circuit held that payments made by insurance companies to Retained Asset Accounts ("RAAs") to satisfy claims made under ERISA-covered life insurance policies were not plan assets, and that the insurance companies were not fiduciaries with respect to the funds in those accounts. Defs' Mem. at 9-14, citing and discussing *Merrimon v. UNUM Life Ins. Co. of Am.,* 758 F.3d 46 (1st Cir. 2014), and *Vander Luitgaren v. Sun Live Assurance Co. of Canada,* --- F.3d ---, 2014 WL 4197947 (1st Cir. Aug. 26, 2014).[4]

These cases do not apply here. When an ERISA plan involves life insurance, as opposed to retirement funds in a defined contribution plan such as the Plans, the plan asset is the life insurance policy itself, *i.e.*, a contractual promise that certain payments will be made upon the death of the covered plan participant. The benefits are contingent, and no funds are set aside in trust to pay future claims on the policy. Instead, the policy is backed by the insurance company's general accounts, which are not subject to trust obligations. As Fidelity acknowledges, this was the basis for the decisions in *Merrimon* and *Vander Luitgaren*. Defs' Mem. at 3-4, 12-13. Life insurance benefits paid on a life insurance policy owned by a plan are not paid from plan assets but instead are paid from the insurer's general account, assets that belong to the insurer, not the plan. *Merrimon* at 56. "There is no basis either in the case law or common sense that funds held in an insurer's general account are somehow transmogrified into plan assets when they are credited to a beneficiary's account." *Id.*

---

[4] The *Merrimon* and *Vander Luitgaren* opinions were decided by the same panel of the Court of Appeals, based on virtually identical facts and briefing by essentially the same set of counsel, so the fact that the same result was reached in two decisions is of no significance, even if the underlying facts in those cases were otherwise similar to those alleged in the case at bar.

Here, in contrast, Fidelity cannot dispute that the mutual fund shares were plan assets before they were sold.[5] Fidelity deposited the cash from the sale of Plan-owned mutual fund shares in accounts in its own name and the name of the mutual funds. But the cash proceeds and interest earned thereon remained Plan assets nonetheless. Fidelity cannot temporarily divert plan assets for its own use or the use of others and by such diversion convert plan assets into its own assets. "I take, therefore it's mine" is not the rule. Just as there was no basis in *Merrimon* to conclude that the funds in the insurer's general account were "somehow transmogrified into plan assets" when they were deposited to the RAA accounts, there is no basis here, "in case law or common sense," for concluding that cash proceeds from the sale of the Plans' mutual fund shares were "somehow transmogrified" into Fidelity general account assets just because Fidelity deposited them in an account registered to Fidelity. Further, the fiduciary status of Fidelity is distinct from that of insurers. The insurers in the RAA cases were alleged to be fiduciaries because they supposedly took control over plan assets. Once the court held that the cash in the RAAs was not a plan asset, the insurers were not fiduciaries for that cash. Here, in contrast, Fidelity was a *named* fiduciary, that is, trustee, for the Plans' assets and required under the trust and other agreements to hold the Plans' assets in trust and for their benefit. The Plans' assets included mutual fund shares and the sales proceeds held in the Deposit Accounts and the Float Income earned thereon. Thus Fidelity owed

---

[5] At one point in their briefing in support of the motion to dismiss, Defendants do state, without citation, that "[t]he Complaint alleges that, before the withdrawals, the funds were owned by the mutual funds – not the plan . . .". Defs' Mem. at 4. There is no such allegation in the Complaint, however. To the contrary, the Complaint alleges that "when Plan Participants withdrew funds from their Plan accounts, disbursements of Plan assets were triggered." Comp. ¶33 (emphasis added). Further, Defendants elsewhere concede that "before a participant requests a withdrawal from his 401(k) account, the plan has a property interest in shares of the mutual funds in which the participant has invested. Defs' Mem. at 13 (emphasis in original), *citing* 29 U.S.C. §1101(b)(1). Because it is the shares of the funds that are sold when a participant requests a withdrawal, the proceeds of the sale retain their status as Plan assets.

the Plans much higher duties than those arising out of the debtor-creditor relationship that exists in the life insurance benefit cases relied on by Fidelity.

