UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
                                                    )
IN RE FIDELITY ERISA FLOAT            )
LITIGATION                                     )          Civil Action No. 13-10222-DJC
                                                    )
_____)

MEMORANDUM AND ORDER

CASPER, J.                                                                                    March 11, 2015

## I.      Introduction

        Plaintiffs bring this purported class action on behalf of the retirement plans (the "Plans")

in which they have been participants or an administrator alleging that Defendants FMR LLC,

Fidelity Management Trust Company ("FMTC"), Fidelity Management and Research Company

("FMRC"), and Fidelity Investments Institutional Operations Company, Inc. ("FIIOC")

(collectively, "Fidelity") have violated the Employee Retirement Income Securities Act

("ERISA"), 29 U.S.C. § 1001 *et seq.*  Fidelity has moved to dismiss.  D. 125.  For the reasons

stated below, the Court ALLOWS the motion.

## II.     Standard of Review

        In considering a motion to dismiss for failure to state a claim upon which relief can be

granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged

"plausibly narrate a claim for relief."  Schatz v. Republican State Leadership Comm., 669 F.3d

50, 55 (1st Cir. 2012).  This determination requires a two-step inquiry.  García-Catalán v. United

States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must distinguish the factual allegations

from the conclusory legal allegations in the complaint.  Id.  Second, taking the Plaintiff's

allegations as true, the Court should be able to draw "the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)).

When deciding a motion to dismiss, the First Circuit has "emphasize[d] that the complaint must be read as a whole." García-Catalán, 734 F.3d at 103. Overall, a claim must contain sufficient factual matter that, accepted as true, would allow the Court to draw "the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Haley, 657 F.3d at 46). However, "[i]n determining whether a [pleading] crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense." Id. (internal citations omitted).

III.    **Factual Background**

Unless otherwise noted, the Court relies on the facts as alleged in the operative complaint, the second amended consolidated complaint, D 122.

Plaintiffs include participants in retirement plans and an administrator for a retirement plan that entered into trust agreements with Fidelity to establish trusts to hold Plan assets. Id. ¶¶ 9-15, 22. The Plans' Trust Agreements are substantially the same in all material respects. Id. ¶ 25. Under the agreements, Defendant FMTC agreed to open and maintain trust accounts for each plan and participant, including in Deposit Accounts, holding the assets of the trust funds for the benefit of the plan participants and beneficiaries. Id. ¶¶ 23, 25. Fidelity's trust agreements would generally provide that FMTC would charge only three types of fees to the Plans: (1) an asset-based fee based on a percentage of Plan assets held in a particular Plan investment; (2) a fixed administrative fee per Plan participant; and (3) fees for individual participant services. Id. ¶ 24.

In light of its authority to manage or dispose Plan assets, FMTC is a fiduciary of the Plans. Id. ¶ 27. Defendant FIIOC is also a fiduciary of the Plans by virtue of it being an agent for FMTC and in this role managing its Depository Account and Redemption Account. Id. ¶ 28. Defendant FMRC is also a fiduciary by virtue of its discretionary management and control over plan assets transferred to the "FICASH" program. Id. ¶ 29.

Plaintiffs allege that Fidelity's ERISA violations arise from "(1) their practice of appropriating float earned on Plan assets to pay banking fees that Fidelity was required to pay, and (2) their practice of misappropriating float income for the use of clients other than the participants in the Plans." Id. ¶ 32. According to the operative complaint, when Plan participants withdrew funds from the Plan a lump-sum disbursement was triggered (unless the Plan participant had entered retirement and was receiving regular retirement payments). Id. ¶ 33. Fidelity's disbursement process occurred in multiple steps. When Fidelity received a withdrawal request, it sold the mutual fund shares and moved the funds from the relevant investment option account to a redemption bank account. Id. ¶ 33a. Electronic disbursements were paid to plan participants from the redemption bank account. Id. ¶ 33f-g. Overnight, Fidelity would transfer the funds into an interest bearing account owned and controlled by Fidelity and the principal of the funds would be transferred back to the redemption bank account the following day. Id. ¶ 33b-d. Any interest earned overnight was not transferred to the redemption bank account. Id. ¶ 33d. This interest is generally referred to as "float." Id. ¶ 3. For participants who did not elect to receive an electronic disbursement, the withdrawn funds were transferred from the redemption bank account to an interest bearing disbursement bank account, which issued a check to the participant in the amount of the withdrawn funds, but not including interest. Id. ¶ 33g. Participants received the funds after they cashed or deposited the check. Id. Fidelity would

retain some portion of the float income generated during the disbursement process and the remainder was credited to mutual funds.  Id. ¶ 33h.