*Merrimon* and *Vander Luitgaren* are also distinguishable because the plan documents in those cases expressly authorized the insurers in each case to redeem the claims on the policy by depositing the full amount of the benefits owed in an RAA or by means other than a lump sum payment. *Merrimon,* 758 F.3d at 59; *Vander Luitgaren,* 765 F.3d at 64. Once the RAA was established and the funds were deposited therein, the insurers had met all of their contractual obligations. Fidelity tries to shoehorn this case into the life insurance context by arguing it discharged all of its contractual duties simply by cutting checks to participants. Defs'. Mem. at 3, 11-12, 16. To the contrary, as Fidelity admits, Plans engage trustees like Fidelity "to hold Plan assets." Defs'. Mem. at 6. As the Complaint alleges, this duty is far greater than simply cutting checks, and includes the duty to hold Plan assets in trust as long as they are in Fidelity's control.

Moreover, the fact that the insurer's contractual duties in *Merrimon* and *Vander Luitgaren* were completed upon establishment of an RAA was a critical factor in the courts' holdings and the basis on which they distinguished *Mogel v. Unum Life Insurance Co.,* 547 F.3d 23, 26 (1st Cir. 2008), in which the First Circuit held that an insurer had not met all of its obligations when it only redeemed claims through the establishment of an RAA when the plan required a lump sum payment. *Merrimon* at 56, 57. *Mogel* dictates a ruling for Plaintiffs because Fidelity's duties were not over when it wrote a check. Rather, its duties extended until the funds in the Deposit Accounts were in fact transferred to the participants. Indeed, *Mogel* stands for the proposition that where payments in connection with an ERISA plan are to be paid in a lump sum, as the insurance contract required in *Mogel* and as the arrangements between the Plans and Fidelity require with respect to redemptions, the cash is a plan asset until the money is fully transferred to the participant, that is, until the check is actually cashed.

*Mogel* relies on *Commonwealth Edison Co. v. Vega*, 174 F.3d 870 (7th Cir. 1999), which held that funds in a plan account on which checks were written to participants continued to be assets of the plan until the checks were cashed and paid through the system for clearing bank transactions. *Id.* at 872-873. Moreover, the court held that the plan continued to earn interest on funds in the account until those checks were in fact paid. *Id.* This case is exactly the same in that Fidelity's fiduciary duties continued to run until payment clearance, not just until a check was written. Accordingly, the Plans are entitled to interest earned until Participant checks clear and are paid.[6]

Fidelity also seeks support from the Eighth Circuit's decision in *Tussey v. ABB, Inc.*, 746 F.3d 327, 340 (8th Cir. 2014). In making its argument, however, Fidelity overstates and mischaracterizes the holding in *Tussey* as it applies to withdrawals and redemptions, suggesting, erroneously, that the *evidence* cited in the *Tussey* appeal after trial is identical to the clear *allegations* of the Complaint here.

In *Tussey* the plaintiffs alleged that the defendants breached their fiduciary duties by retaining Float Income both with respect to contributions and redemptions. As to contributions, the Court stated:

> the record evidence indicates that when a contribution was made, Fidelity credited the participant's Plan account and the Plan became the owner of the shares of the selected investment option—typically shares of a mutual fund—the same day the contribution was received. The Plan received the full benefit of ownership—including any capital gains or dividends from the purchased shares—as of the purchase date.

Based on this evidence, the court agreed with Fidelity's argument, unrebutted by the plaintiffs, that "[o]nce the Plan became the owner of the shares, it was no longer also owner of the money used to purchase them." *Tussey*. 746 F.3d at 339-340. *Tussey* based its ruling, in part, on "basic" property rights, namely that on the date of the contribution, the Plan received the benefits and burdens of

---

[6] Like all ERISA plans, the Commonwealth Edison plan assets had to be held in a trust and managed by trustees. 29 U.S.C. § 1103. Consequently, just like the Deposit Accounts in this case, the account from which the checks were written had to be opened and managed by a trustee for the benefit of the Plans.

share ownership, including dividends, capital gains and losses on those shares. *Id.* at 339. Contemporaneously, on the date of the cash contribution, the mutual funds, not the Plans, received the benefits of owning the cash, including Float Income. *Id.* at 339.