Although all of the accounts described above incurred bank expenses, these expenses were part of Fidelity's ordinary operating expenses for recordkeeping and administering the Plans.  Id. ¶ 35.  Thus, Fidelity used float income – which Plaintiffs allege belong to them – to pay these recordkeeping and administrative expenses.  Id. ¶¶ 36-37.  Plaintiffs allege that these expenses were outside the scope of the agreed-upon fees they would pay Fidelity and, therefore, Fidelity's practice amounted to a violation of Fidelity's fiduciary duties.  Id. ¶¶ 24, 59-60.

## IV.    Procedural History

Plaintiffs instituted this action on February 5, 2013.  D. 1.  The Court consolidated this case with three other cases (13-cv-10570-DJC; 13-cv-10524-DJC; and 13-cv-11011-DJC) on December 27, 2013.  D. 62.  On February 7, 2014, Plaintiffs – six plan participants and a plan administrator – filed an amended consolidated complaint, D. 67, which Fidelity moved to dismiss on March 7, 2014, D. 82.  In its motion to dismiss, Fidelity argued that ERISA's six-year statute of repose barred Plaintiffs' claims, D. 83 at 16, that ERISA's three-year statute of limitations barred Plaintiffs' claims, id. at 26, that Plaintiffs lacked constitutional standing to bring this class action, id. at 30, and that Plaintiffs failed to state a claim against FMR because the complaint did not allege that FMR is a fiduciary to the Plans, id. at 35.  The Court heard the parties on the motion on June 18, 2014 and took those matters under advisement.  D. 100.

The amended consolidated complaint alleged that the fiduciary breaches described were of the same nature of those which had garnered certain plaintiffs a victory against Fidelity in another litigation and the complaint expressly incorporated the findings of fact and conclusions of law of that action.  D. 67 ¶ 6 (citing Tussey v. ABB, Inc., No. 06-04305-CV-NKL, 2012 WL

1113291 (W.D. Mo. Mar. 31, 2012)).  On March 19, 2014, after Fidelity had filed its motion to dismiss, D. 82, the Eighth Circuit reversed relevant portions of the district court's decision in Tussey.  Tussey v. ABB, Inc., 746 F.3d 327 (8th Cir. 2014), cert. denied, 135 S. Ct. 477 (2014). In light of the Eighth Circuit decision, Fidelity filed a supplemental motion to dismiss on June 30, 2014, after the hearing on the previously filed motion, arguing that Plaintiffs' allegations failed as a matter of law.  D. 103.  In response, Plaintiffs filed a first amended consolidated complaint on July 21, 2014, D. 114, and on September 24, 2014, Plaintiffs filed a consented-to second amended consolidated complaint alleging violations of ERISA §§ 404 and 406 and Department of Labor Regulations ("DOL"), 29 C.F.R. § 2550, D. 122 ¶ 4.[1]  Fidelity has now moved to dismiss the operative complaint, the second amended consolidated complaint, arguing that Plaintiffs' allegations fail as a matter of law and reiterating, in part, its previous procedural arguments.  D. 125.  The Court heard the parties on Fidelity's motion to dismiss Plaintiffs' second consolidated complaint on January 21, 2015 and took those matters under advisement. D. 138.