Plaintiffs agree with this assessment with respect to contributions, which is why they withdrew their claim for Float Income on contributions after the Plans received all benefits of ownership of the mutual fund shares. But, as the Complaint alleges, the opposite is true with respect to redemptions. Specifically, when a participant makes a redemption request, the shares of mutual fund or other investments are "sold" as of the date of the request. Comp. ¶33(a). At that point, the Plan immediately surrenders "the full benefit of ownership—including any capital gains or dividends" and instead owns the cash proceeds from the sale. Ownership of the cash entitles the Plans to the "full benefit of ownership," including Float Income. Accordingly, under the "basic property rights" rationale of *Tussey*, the cash proceeds from the sale of the Plans' mutual fund shares belong to the Plans the moment the Plans surrender the risks and benefits of mutual fund share ownership. Simultaneously, the Plans receive the benefits of ownership of the cash proceeds of sale, including Float Income. Logic and equity do not permit any other conclusion. Just as the Plans cannot have it both ways at purchase, Fidelity cannot have it both ways at sale. It cannot retain the benefits of ownership in the cash while at the same time cease to provide the benefits of mutual fund share ownership to the Plans.

*Tussey* does not hold to the contrary. In ruling for Fidelity on the issue of whether the funds in the redemption account were plan assets, the Court held *only* that "the participants do not cite any record evidence establishing the Plan as the 'funder of the check' or the owner of the funds in the redemption account. Absent proof of any ownership rights to the funds in the redemption account, the Plan had no right to Float Income from that account." *Tussey*, 746 F.3d at 340. Without such

proof, the Court looked to the owner or beneficiary of the account to determine the "funder of the check" and ownership of the funds in the account. *Id.*

While Plaintiffs do not know how or why the *Tussey* record does not establish that the Plans had an ownership interest in the redemption account, it has no bearing on the facts alleged in this case. Plaintiffs clearly allege that: (1) Fidelity was the trustee for all of the Plans' assets; (2) the Plans had an ownership interest in the shares of mutual funds in which the Plans invested; (3) those shares were "sold" when withdrawals were requested by Participants; (4) the proceeds of the sale of such plan assets were deposited in the Deposit Accounts established and controlled by Fidelity; and (5) Fidelity held those funds, which retained their status as Plan assets, in trust for the benefit of the Plans. Comp. ¶¶ 22, 23, 25, 27, 33. These allegations suffice to support Plaintiffs' claim that the Plans are the beneficial owners of the Deposit Accounts and the "funder" of the disbursement checks and electronic deposits issued to Plan Participants.

## Fidelity Was Not Entitled to Use Float Income to Pay Bank Fees

Plaintiffs allege that Fidelity misappropriated the Float Income from Plan assets to pay for certain bank fees, contrary to its agreements with the Plans.. Comp. ¶¶ 4, 23-25. Specifically, Fidelity was authorized to charge only three types of fees for its services: (1) an asset-based fee based on plan assets, (2) an administrative fee per plan participant (also known as a "hard-dollar payment"), and (3) fees for individual participant services such as loans. Comp. ¶24. All of the Trust Agreements for the Plans specified the fees to be charged to the Plans and the services that Fidelity would provide in exchange for those fees. *Id.* ¶25. The bank expenses to which Fidelity applied the Float Income were incurred in connection with the maintenance of Deposit Accounts that were integral to the services Fidelity agreed to provide for the fees specified in the agreements. *Id.* ¶¶35, 36, 59, 68, 71.

12

Fidelity argues first that the use of Float Income to pay bank fees and expenses was not a breach of fiduciary duty because Float Income is not a Plan asset. But Float Income is a Plan asset for the reasons stated above.