## V.    Discussion

Plaintiffs allege that Fidelity has violated its fiduciary duties "by using the float income for themselves to defray their own expenses" and "by giving float belonging to the Plans to other Fidelity clients."  D. 122 ¶¶ 59, 60.  Plaintiffs further allege that Fidelity engaged in prohibited transactions by "dealing with the assets of a plan for its own interest or account."  Id. ¶ 69. Fidelity asserts that Plaintiffs' claims fail as a matter of law because float is not a Plan asset and because Fidelity is not an ERISA fiduciary as to float.  D. 126 at 13.

---

[1] In light of the filing of Plaintiffs' second amended consolidated complaint, the Court DENIES the Defendant's prior motions to dismiss, D. 82, 103, as moot.

### A.   Plaintiffs Have Not Plausibly Alleged that Float Income Is a Plan Asset

At base, Plaintiffs' allegations rise and fall on the premise that float income is a Plan asset. Although the Court may rely upon the allegations in the operative complaint, the Court notes that there is little debate among the parties about the factual allegations as the parties' dispute focus upon whether the float at issue is, or is not, a plan asset. Fidelity asserts that float is not a plan asset and, therefore, the Plans have no right to any income earned on the float. D. 126 at 16. Fidelity points to the Tussey defendants' success on appeal as evidence of the propriety of Fidelity's retention of float here. Id. at 6, 16. Fidelity further points to two recent First Circuit decisions to support its argument: Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46 (1st Cir. 2014); and Vander Luitgaren v. Sun Life Assurance Co. of Canada, 765 F.3d 59 (1st Cir. 2014). D. 126 at 2.

The Tussey case concerned the same float practices challenged by the Plaintiffs in this action. The district court held, in relevant part, that Fidelity had breached its fiduciary duties by failing to distribute float income for the interest of the Plan. Tussey, 2012 WL 1113291, at *2. On appeal, the Eighth Circuit reversed, holding that Fidelity had not breached its fiduciary duties by failing to pay float income to the Plan because "the participants failed to adduce any evidence the Plan had any property rights in the float or float income." Tussey, 746 F.3d at 339. With regard to the redemption float – the type of float at issue in this action – the Eighth Circuit held that the plaintiff-participants had failed "to establish the Plan had any rights in the redemption account balance." Id. at 340. To reach this conclusion, the Eighth Circuit considered that "[a]s a matter of black-letter commercial law, the payee of an uncashed check has no title in or right to interest on the account funds." Id. (citation omitted). Although the Tussey plaintiffs, like the plaintiffs here, argued that the Plan owned the funds and, therefore, the float income was a Plan

asset, the Eighth Circuit held that the plaintiffs "failed to show the float was a Plan asset under the circumstances of th[e] case" since the participants did not cite to any evidence that the Plan was "the funder of the check or the owner of the funds in the redemption account."  Id. (quotation mark omitted).   As the circumstances of that case are nearly identical to the circumstances of this action, Fidelity argues that the Plaintiffs have necessarily failed to state a claim.  D. 126 at 6.

Here, Plaintiffs allege that Fidelity "owned and controlled" the relevant bank accounts that funded the checks, D. 122 ¶ 33a, c, g, and as a result, there is no allegation that the Plans owned the accounts.  Furthermore, Plaintiffs concede that the Plans do not "own the underlying assets of a mutual fund in which they invest."  D. 130 at 8.  Rather, the Plaintiffs allege that the Plans owned the shares of the mutual funds and, therefore, the Plans were the "beneficial owners" of the accounts and owned the cash proceeds from the sale of those mutual fund shares (i.e. that the cash proceeds were Plan assets).  Id.  at 8, 14.

"ERISA nowhere contains a comprehensive definition of what constitutes 'plan assets.'" Merrimon, 758 F.3d at 56 (citing John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 89 (1993)).  The DOL, however, has consistently stated that plan assets "are to be identified on the basis of ordinary notions of property rights under non-ERISA law."  Merrimon, 758 F.3d at 56 (quoting U.S. Dep't of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at *4 (May 5, 1993)); see also Tussey, 746 F.3d at 339 (noting that "[a]lthough 'ERISA does not exhaustively define the term 'plan assets,' . . . [t]he Secretary of Labor has repeatedly defined 'plan assets' consistently with ordinary notions of property rights") (quoting Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 647 (8th Cir. 2007)).