As a back-up argument, Fidelity contends that the Plan documents and Trust Agreements supposedly authorized it to use plan assets for "defraying reasonable expenses of administering the plan." Defs' Mem. at 18. Fidelity's quote is highly misleading if not deceptive. The Trust Agreement actually says that "any and all expenses . . . reasonably incurred by the Trustee in connection with its duties and responsibilities hereunder shall, unless some or all have been paid by the employer, be paid from the Trust *in the method specified in the Service Agreement*." Dkt. 227-1 (Ex. 1 to Hemani Decl.), § 20.12 at FID-FLOAT-00011777 (emphasis added). Fidelity omits the italicized text, which is critical because the Service Agreement limits the fees paid to Fidelity under "Withdrawal and Loan Services." Withdrawal and Loan Services includes the processing of redemptions and the distribution of benefits to Plan Participants. The fees for those services are delineated in the parties' Service Agreements, which do not authorize any other reimbursement or compensation to be taken by Fidelity from Plan assets in connection with redemptions. *See, e.g.* Dkt. 227-2 (Ex. 2 to the Hemani Decl.) at FID-FLOAT-00011831-11839.

Fidelity's argument also ignores the well-settled contract principal that specific terms of an agreement control over general terms. Here, the Service Agreements dictated the three types of fees the parties agreed Fidelity could charge to "defray reasonable expenses", which controls over the generic, boilerplate expense language. Again, the Service Agreements set out the specific amounts to be paid to Fidelity for its "Recordkeeping and Trustee Services" and do not authorize any other fees, except in specific instances not applicable here. *See, e.g.* Dkt. 227-2 (Ex. 2 to the Hemani Decl.) at FID-FLOAT-00011831-11839. The only reasonable interpretation of the Trust Agreements and Service Agreements is that bank fees incurred in the disbursement process were to be borne by

13

Fidelity as part of the services covered by the contractual fee provisions. Accordingly, the use of Plan assets in the form of the Float Income for Fidelity's benefit (either as retained income or payment of the cost of services like bank fees that Fidelity was contractually obligated to perform) was both a breach of its fiduciary duties and a prohibited transaction.

Further, Fidelity cannot use plan assets to pay bank fees without explicit disclosure to and agreement by the Plans. Department of Labor Advisory Opinion 93-24A and Field Assistance Bulletin ("FAB") 2002-3 make it clear that a fiduciary's use of Float Income for its own benefit constitutes a prohibited transaction unless the practice is fully disclosed and openly negotiated. Comp. ¶¶ 31, 72. Such disclosure should include the specific circumstances under which float will be earned and retained, the rate of the float or the manner in which it will be determined and, in the case of float on distributions, when the float period commences and ends and the time frames of any administrative practices that will affect the duration of the float. FAB 2002-3. Plaintiffs have expressly alleged that Fidelity did not disclose the Float Income and did not negotiate the ability to use the Float Income as part of its compensation for providing the services rendered to the Plans. Comp. ¶ 72.

The Complaint alleges that maintaining Deposit Accounts for Plan disbursements is an integral part of the services provided by Fidelity under the Trust Agreement and Service Agreement, that the Service Agreement identifies all of the compensation to which Fidelity was entitled for providing those services, and that Fidelity's use of the Float Income to pay bank fees on the deposit accounts was not disclosed or negotiated. These allegations are sufficient to state a claim that Fidelity's appropriation of Float Interest was a prohibited transaction in violation of ERISA § 406(b)(1), and require the denial of the motion to dismiss.

14

**Plaintiffs' Claims Are Timely.**

Fidelity adopts its prior argument on statute of limitations. We do as well. But Fidelity fails to address two important developments since the last round of briefing. First, the Supreme Court's decision in *CTS Corp. v. Waldburger*, 134 S.Ct. 2175 (2014), establishes that regardless of whether ERISA's limitations period is a statute of repose or a statute of limitations, Plaintiffs' claims here are timely. In *CTS,* the Supreme Court stated:

> A statute of limitations begins to run when the cause of action "accrues"—that is, when the plaintiff can file suit and obtain relief. Measured by this standard, a claim accrues in a personal-injury or property-damage action when the injury occurredor was discovered.
>
> ***
>
> A statute of repose, on the other hand, … measure[s] not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant.