In Merrimon, 758 F.3d 46, and Vander Luitgaren, 765 F.3d 59, cases upon which Fidelity also relies, the First Circuit considered whether a life insurer's use of retained asset accounts violated the same ERISA provisions alleged here.  In both cases, the insurer redeemed the claims by establishing accounts for the beneficiaries, crediting to the beneficiaries' accounts the full amount of benefits owed and mailing a book of drafts to the beneficiary that could be used to draw down the credited funds.   Merrimon, 758 F.3d at 51; Vander Luitgaren, 765 F.3d at 61. While the funds remained unliquidated, however, the insurer retained the funds in its general account and selected an interest rate to pay the beneficiary, keeping the rest of the interest earned for its own benefit.  Id.  Although the Merrimon and Vander Luitgaren plaintiffs acknowledged that the underlying funds held in the insurers' accounts were not plan assets, they argued that when the benefits accrued and were redeemed that the redeemed funds became plan assets until the account was fully liquidated.  Merrimon, 758 F.3d at 56-57; Vander Luitgaren, 765 F.3d at 63.  The First Circuit disagreed and held "that the funds backing the plaintiffs' [retained asset accounts] were not, and never became, plan assets."  Merrimon, 758 F.3d at 57; see also Vander Luitgaren, 765 F.3d at 63 (same).  These holdings were grounded on "ordinary notions of property rights," Merrimon, 758 F.3d at 56, and "on the principle that the assets of a policy-issuing insurer are not plan assets and are not transformed into plan assets by the establishment of an [retained asset account]."   Vander Luitgaren, 765 F.3d at 63 (internal citation omitted) (citing Merrimon, 758 F.3d at 56).  The Court agrees with Fidelity that a similar reasoning applies here.

As noted above, Plaintiffs acknowledge that the Plans do not "own the underlying assets of a mutual fund in which they invest."  D. 130 at 8.  Rather, before a participant withdraws from the retirement plan, the Plan only "has a property interest in the shares of the mutual fund in

which the participant has invested; but the plan does not have a property interest in the mutual

funds' underlying assets."  D. 126 at 17 (emphasis in original) (citing 29 U.S.C. § 1101(b)(1));

see also Tussey, 746 F.3d at 340 (noting that "[o]nce the Plan became the owner of the shares, it

was no longer also owner of the money used to purchase them").  When a withdrawal request is

made, the mutual funds shares are redeemed and the proceeds are transferred to accounts

"registered to Fidelity" and "owned and controlled by Fidelity."  D. 122 ¶ 33a-g.  Fidelity

concedes that Plaintiffs are entitled to the money withdrawn from the Plan, D. 126 at 14,

however, as in Merrimon and Vander Luitgaren, the Plan does not own the underlying assets

before they are withdrawn, and the assets are not "transmogrified into plan assets when they are

credited to a beneficiary's account."  Merrimon, 758 F.3d at 56.

Plaintiffs have not pointed the Court to any factual allegations that distinguish this case

from the relevant cases discussed above.  Rather, Plaintiffs cite Mogel v. UNUM Life Insurance

Co. of Am., 547 F.3d 23, 26 (1st Cir. 2008) and Commonwealth Edison Co. v. Vega, 174 F.3d

870 (7th Cir. 1999), a case on which Mogel relied, "for the proposition that where payments in

connection with an ERISA plan are to be paid in a lump sum, . . . as the arrangements between

the Plans and Fidelity require with respect to redemptions, the cash is a plan asset until the

money is fully transferred to the participant, that is, until the check is actually cashed."  D. 130 at

11.  The Mogel decision, rested, however, on the fact that the insurer ignored a specific directive

to pay beneficiaries in one lump sum and instead issued a checkbook which they could draw

down.  Mogel, 547 F.3d at 26 (quoting Mogel v. UNUM Life Ins. Co. of Am., 540 F. Supp. 2d