134 S.Ct. at 2182 (quotations and citations omitted). Under this test, Plaintiffs' claims are timely.

Regarding statute of limitations, Plaintiffs suffered a discrete injury within the six years preceding the original complaint each time Fidelity misappropriated the Plans' Float Income. Those injuries did not and could not occur until Fidelity actually took the cash. Therefore, each separate misappropriation of interest within the six years preceding the complaint is actionable and Plaintiffs' complaints about them are timely if 29 U.S.C. §1113 is a statute of limitations. Regarding statute of repose, because Fidelity engaged in a discrete culpable act each time that it misappropriated Float Income, if 29 U.S.C. §1113 is a statute of repose, then a discrete six-year limitations period ran from each misappropriation, *i.e.*, each culpable act of taking Float Income within the six years preceding the original complaint.

Second, the Supreme Court granted *certiorari* in *Tibble v. Edison International*, 729 F.3d 1110 (9th Cir. 2013), on the limitations holding on which Fidelity's motion depends. *See Tibble v. Edison*

15

*Int'l*, 2014 WL 4916188 (S.Ct. Oct. 2, 2014).[7] Thus, whether *Tibble* (and the other two similar cases cited by Fidelity) is good law is very much in doubt.

### Plaintiffs Have Article III Standing. Their Ability to Represent Plans Other Than Their Own Is an Issue for Class Certification, Not a Motion to Dismiss.

Fidelity's last brief adds little to their prior briefing on the standing issue. (*Compare* Defs' Mem. at 20 with Mem. in Supp. of Mtn. to Dismiss Pls.' Cons. Compl. [Doc. 83] at 24-28.) Fidelity continues to rely exclusively on a misreading of *Plumbers' Union Local No. 122 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011) ("*Nomura*"). Defs' Mem. at 20. As Plaintiffs previously explained, this reliance is misplaced. *See* Mem. in Opp. to Defs' Mtn. to Dismiss Pls.' Cons. Compl. [Doc. 93] at 16-19. The Court in *Nomura* did not hold that plans or plan participants lack constitutional standing to assert claims on behalf of retirement plans other than their own. To the contrary, *Nomura* expressly acknowledged that "in a properly certified class action, the named plaintiffs regularly litigate not only their own claims but also claims of other class members based on transactions in which the named plaintiffs played no part." *Id.* at 769.

Instead, the *Nomura* court held that the plaintiffs there could not pursue claims against defendants that did not injure them and that they could not pursue claims about securities they did not purchase. Here, in contrast, all of the named Plaintiffs have been injured by and have claims against all of the named Defendants, as do the members of the putative class. And, the named Plaintiffs here complain about a practice common to all the Plans in the alleged class. Unlike *Nomura*, Plaintiffs are not complaining about a particular feature of a particular Fidelity mutual fund or the offering documents associated with that fund. Instead, Plaintiffs allege uniform wrongful conduct by all Defendants that affected all Plaintiffs and all Plans and their participants in exactly the same way. Thus, *Nomura's* standing holding is inapposite. In any event, any issue as to whether

---

[7] The Solicitor's brief urging the grant of certiorari is attached hereto as Exhibit 1.

Plaintiffs can represent other Plan participants who suffered the same type of harm is properly the subject of a class certification adequacy and typicality analysis, not grounds for a motion to dismiss.

Critically, Fidelity makes no effort to distinguish or otherwise address the many cases cited by Plaintiffs holding that "[O]nce a plaintiff establishes his own standing, the question of whether a plaintiff will be able to represent the putative class, "depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure." *Glass Dimensions, Inc. v. State Street Bank &Trust Co.,* 285 F.R.D. 169, 174, (D. Mass. 2012), citing *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). *See, also Braden v. Wal-Mart Stores* 588 F.3d 585, 591-92 (8th Cir. 2009), *In re Prinicpal U.S. Property Account ERISA Litigation,* 274 F.R.D. 649 (S.D. Iowa 2011) and cases cited at p.17, n. 26 of Mem. in Opp. to Defs' Mtn. to Dismiss Pls.' Cons. Compl. [Doc. 93]. Moreover, the way Fidelity frames its standing argument shows that this is an issue for class certification, not a 12(b)(1) motion to dismiss. Fidelity does not address the actual elements of Article III standing: (1) injury in fact, (2) traceability to defendant's conduct, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Instead, it focuses exclusively on Plaintiffs' alleged lack of incentive to pursue claims on behalf of other Plans and alleged inability to prove claims on behalf of the entire class without evidence that Fidelity's conduct violated the terms of its contract with each plan. These are precisely the types of issues that Rule 23's requirements of adequacy, typicality and commonality are designed to address. When those requirements are satisfied, as Plaintiffs are confident they will be, Rule 23 authorizes class action plaintiffs to pursue claims on behalf of other individuals who suffered similar harm based on the same conduct.[8]