258, 262 (D. Mass. 2008)) (noting that "[t]he difference between delivery of a check and a

checkbook . . . is the difference between [the insurer] retaining or [the insurer] divesting

possession of Plaintiffs' funds").  The First Circuit held in Mogel only that the insurer, who had

not paid the policy proceeds in a manner permitted by the plan documents, had violated its fiduciary duties and, therefore, "the sums due plaintiffs remain[ed] plan assets subject to [the insurer's] fiduciary obligations until actual payment." Id.; see also Merrimon, 758 F.3d at 56-57 (noting that "neither the holding in Mogel nor its broadly cast language" are "at odds with the conclusion that the monies retained by the insurer are not plan assets"); Edmonson v. Lincoln Nat. Life Ins. Co., 725 F.3d 406, 428 (3d Cir. 2013) cert. denied, 134 S. Ct. 2291 (2014) (explaining that "[t]he Mogel court, however, did not mention that plan assets are to be determined based on the ordinary notions of property rights, nor did it consider the definition of plan assets"). Here, as discussed further below, Fidelity's fiduciary obligations were discharged after it "process[ed] all approved withdrawals and mail[ed] distribution checks, or remit[ted] distributions as direct deposits to Participants." D. 126 at 20 (quoting D. 128-4 at 18).

The Commonwealth Edison Co. case is also distinguishable. In that case, under the terms of the pension plan, when benefits were due to a participant, the plan itself wrote the check. Commonwealth Edison, 174 F.3d at 872. When the participant cashed the check it was "paid by the plan," but until that time the money "remain[ed] in the plan's coffers." Id. Commonwealth Edison only acknowledged, then, that as a factual matter the funds in that case remained plan assets until cashed, but it did not address whether, as a matter of law, such funds are always plan assets. Id. As noted above, Plaintiffs here have alleged that Fidelity "owned and controlled" the relevant bank accounts that funded the checks. D. 122 ¶ 33a, c, g. So, unlike in Commonwealth Edison, the checks here were funded not from the "plan's coffers" but from Fidelity's.

Plaintiffs also rely on guidance from the DOL to argue that a fiduciary's undisclosed use of float income is a prohibited transaction under ERISA. D. 130 at 8. Plaintiffs allege that "[t]he Department of Labor has indicated, in both Advisory Opinion 93-24A and in Field Assistance

Bulletin 2002-3, that a trustee's use of float income for its own benefit constitutes a prohibited transaction unless the trustee (1) disclosed the float to the independent plan fiduciary at the time the trustee was retained, (2) openly negotiated with the independent plan fiduciary to retain float income as part of its overall compensation, and (3) was not in a position to affect the amount of its float compensation, as it would, for example, if it had 'broad discretion over the duration of the float.'"   D. 122 ¶ 31 (citing DOL Adv. Op. 93-24A (Sept. 13, 1993) and DOL Field Assistance Bulletin 2002-3 (Nov. 5, 2002)).   The DOL Field Assistance Bulletin, relied upon by Plaintiffs, concerns "the obligations of plan fiduciaries' and service providers" when retaining the earnings that result from holding plan assets.   DOL Field Assistance Bulletin 2002-3. Meanwhile, the Advisory Opinion considers "whether a plan has an interest in an administrative account when plan assets are transferred to the account in support of an outstanding benefit check."   DOL Adv. Op. 93-24A.   These questions presume, however, the answer to the question at issue here – whether the funds in the Fidelity account are, in fact, "plan assets."   Because the DOL guidance assumes that plan assets have been transferred into the trust accounts and that the plan assets are the source of the float income, the decisions do not squarely address how to determine whether the underlying funds are in fact plan assets when that issue is disputed. Moreover, the Court notes that this guidance – approximately twenty-one and twelve years old, respectively – pre-dates the First Circuit decisions in Merrimon, 758 F.3d 46, and Vander Luitgaren, 765 F.3d 59, and pre-dates the Eighth Circuit decision in Tussey, 746 F.3d 327, which addresses the float practices challenged here.

In sum, Plaintiffs have not pointed the Court to any allegations that establish that the float was a Plan asset.   In Plaintiffs' own briefing, they summarize their allegations as follows:

> Plaintiffs clearly allege that: (1) Fidelity was the trustee for all of the Plans'
> assets; (2) the Plans had an ownership interest in the shares of mutual funds in

which the Plans invested; (3) those shares were "sold" when withdrawals were requested by Participants; [and] (4) the proceeds of the sale of such plan assets were deposited in the Deposit Accounts established and controlled by Fidelity.