---

[8] Defendants' argument that Plaintiffs have no incentive to offer proof concerning the relevant provisions of the trust agreement for the alleged "thousands of plans" in which they did not participate (Dkt. 83 at 26-27) implies that such proof will necessarily be difficult or individualized.

**CONCLUSION**

In sum, Fidelity was the trustee for all of the Plans' assets entrusted to it. Those assets

included mutual fund shares. When the Plan sold mutual fund shares in exchange for cash, the cash

became a Plan asset. Fidelity diverted that cash for its own use by depositing it in accounts in its

own name instead of trust accounts for the benefit of the Plans. Fidelity then took the interest

earned on that cash for its own use. This fiduciary misconduct is exactly the kind of harm that

ERISA was enacted to prevent.

---

As Fidelity concedes, however, the agreements with each of the plans "contain similar provisions concerning the requirements for processing a withdrawal." Dkt. 126 at 11, n. 5. Moreover, Plaintiffs' ability to establish their class claims through common proof (including, e.g., deposition testimony or other evidence that form agreements are used) is one of the issues to be considered on the motion for class certification based on an evidentiary record. *See, e.g. In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* 522 F.3d 6, 20 (1st Cir. 2008).

November 14, 2014                              Respectfully submitted,


                                               /s/ Gregory Y. Porter
Robert A. Izard (*pro hac vice*)               Gregory Y. Porter (*pro hac vice*)
Mark P. Kindall (*pro hac vice*)               Bailey & Glasser LLP
Izard Nobel LLP                                910 17th Street, NW
29 South Main Street, Suite 215                Suite 800
West Hartford, CT 06107                        Washington, DC 20004
T: 860-493-6295                                T: 202-543-0226
firm@izardnobel.com                            gporter@baileyglasser.com
mkindall@izardnobel.com

                                               John J. Roddy (BBO 424240)
Todd M. Schneider (*pro hac vice*)             Elizabeth A. Ryan (BBO 549632)
Joshua G. Konecky (*pro hac vice*)             Bailey & Glasser LLP
Mark T. Johnson (*pro hac vice*)               125 Summer Street, Suite 1030
Scheider Wallace Cottrell                      Boston, MA 02110
Konecky LLP                                    T: 617-439-6730
180 Montgomery Street, Suite 2000              jroddy@baileyglasser.com
San Francisco, CA 94104                        eryan@baileyglasser.com
T: 415-421-7100
tschneider@schneiderwallace.com
jkonecky@schneiderwallace.com                  Bradford S. Babbitt (BBO 566390)
mjohnson@schneiderwallace.com                  Craig A. Raabe (*pro hac vice*)
                                               Elizabeth R. Leong (*pro hac vice*)
                                               Robinson & Cole, LLP
Garrett W. Wotkyns (*pro hac vice*)            280 Trumbull St.
Michael C. Mckay                               Hartford, CT 06103-3597
Scheider Wallace Cottrell                      T: 860-275-8200
Konecky LLP                                    bbabbitt@rc.com
8501 North Scottsdale Road                     craabe@rc.com
Suite 270                                      elong@rc.com
Scottsdale, AZ 85253
T: 480-428-0142
gwotkyns@schneiderwallace.com                  Thomas G. Shapiro (BBO 454680)
                                               Michelle H. Blauner (BBO 549049)
                                               Shapiro Haber & Urmy LLP
                                               Seaport East
                                               2 Seaport Lane
                                               Boston, MA 02210
                                               T: (617) 439-3939
                                               tshapiro@shulaw.com
                                               mblauner@shulaw.com

                                               *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

       I, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 14, 2014, and that those indicated as non-registered participants on the ECF notice will be served by email on November 14, 2014.

                                     */s/ Gregory Y. Porter*
                                       Gregory Y. Porter