D. 130 at 14 (citing D. 122 ¶¶ 22, 23, 25, 27, 33).   None of these allegations support the inference that the funds backing the Plans' assets ever became Plan assets.   Plaintiffs further allege that "Fidelity held those funds, which retained their status as Plan assets, in trust for the benefit of the Plans," id., however, the complaint alleges no particularized facts to support the conclusion that those funds retained their status as Plan assets.   Rather, Plaintiffs appear to argue that the cash proceeds from the mutual fund sales must be a Plan asset because "the Plans own all of their assets, whether invested in shares or cash."   D. 130 at 7.   On this point, Plaintiffs attempt to distinguish Merrimon and Vander Luitgaren, arguing that in those cases the underlying assets belonged to the insurer, not the plans, and that the benefits were contingent, backed only by the insurer's general accounts.   D. 130 at 9-10.   Here as well, the underlying assets of the mutual funds belonged to the funds, not the Plans, D. 130 at 8, but Plaintiffs argue that because the shares of the mutual fund were sold to pay the benefits that this case is distinct and the cash proceeds necessarily remained Plan assets, id. at 9-10.   The relevant inquiry, however, is whether cash proceeds from the sale of the mutual fund shares are Plan assets once the shares are sold.   Tussey, 746 F.3d at 340 (holding that "[b]ecause the participants have failed to show the float was a Plan asset under the circumstances of this case, the district court erred in finding Fidelity breached its fiduciary duty").

As Fidelity points out, Plaintiffs' argument appear to ignore that the assets at issue were in fact withdrawn from the Plan.   D. 131 at 4-5 (noting that "[t]his case is about whether assets that have been withdrawn from a 401(k) plan nonetheless belong to the plan" and arguing that "[o]ne would think that simply to ask that question is to answer it").   In Merrimon, the First

Circuit addressed a similar argument that death benefit funds remain plan assets until the beneficiary account is completely liquidated and concluded that under "ordinary notions of property rights . . . [i]t is the beneficiary, not the plan itself, who has acquired an ownership interest in the assets backing the [retained asset account]." Merrimon, 758 F.3d at 56. Once the Plan assets – the mutual fund shares – are sold, therefore, "[u]nless the plan documents clearly evince a contrary intent . . . a beneficiary's assets are not plan assets," id., and "[a]ny further obligation that [Fidelity] had to the beneficiaries 'constituted a straightforward creditor-debtor relationship.'" Id. at 59 (quoting Faber v. Metro. Life Ins. Co., 648 F.3d 98, 105 (2d Cir. 2011)); see Edmonson, 725 F.3d at 428 (noting that "ordinary notions of property rights determine whether an asset is a plan asset, and that [courts] should look to the plan and the plan documents in making this determination"); Vander Luitgaren, 765 F.3d at 64 (citation omitted) (noting that "[t]he Supreme Court has explained that 'ERISA's principal function [is] to protect [those] contractually defined benefits").

Here, the Plaintiffs did not contract for an alternative arrangement, for example, specifying that beneficiaries would be paid from accounts owned by the Plan. As a result, Fidelity owned the relevant bank accounts, was responsible for the account fees associated with those accounts and was, therefore, free to pay those fees using the float income. See D. 131 at 9 & n.8 (pointing out that the Parties "could have contracted for the arrangement that the named Plaintiffs consider preferable—one in which the plans owned the Bank Accounts, paid the account fees when those fees exceeded the interest earned . . . and bore the risk of account loss" and noting that "[d]uring the putative class period, which includes the financial crisis, over 500 banks failed"). As in Tussey, then, "when a participant chose to receive a check rather than an electronic disbursement, the relevant Plan investment options retained all rights to the

redemption float until the disbursement check was cashed." Tussey, 746 F.3d at 340. Accordingly, in the absence of allegations suggesting special circumstances, as with any other mutual fund sale, the investor is not entitled to earn interest while their check remains uncashed. See id. (noting that "the funder of the check owns the funds in the checking account until the check is presented, and thus is entitled to any interest earned on that float").

### B.       Fidelity is Not an ERISA Fiduciary as to Float

Alternatively, even if float were a Plan asset, it is also the case that Fidelity is not an ERISA fiduciary as to float.  Fidelity again relies on Merrimon and Vander Luitgaren to argue that it is not an ERISA fiduciary as to float, D. 126, because in the context of distribution of plan benefits "once a fiduciary (1) complies with the requirements of the governing agreements, and (2) provides a beneficiary with 'immediate and unfettered' access to the promised benefit, it has complied with its fiduciary duties, and its job as a fiduciary is done."  D. 131 at 6 (quoting Vander Luitgaren, 765 F.3d at 64).  In Merrimon and Vander Luitgaren, the First Circuit rejected plaintiffs' argument that when insurers set up the retained asset accounts they breached their fiduciary duties by not acting solely for the benefit of the participants and beneficiaries.  See Vander Luitgaren, 765 F.3d at 63-64.  Noting that "plan sponsors have considerable latitude to set the terms of a plan, including terms that spell out how benefits are to be paid," the First Circuit held that "a fiduciary must act in accordance with the documents and instruments governing the plan."  Id. at 64 (citations and internal quotation marks omitted).  Moreover, in Vander Luitgaren, the First Circuit held that the insurers could discharge their fiduciary duties "through any one of a range of recognized payment modalities" as long as "the chosen modality does not unfairly diminish, impair, restrict, or burden the beneficiary's rights."  Id. at 64.  The focus then is on how the method of payment affects the beneficiary, not the fiduciary.  See id.

Accordingly, the First Circuit held that there was no breach by an insurer as long as the insurer complies with "the language of the Plan" and as long as it gives the beneficiary "immediate and unfettered access to the promised benefit in its entirety." Id. at 64-65.

Here, the trust documents governing the Plans, and Fidelity's fiduciary duties and obligations with respect to the Plans, direct Fidelity in regard to the processing of approved withdrawals and mailing of distribution checks or remitting distributions as direct deposits to the Participants. D. 128-4 at 18. Fidelity contends that it fully complied with its duties under the governing agreement, processing the withdrawals and mailing distribution checks for the full amount owed or remitting the payments electronically. D. 131 at 7 (citing D. 122 ¶ 33f-g). Plaintiffs counter that the trust documents further required Fidelity "to hold Plan assets," arguing that Fidelity's duties were not discharged simply by cutting a check. D. 130 at 11. The trust documents indicate, however, that Fidelity must only hold Plan assets in certain investments, D. 128-2 at 23, and that Fidelity was not authorized to retain uninvested cash unless expressly directed to do so by the plan administrator. Id. at 23-24. The complaint does not allege that the plan administrators expressly directed Fidelity to hold cash assets; therefore, "the scope of Fidelity's authority as trustee was limited to holding investments in fund shares." D. 131 at 10. As a result, Fidelity was no longer acting as an ERISA fiduciary.

As noted above, the Plans could have contracted for an agreement dictating that the Plans would own the bank accounts and, consequently, pay the fees, bearing the risk of loss if the account fees exceeded the interest earned. Since the governing agreements do not provide for such an obligation, however, and since the Plaintiffs have not alleged that Fidelity did not process withdrawals, mail distribution checks or remit distributions, see generally, D. 122, Plaintiffs have not sufficiently alleged a fiduciary breach.

C.      <u>**Fidelity's Remaining Arguments**</u>

Fidelity has also raised a number of arguments arguing for dismissal of this action.  See e.g., D. 126 at 9.  In light of the Court's rulings discussed above, however, the Court need not reach Fidelity's remaining arguments.

**VI.     Conclusion**

For the foregoing reasons, the Court ALLOWS Fidelity's motion to dismiss, D. 125.  In light of this ruling, the Court also DENIES the Defendant's prior motions to dismiss, D. 82, 103, as moot.

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge

16